Susan Ely, Maine Bar # 005087
Natural Resources Council of Maine
3 Wade Street
Augusta, ME 04330
(207) 430-0175
sely@nrcm.org

Kevin Cassidy (*pro hac vice* application forthcoming)
Earthrise Law Center
P.O. Box 445
Norwell, MA 02061
(781) 659-1696
cassidy@lclark.edu

Lia Comerford (*pro hac vice* application forthcoming)
Earthrise Law Center
10101 S. Terwilliger Blvd.
Portland, OR 97236
(503) 768-6823
comerfordl@lclark.edu

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **SIERRA CLUB, NATURAL RESOURCES COUNCIL OF MAINE,** and **APPALACHIAN MOUNTAIN CLUB,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES ARMY CORPS OF ENGINEERS,** an agency of the United States government, **COLONEL JOHN A. ATILANO II**, Commander and District Engineer, in his official capacity, and **JAY L. CLEMENT**, Senior Project Manager, in his official capacity,<br><br>Defendants. | CIVIL NO.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Pursuant to the Administrative Procedure Act and the National Environmental Policy Act) |

COMPLAINT                                                                 1

## INTRODUCTION

1.      The Sierra Club, Natural Resources Council of Maine, and Appalachian Mountain Club ("Plaintiffs") challenge the U.S. Army Corps of Engineers' ("Corps") failure to comply with the National Environmental Policy Act ("NEPA") when it prepared an Environmental Assessment and Finding of No Significant Impact ("EA/FONSI") for a proposed project by Central Maine Power ("CMP") to construct 171.4 miles of electrical transmission lines and related facilities in Maine (hereafter, the "Project" or the "CMP Project"). 53.1 miles of the transmission line corridor will create a new, permanent scar on the landscape of Maine's Western Mountains Region and irreparably damage and fragment numerous aquatic resources and important wildlife habitat.

2.      The new transmission corridor will bisect a vast, globally significant and largely undeveloped forest, including part of the Western Maine Mountains, a vital core of the largest intact temperate forest in the eastern United States. The area supports abundant wildlife, including iconic Maine species like moose and American marten, as well as threatened Canada lynx. The western Maine forests in the area of the CMP Project are key parts of the last stronghold of native, wild brook trout habitat in the eastern United States and contain the only remaining substantial deer wintering yard in the region; the newly cleared corridor would slice right through the middle of that important deer habitat. Many rivers and streams course through the Project area, including the Kennebec River, famous for its scenic and thrilling whitewater rafting and paddling. The CMP Project will employ horizontal directional drilling to run the transmission line under the Kennebec River.

3.      The abundant natural resources of the region support a thriving tourism industry of fishing guides, hunters, hikers, and boaters. Outdoor enthusiasts come from far and wide to

COMPLAINT                                                                                              2

recreate and enjoy the scenery and natural beauty of the area and pump millions of dollars into the area's local economies.

4.      Through this geographically unique and ecologically critical area, CMP proposes to cut a new 53.1 mile, 150-foot wide corridor, 54 feet of which will be completely cleared. The CMP Project will instantly become one of the area's largest fragmenting features, and it will cause immediate and irreparable harm to terrestrial and aquatic environments and the wildlife that depend on those environments for suitable habitat and survival. It also will disrupt the outdoor recreation tourism industry of the region, which is why, among other outdoor recreation groups, the Sportsman's Alliance of Maine, New England Backcountry Hunters and Anglers, and Trout Unlimited either oppose or have rescinded their prior support for the CMP Project.

5.      The CMP Project's stated purpose is to fulfill long-term contracts for "clean energy" projects with the State of Massachusetts. However, the Corps was presented with substantial evidence undermining the claimed greenhouse gas ("GHG") emissions benefits of the CMP Project. The reduction in GHG emissions at a regional level is the primary rationale for the Project but neither CMP nor the Corps has conclusively demonstrated such reductions.

6.      The CMP Project requires a Clean Water Act ("CWA") section 404 permit due to its impacts to waters of the United States. Because a CWA section 404 permit is a major federal action, NEPA, 42 U.S.C. §§ 4321-4370m, requires the Corps to analyze the environmental impacts of the Project before issuing the Permit.

7.      NEPA requires agencies to take a "hard look" at the environmental impacts of their actions before the actions occur, and to prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." *Id.* at § 4332(2)(C). However, rather than prepare an EIS for the CMP Project, the Corps, on July 7,

2020, finalized and approved a Finding of No Significant Impact ("FONSI") after conducting Environmental Analysis ("EA"). Significantly, the Corps did not release a draft or final EA/FONSI for public comment; instead the public was forced to submit comments based on a March 19, 2019 Corps public notice that the United States Environmental Protection Agency ("EPA") said "was issued prematurely." To remedy the public notice's "deficiency," EPA recommended the Corps "issue a revised notice" that "provide[d] a link to the draft Environmental Assessment the [Corps] is developing for the project." The Corps did not issue a revised public notice, nor did it make its draft or final EA available to the public for comment.

8.     Mainers overwhelmingly oppose the CMP Project. Twenty-five towns along the transmission corridor's route voted to oppose the CMP Project or rescinded their support of the Project. Opponents of the Project gathered more than 66,000 certified signatures for a petition for a ballot measure that would have required the Maine Public Utilities Commission to reverse its May 3, 2019 Order that provided CMP with a certificate of public convenience and necessity for the Project. In addition to Plaintiffs, several other entities, including the Penobscot Nation, the Town of Caratunk, Congressional Representative Jared Golden, the Friends of Sebago Lake, and hundreds of Maine citizens, requested the Corps prepare an EIS for the CMP Project. Further, the electricity the CMP Project will transmit comes from large hydropower "megadams" in Canada, which cause ecological destruction when constructed and operated and which expose local, indigenous communities near the dams to unsafe levels of methylmercury and to threats of dam failures. These megadams also have disrupted First Nation communities' ability to pursue their traditional fishing and hunting practices.

9.     By issuing an EA/FONSI and failing to prepare an EIS, which would have provided the appropriate and legally required level of environmental review and public

COMPLAINT                                                                                    4

participation for a major transmission line and corridor project cutting through western Maine's mountains and forests, the Corps violated NEPA and the Administrative Procedure Act ("APA").

## JURISDICTION AND VENUE

10.    The Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a Defendant), and the APA.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e). The CMP Project and events giving rise to these claims all will take place or have taken place in the District of Maine. Further, the Defendant Corps has its New England District, Maine Project Office in Augusta, Maine. Plaintiffs reside in Maine and have members in Maine who have been injured by Defendants' actions and activities complained of herein.

## PARTIES

12.    Plaintiff Sierra Club is a national nonprofit organization with 67 chapters and more than 800,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Founded in 1892, the Sierra Club's mission is to "explore, enjoy and protect the planet" and "to practice and promote the responsible use of the Earth's ecosystems and resources." The Maine Chapter of the Sierra Club is a volunteer-run, grassroots organization representing approximately 24,000 members and supporters who care deeply about Maine's natural environment. The Maine Chapter works to protect Maine's wilderness heritage, fight global warming, safeguard Maine's clean water, and promote clean air and energy efficiency, among other efforts to protect Maine's environment and natural resources.

13.   Plaintiff Natural Resources Council of Maine ("NRCM") is a non-profit membership organization with more than 25,000 supporters statewide and beyond. NRCM is dedicated to protecting, restoring, and conserving Maine's environment, now and for future generations. NRCM has been working since 1959 to protect the environment and natural resources of Maine.

14.   Plaintiff Appalachian Mountain Club ("AMC") is a non-profit membership organization with more than 100,000 members, supporters, and advocates, some 6,500 of which live in Maine. Founded in 1876, AMC's mission is to foster the protection, enjoyment, and understanding of the outdoors. AMC envisions a world where our natural resources are healthy, loved, and always protected, and where the outdoors occupies a place of central importance in every person's life. AMC owns and manages 74,000 acres in the 100 Mile Wilderness region of the Maine Woods for conservation and recreation purposes.

15.   Plaintiffs have many members who regularly visit and recreate in the areas of Maine where the CMP Project will be built, and their use and enjoyment of those areas will be directly and irreparably harmed by the Project.

16.   As a result of these interests, Plaintiffs, on behalf of their members, have engaged, to the extent possible given information publicly available, in the public processes related to the CMP Project, at the federal, state, and local levels. For example, Plaintiffs submitted comments to the Corps related to its authorizing of the Project and participated in the one public hearing the Corps held on December 5, 2019.

17.   The aesthetic, recreational, commercial, scientific, educational, and organizational interests of Plaintiffs and their members will be adversely affected and irreparably injured if construction of the CMP Project is permitted pursuant to the EA/FONSI and the

forthcoming CWA section 404 Permit. These are actual, concrete injuries caused by the Defendants' failure to comply with the mandatory obligations under NEPA and the APA. The relief sought in this action will redress these injuries.

18.     Defendant United States Army Corps of Engineers ("Corps") is an agency of the United States Department of the Army. The Corps is responsible for the lawful administration of the Clean Water Act, 33 U.S.C. § 1344 and prepared and approved the EA/FONSI challenged in this action.

19.     Defendant Colonel John A. Atilano II is the Corps New England District Commander and District Engineer. The previous Commander, Colonel William M. Conde, approved the EA/FONSI challenged in this action on July 7, 2020. Colonel Atilano assumed command from Colonel Conde on July 8, 2020. Colonel Atilano is being sued in his official capacity only.

20.     Defendant Jay L. Clement is the Senior Project Manager for the Corps' Maine Project Office and is the official responsible for oversight of the CMP Project for the Corps. Mr. Clement prepared the EA/FONSI challenged in this action, and is being sued in his official capacity only.

## LEGAL BACKGROUND

### *The National Environmental Policy Act*

21.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (1978). Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b),

(c).

22.     The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, *see id.* §§ 1500-1508, which are "binding on all federal agencies." *Id.* § 1500.3.[1] The Corps also has promulgated its own NEPA implementing regulations. *See generally* 33 C.F.R. Part 325, Appendix B.

23.     To accomplish its purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement—known as an Environmental Impact Statement ("EIS")—must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," and (3) "alternatives to the proposed action." *Id.* § 4332(C)(i)-(iii). By definition, the environmental impacts that require analysis under NEPA are far broader than just those affecting the ecosystem itself; such effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" impacts. 40 C.F.R. § 1508.8(b) (1978).

24.     Each EIS must consider the underlying federal "purpose and need" for the proposed action, and "rigorously explore and objectively evaluate" the environmental impacts of "*all* reasonable alternatives" to the proposed action. *Id.* §§ 1502.13, 1502.14 (emphasis added).

---

[1] CEQ issued revised NEPA regulations, which became effective on September 14, 2020; the new regulations do not apply retroactively. The Corps completed its NEPA analysis process on July 7, 2020, prior to the new NEPA regulations taking effect, and the Corps cited to the 1978 regulations in effect at that time in its final EA/FONSI for the CMP Project. Accordingly, the applicable NEPA regulations for this matter are the 1978 regulations, which Plaintiffs set forth herein.

NEPA further provides that agencies "shall … study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E).

25.    In evaluating the alternatives of a proposed action, NEPA requires that agencies take a "hard look" at the effects of the proposed action as compared to all reasonable alternatives. *See* 40 C.F.R. §§ 1502.1, 1502.16 (1978). The EIS must assess the direct, indirect, and cumulative impacts of the proposed action on the environment, including adverse environmental effects that cannot be avoided. *Id.* § 1508.25. Direct effects are those "caused by the action and occur at the same time and place," while indirect effects are those "caused by the action" that occur "later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8. Cumulative impacts are those that result from the "incremental impact[s]" of the proposed action when added to the impacts of other past, present, and reasonably foreseeable future actions, whether undertaken by other federal agencies or private third parties. *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

26.    To determine the significance of a federal action, and whether or not to prepare an EIS, CEQ regulations require agencies to evaluate both the context and intensity of an action. *Id.* § 1508.27. Context refers to the significance of the action in regards to society as a whole, the affected region, the affected interests, and the locality. *Id*. § 1508.27(a). Both short- and long-term effects are relevant to the action's context. *Id*.

27.    The intensity of the action is evaluated based on several factors, including, but not limited to, the unique characteristics of the geographic area such as proximity to ecologically critical areas, the degree to which the effects on the quality of the human environment are likely

to be highly controversial, the degree to which the possible effects on the human environment are highly uncertain or involve unknown characteristics, and the degree to which the action may adversely affect an endangered or threatened species or its habitat. *Id.* § 1508.27(b). Satisfying even one of these factors may suffice to reach the "significance" threshold.

28.     The scope of NEPA's environmental effects review is broad, including consideration of direct, indirect and cumulative impacts on "ecological … aesthetic, historic, cultural, economic, social, or health" interests. *Id.* § 1508.8.

29.     If an agency is uncertain whether an action will have a significant effect on the environment, the agency may begin the environmental review process by preparing an EA. *Id.* §§ 1501.3, 1508.9. An EA "shall include brief discussions of the need for the proposal, of alternatives … [and] of the environmental impacts of the proposed action and alternative." *Id.* § 1508.9(b). Only if the conclusion of the EA is that the action clearly will not have a significant effect, then the EA may culminate in a FONSI. *Id.* §§ 1501.4(e), 1508.13. A FONSI is a final agency action subject to judicial review under the APA. The agency must supply a convincing statement of reasons and findings to explain why a project's impacts are insignificant. Otherwise, the action agency must prepare an EIS. *Id.* § 1501.4(c). An EA should typically not be more than 10 to 15 pages—"[i]n most cases …, a lengthy EA indicates that an EIS is needed." 46 Fed. Reg. 18,026 (Mar. 23, 1981) ("Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations").

30.     Public disclosure of important information concerning an agency's proposed action, its impacts, and reasonable alternatives to the action is central to NEPA's statutory and regulatory scheme, regardless of whether an agency prepares an EIS or an EA. For example, the CEQ regulations require federal agencies "shall to the fullest extent possible … encourage and

facilitate public involvement in decisions which affect the quality of the human environment," 40 C.F.R. § 1500.2 (1978), and require agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." *Id.* § 1506.6(a). Thus, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b). Accordingly, NEPA's implementing regulations explain that "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

31.     To accomplish NEPA's public disclosure and involvement requirements, both draft and final EISs must be circulated for public comment, and the agency must respond to comments received. *Id.* § 1503.4. NEPA also requires agencies to solicit public comment for a minimum of 30 days with respect to any draft EA and FONSI where either: (1) "[t]he proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement," or (2) "[t]he nature of the proposed action is one without precedent." *Id.* § 1501.4(e)(2). The CEQ has further clarified the circumstances in which NEPA requires a 30-day public comment period for a draft EA and FONSI, including "(a) if the proposal is a borderline case, i.e., when there is a reasonable argument for preparation of an EIS; (b) if it is an unusual case, a new kind of action, or a precedent setting case such as a first intrusion of even a minor development into a pristine area; (c) when there is either scientific or public controversy over the proposal; or (d) when it involves a proposal which is or is closely similar to one which normally requires preparation of an EIS." 46 Fed. Reg. at 18,037. "Agencies also must allow a period of public review of the FONSI if the proposed action would be located in a floodplain or wetland." *Id.*

32.     Under NEPA, an agency also must discuss how the proposed action's impacts

may be mitigated. 40 C.F.R. §§ 1502.16(h), 1508.20 (1978). Mitigation measures are methods that serve to avoid, minimize, rectify, reduce, or compensate for the impact of an action that is otherwise potentially harmful to the environment. *Id.* § 1508.20(a)–(e). As a general rule, agencies should "not rely on the possibility of mitigation as an excuse to avoid the EIS requirement." *See* 46 Fed. Reg. at 18,038. If a project would have a significant impact on the environment, agencies can only issue a FONSI in lieu of an EIS if the agency can show through substantial evidence that mitigation measures reduce these impacts in such a way that they are no longer significant. Merely listing mitigation measures in an EA is insufficient.

33.     "[W]here the proposal itself so integrates mitigation from the beginning that it is impossible to define the proposal without including the mitigation, the agency may then rely on the mitigation measures in determining that the overall effects would not be significant …. In those instances, agencies should make the FONSI and EA available for 30 days of public comment before taking action." *Id.*

### The Administrative Procedure Act

34.     The Administrative Procedures Act ("APA") provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Final agency actions "for which there is no other adequate remedy in a court" are reviewable under the APA. *Id.* § 704.

35.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions may also be set aside if the action is "without observance of procedure required by law." *Id.* § 706(2)(D). A court may also compel agency action that is "unlawfully withheld." *Id.* § 706(1).

**FACTUAL BACKGROUND**

**The CMP Project and Its Environmental, Economic, and Social Impacts**

36.    The Western Maine Mountains region is an exceptional landscape that is ecologically important for many reasons. It is the heart of a globally significant forest region that is notable for its relatively natural forest composition, lack of permanent development, and high level of connectivity. It is a highly resilient landscape in the face of climate change and a critical ecological link between the surrounding undeveloped lands. It is home to many species, and provides critical and unique habitat. The region includes more than half of the United States' largest globally important bird area, which is crucial habitat for 34 northern woodland songbird species. The region provides core habitat for keystone species such as American marten and Canada lynx as well as loon, moose, and a host of other iconic Maine animals. It is the heart of the largest block of intact freshwater aquatic habitat in the Northeast, supporting populations of wild, native brook trout that have been identified as the "last true stronghold for brook trout in the United States."

37.    In September 2017, CMP applied to the Corps for a CWA section 404 permit to construct and operate a transmission line and related facilities capable of delivering up to 1,200 megawatts of electricity from the Canadian border to southern New England. The CMP Project is divided into five segments covering the 171.4 miles of transmission corridors and lines. Segment 1 is 53.1 miles of new transmission line corridor cutting through the Western Maine Mountains region (including a southern portion of Maine's North Woods) from the Canadian border to The Forks Plantation. The transmission line will pass beneath the Kennebec River via horizontal directional drilling, which will require termination stations on both sides of the River in Moxie Gore and West Forks. Segments 2, 3 and 4 of the transmission line run along 91.8

miles of existing corridor, which will require additional clearing and widening of up to 75 feet to accommodate the new transmission lines, resulting in a 225 to 350-foot wide corridor. In total, Segments 1 through 4 of the Project will cover 144.9 miles of transmission corridors and lines and require clearing and permanent degradation of more than 1,000 acres, the majority of which is occurring in Segment 1. Segment 5 is a stand-alone 26.5 miles of transmission line from the existing Coopers Mills Substation in Windsor to the existing Maine Yankee Substation in Wiscasset.

38.    The EA/FONSI states the purpose of the Project, as provided by CMP and reviewed by the Corps, is to deliver up to 1,200 Megawatts (MW) of Clean Energy Generation from Quebec to the New England Control Area at the lowest cost to ratepayers. The need for the Project is Massachusetts seeking long-term contracts to supply 9,450,000 MW hours of Clean Energy Generation.

39.    The new corridor of Segment 1 will be one of the largest permanent fragmenting features bisecting the Western Maine Mountains and will have immediate and irreparable adverse effects on wildlife habitat, wildlife lifecycles, and travel corridors. For example, the Project will pass through critical habitat, designated under the federal Endangered Species Act ("ESA"), for threatened Canada lynx. Species' critical habitat is comprised of areas "essential to the conservation of the species and which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A). Additionally, areas can be considered unique for purposes of NEPA analysis due to their proximity to habitats for endangered and threatened species. The Project presents additional risks to other Maine wildlife, particularly species that require unfragmented, mature forest habitat such as American marten.

40.    In addition, the new corridor will substantially fragment brook trout habitat, with

COMPLAINT                                                                                    14

multiple stream crossings that adversely impact coldwater streams, and the creation of a new corridor that could be a vector for increased human use and introduction of invasive species. The corridor would clear forest cover from riparian areas and increase water temperatures in these critical coldwater streams. For example, the CMP Project will cross Cold Stream in an area where the corridor parallels two small perennial tributaries that have their confluence essentially at the Project's crossing of Cold Stream. This results in an extended reach—about 1,400 feet of stream—that closely parallels the cleared corridor. Cold Stream from its source to its mouth at the Kennebec River produces high numbers of brook trout and there is not a single known occurrence of non-native fish in the watershed.



*Native brook trout (Todd Towle)*

41.     The cleared new corridor in Segment 1 will impact vernal pools and important travel routes for amphibians and invertebrates to and from pools, resulting in impacts ranging from complete destruction for some vernal pools to greatly compromised habitat for others. The cumulative impacts of the Project will likely greatly diminish the resiliency of pool-breeding amphibians along the corridor.

COMPLAINT                                                                            15

42.     The Project also will irreparably impact what little remains of quality deer wintering areas in the region of the new corridor (Segment 1). Deer wintering areas are a habitat type that is critical to help deer survive Maine's long winters when food and shelter are severely limited.

43.     Segments 2, 3, and 4—where the Project involves widening an existing transmission corridor—will cause similar adverse impacts to the environment and species in their surrounding areas. These impacts may be less devastating than the impacts caused by Segment 1 of the Project because, for these Segments, the transmission line corridor already exists and thus the areas have already suffered many of the impacts caused by the corridor. However, the widening of the existing corridor will expand the corridor's footprint, and thus expand the reach of the harms caused by the corridor into the adjacent forest and to species that rely on the adjacent forest for habitat. The expansion of the existing right of way will cross an additional 22 deer wintering areas, increasing fragmentation in at least 11 of these by cutting large numbers of older trees that make up important habitat. It will also result in additional clearing and impacts to wetlands and vernal pools and species that depend on these waters for survival.

44.     In addition, Segment 5 of the Project includes an additional crossing of the West Branch Sheepscot River, an important river for endangered Atlantic salmon. This river is already heavily impacted by powerline and pipeline crossings that have removed much of the riparian vegetation from almost a half-mile of the river. The right of way created by the Project's crossing of the River will stretch for more than 1,300 feet along the River, resulting in the removal of the little riparian vegetation that remains along this river reach. This removal will negatively affect salmon, adding to the cumulative harmful effects that the existing development along the River already has on salmon.

45.     According to the EA, the CMP Project in total (for all segments) will result in permanent fill of Corps-jurisdictional wetlands (4.87 acres), and 47.64 acres of Corps-jurisdictional wetlands will be temporarily impacted. The Project also will result in the permanent conversion of 111.55 acres of forested wetlands to scrub-shrub wetlands. Additional aquatic resources, including wetlands and vernal pools, that are not Corps-jurisdictional wetlands (i.e., that are not determined to be waters of the United States) also will be impacted by the Project.

46.     Beyond direct and indirect impacts to aquatic resources and wildlife, this Project is not consistent with and would negatively impact the scenic character and existing uses in the Western Maine Mountains, particularly impacting tourism and guiding industries dependent on the scenic and remote qualities of this region, including impacts to the Appalachian Trail. The Project also would harm the experience of existing recreational users, including hikers, boaters, and paddlers, and those who hunt and fish in these remote and beautiful areas, many of whom are members of the Plaintiff organizations.

47.     In a February 12, 2019 letter to Governor Mills, the Maine State Federation of Firefighters wrote to express concerns about fire and other emergency response capacities within the areas located along and adjacent to the proposed CMP corridor. This year, 2020, has been an unprecedented wildfire season in Maine, as well as other areas of the country. As of July 25, 2020, Maine had seen a 170 percent increase in wildfires over 2019. At least four of the wildfires this year in Maine have been caused by powerlines.

48.     In addition, the electricity the Project will transmit comes from large hydropower "megadams" in Canada that present climate change, human rights, and environmental justice issues. While CMP's stated need for the Project is to fulfill contracts in Massachusetts for

"clean" energy (in other words, energy sources that reduce greenhouse gas ("GHG") emissions), evidence presented during Maine and Massachusetts utility commission hearings and at the Maine administrative hearings on the Project failed to establish there would be any global reduction in GHGs attributable to the Project. To the contrary, evidence showed the Project would have no climate benefit and could actually increase GHGs emissions. Evidence before the Corps indicates that Hydro-Québec has insufficient hydroelectric energy to provide incremental hydroelectricity to New England and it will instead engage in arbitrage, moving sales from different markets without any real reductions in GHG emissions. Further, the construction and operation of large hydropower "megadams" dams and their reservoirs increase GHGs, which would directly contradict the stated purpose and need for the Project. CMP has not provided information necessary to calculate the GHG emissions that will result from this Project. At a minimum, there is significant scientific dispute and disagreement among experts, as well as overall uncertainty, regarding the Project's impacts related to GHG emissions and how Hydro-Québec will supply the new electricity.

49.     Moreover, permanently damming rivers disrupts the balance of ecosystems and displaces people and animals that have been relying on that environment for thousands of years. Construction and operation of large hydropower dams have devastated First Nation communities in Canada and their traditional fishing and hunting grounds. A 2016 Harvard School of Public Health study forecasted alarming increases in concentrations of the neurotoxin methylmercury in food webs near indigenous communities resulting from new hydroelectric reservoirs. Prior to finalizing the EA/FONSI, the Corps was presented with evidence showing that electricity that will flow through the CMP corridor may come from new dams.

50.     Lastly, CMP identified more than 100 resources listed in or eligible for listing in

the National Register of Historic Places ("NRHP") that are within the Project area. Some of these NRHP-listed or eligible resources include the Appalachian Trail, Arnold Trail to Quebec, and various barns and farmsteads. Maine's State Historical Preservation Officer noted that the Project would adversely affect four of these resources, including two farmsteads in Starks, Maine; a barn in Livermore Falls; and the Bowman Airfield, also in Livermore Falls.

51.     Recognizing the significant adverse impacts of the CMP Project, a substantial number of Mainers indicated their opposition to the Project by signing onto a petition for a ballot measure that would have reversed a State agency determination that the Project could go forward. Similarly, 25 towns along the transmission corridor have either voted to oppose the Project or have rescinded their prior support, based largely on concerns about the Project's adverse impacts on Maine's environment and natural resources and the tourism industry dependent on those natural resources. Several towns along the transmission line corridor, including Caratunk, Embden, New Sharon, and Wilton, passed electric transmission moratoriums which paused the development of electricity transmission corridors to give the towns time to develop ordinances regulating the construction and operation of transmission line corridors within their jurisdictions. At least two towns, Caratunk and Wilton, have since passed such ordinances.

52.     Because the Project involves an electricity transmission line crossing over an international border, from Canada to the United States, it also requires a Presidential Permit from the Department of Energy ("DOE"). CMP applied for that Presidential Permit in July 2017. CMP's application for a Presidential Permit and DOE's separate NEPA analysis of the Project pursuant to that permit application are pending.

## The CMP Project's Flawed Public Process

53.     In 2017, at the time CMP submitted its applications to the Corps and DOE for the permits for the Project, the preferred transmission line project to bring electricity from Canada to Massachusetts was the Northern Pass Project, which was proposed to run 192 miles through New Hampshire. For that project, the federal agencies determined at the outset that the appropriate level of NEPA review was an EIS. *See* 78 Fed. Reg. 7828 (Feb. 11, 2011) (notice from DOE, in cooperation with the Corps and other federal agencies, of its intent to prepare an EIS).

54.     In February 2018, the New Hampshire Site Evaluation Committee denied a necessary permit for the Northern Pass, which caused Massachusetts to look elsewhere for its large hydro-sourced electrical power. Massachusetts' "Plan B" turned out to be the CMP Project, a substantially similar transmission line project in length and scale but proposed to run through Maine. However, the federal agencies' approach to the environmental review of the two projects could not be more different. When DOE issued the Final EIS for the Northern Pass in August 2017, after multiple years of agency review and public participation, it totaled 3,676 pages and included 19 appendices. In contrast to Northern Pass project, the CMP Project will cause significantly greater adverse environmental impacts. Its 53.1 miles of new corridor will bisect the heart of a large undeveloped forest region, whereas Northern Pass's 32 miles of new corridor was proposed to pass through the western fringe of the region, which would have mitigated the harm due to fragmentation. The CMP Project's impacts to native brook trout habitat also are far more significant than the Northern Pass project would have caused. Yet the Corps failed to prepare an EIS for the CMP Project, and the Corps' has refused to even put its 163-page combined EA/FONSI, Clean Water Act 404(b)(1) Guidelines analysis, and public interest review document out for public comment.

55.     On March 26, 2019, the public portion of the federal evaluation of the CMP Project began with the issuance by the Corps of Notice of CMP's permit application to conduct work in the waters of the United States. Prior to that date, the Corps and DOE had engaged in extensive contacts with CMP about the Project for nearly two years. Further, prior to submitting its applications in 2017, CMP already had purchased land or secured easements for the corridor, which limited the Corps' analysis of reasonable alternatives.

56.     On April 25, 2019, Plaintiffs submitted extensive comments to the Corps noting the multiple deficiencies of the Corps' Public Notice, which made it impossible to submit fully informed comments. For example, the Corps was aware, at least as of April 2018, of the federally listed threatened and endangered species and their critical habitat that the CMP Project may affect. Despite that knowledge, the Corps failed to include the names of those species in its March 2019 Public Notice. Another theme of Plaintiffs' comments was the need and legal requirement for the Corps to prepare an EIS for the Project. Plaintiff Sierra Club specifically urged the Corps to save itself and the public time and effort by skipping the EA process and proceeding directly to an EIS, as the federal agencies had done with the Northern Pass project. In addition, Plaintiffs' comments all stressed the significant environmental, economic, and social adverse impacts the CMP Project would have in Maine, for a project that was delivering profits to Canada and electricity to Massachusetts.

57.     EPA agreed with Plaintiffs' assessment of the deficient public notice. In an unusual rebuke of a fellow federal agency, EPA, in an April 25, 2019 letter to the Corps, noted the Corps' notice "was issued prematurely." To remedy the public notice's "deficiency," EPA recommended the Corps "issue a revised notice" that "provide[d] a link to the draft Environmental Assessment the [Corps] is developing for the project." The Corps followed

COMPLAINT                                                                                      21

neither of EPA's recommendations.

58.     At the same time, some within the Corps were aware of EPA's concerns about the Corps' review of the project. In an April 8, 2019 email to Colonel William Conde, the Corps' New England District Engineer at the time, a Corps employee stated about the CMP Project: "EPA is making noise about an EIS but we're not convinced it's anywhere close to that level of impact." The purpose of an EA, however, is to determine whether or not an EIS is required and the Corps is supposed to suspend its judgment on that issue until the public comment process and the EA is completed, which did not occur until July 7, 2020.

59.     The Corps' refusal to prepare an EIS for the CMP Project is consistent with its pattern and practice in Maine for NEPA review. The Corps has not prepared an EIS for any federal projects or permits in Maine for at least the last 10 years.

60.     On December 5, 2019, the Corps held a single public hearing on the CMP Project in Lewiston, Maine, the southernmost terminus of the Project and a several hours drive from some of the areas in western Maine most affected by the Project. At the hearing, the public testimony was limited to only two minutes per person, and not all attendees who wanted to speak were able to do so. Of those who were able to comment at the hearing, 61 commenters opposed the Project, 13 supported it, and two were neutral; most commenters who opposed the Project requested the Corps prepare an EIS. After the hearing, the Corps acknowledged the "magnitude of the public opposition" to the CMP Project, and that "[p]revailing public comments and hearing testimony received to date slants heavily toward project opponents." As a result of the significant public opposition, the Corps provided CMP the unsolicited opportunity "to update and enhance" certain portions of the draft EA and told CMP it "may wish to greater emphasize the project benefits."

COMPLAINT                                                                                    22

61.     While the Corps was giving CMP the chance to "update and enhance" the draft EA, it continued to withhold the draft EA from the public, despite EPA's recommendation that it provide it to the public and Plaintiffs' requests for an opportunity to comment on the draft EA before the Corps finalized it.

62.     The CMP Project clearly integrated mitigation measures from the outset of the Project, and the Corps clearly relied on those mitigation measures to arrive at its FONSI. "In those instances, agencies should make the FONSI and EA available for 30 days of public comment before taking action." 46 Fed. Reg. 18,026, 18,038 (Mar. 23, 1981). To date, the Corps has not made the EA or FONSI available for any public comment.

### The Corps' Flawed EA

63.     In response to a Freedom of Information Act Request, Plaintiffs received a copy of final EA/FONSI, which is signed by the four responsible Corps officials, including Defendants Clement and Atilano, and dated July 7, 2020. This document constitutes the EA, Clean Water Act section 404(b)(1) Guidelines and public interest review, and statement of findings for CMP's CWA section 404 permit application for the CMP Project. This document also constitutes the Corps' FONSI for the CMP Project, and Plaintiffs will refer to the document as the "EA/FONSI." The EA/FONSI suffers from numerous flaws.

#### _Scope of Analysis_

64.     The Corps limited the scope of its NEPA analysis to only waters of the United States and the immediately surrounding uplands. The Corps' NEPA regulations set forth several "typical" factors that the Corps must consider when determining the scope of its NEPA analysis, including "whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project)"; "[w]hether there are aspects of the

upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity"; "[t]he extent to which the entire project will be within the Corps jurisdiction"; and "[t]he extent of cumulative Federal control and responsibility." 33 C.F.R. Part 325, Appendix B(7)(b)(2).

65.     Here, even when only considering the factors expressly enumerated in the regulation, it is clear that the Corps improperly narrowed the scope of its NEPA analysis. For example, jurisdictional waters are not limited to merely one particular area of the proposed transmission line corridor but appear frequently, throughout the length of the corridor. The presence of jurisdictional waters along the length of the corridor affected the location and configuration of the transmission line.

66.     Cumulatively the federal government has extensive control and responsibility over the Project. While the Corps has jurisdiction based on the Project's impacts to waters of the United States, the Federal Energy Regulatory Commission ("FERC") and DOE also have control and responsibility over the Project. FERC is responsible for transmission rate approval, interconnection agreements, and an operating agreement. DOE has control and responsibility over the Project because the Project involves an electric power transmission line that will cross an international border. As such, CMP must receive a Presidential Permit from DOE allowing CMP to construct and operate the line.

*Purpose and Need*

67.     The Corps did not independently assess the "purpose and need" for the CMP Project. The purpose of the Project, as provided by CMP and "reviewed" by the Corps, "is to deliver up to 1,200 MW of Clean Energy Generation from Quebec to the New England Control Area at the lowest cost to ratepayers." The need for the Project is to satisfy "a Massachusetts

COMPLAINT                                                                                      24

RFP seeking to procure clean energy through "cost-effective long-term contracts." Instead of engaging in its own analysis to determine whether the Project meets this need, the Corps improperly assumed "[t]he Project's selection under the RFP demonstrates that Massachusetts has concluded that the NECEC will meet this need." That assumption itself rests on multiple unproven or uncertain assumptions, including that hydropower is "clean energy" that "will provide firm, guaranteed, and tracked year-round energy deliveries that will reduce winter electricity price spikes, improve system reliability, and provide renewable energy to help Massachusetts meet its greenhouse gas (GHG emissions reductions goals)."

*Discussion of Baseline Conditions and No Action Alternative*

68.     Establishing the baseline conditions of the environment that would be affected by a proposed project is a critical component of the NEPA analysis. The Corps' EA does not adequately assess the baseline conditions of the Project area, particularly Segment 1, where the new transmission line corridor will be cut. For example, the EA repeatedly refers to the fact that forest through which Segment 1 of the Project will be built is, e.g., "heavily managed" or "dominated by industrial scale timber harvesting," but there is no discussion in the EA regarding the actual nature, extent, location, or impacts from this management or timber harvesting.

69.     The Corps' NEPA implementing regulations require that the Corps' EA "include a discussion of the reasonable alternatives which are to be considered by the ultimate decisionmaker", including the "no action" alternative which, if selected, would result in denial of the permit. 33 C.F.R. 325, Appendix B(7)(a). The purpose of the no action alternative is to provide a baseline against which the action alternative is evaluated.

70.     The Corps discussed the "no action alternative" in one paragraph in the EA/FONSI.  Its analysis depends on the assumption that if the no action alternative is selected,

the purported project benefits will not be achieved. There is no analysis in the EA regarding whether the CMP Project is the only way to achieve reduced regional GHG emissions, reduced wholesale cost of electricity across the region, and enhanced electrical system reliability, despite there being a total of 45 alternative bids submitted to Massachusetts seeking long-term contracts to supply Clean Energy Generation.

71.     Moreover, the purpose of the "no action" alternative is to allow for a comparison between existing environmental baseline conditions and the environment if the Project goes forward, such that the impacts to the environment from the Project can adequately be assessed. Because the Corps did not adequately analyze the baseline conditions of the Project area, the Corps' attempt via the no action alternative to compare baseline conditions to impacts from the preferred alternative is legally deficient.

72.     The no action alternative discussion also is flawed because the statement that alternative "does not meet the project purpose and is therefore not practicable" is circular logic. The whole point of a "no action alternative" is that the proposed project will not occur. Therefore, a no action alternative could never satisfy a proposed project's purpose.

*Reliance on Mitigation*

73.     The EA extensively discusses the CMP's proposed avoidance and minimization measures, and how these measures will minimize the Project's impacts to the environment. But many of these measures were included in CMP's CWA section 404 Permit application, and thus the project "impacts" they mitigate against were already accounted for at the time of application. Therefore, the Corps' reliance on these measures to mitigate the impacts of the CMP Project as proposed, is misplaced. The EA does include additional compensatory mitigation, but the EA does not qualitatively assess whether this mitigation adequately compensates for the

environmental impacts caused by the Project.

74.     Because the Corps relies on mitigation to arrive at a FONSI for the Project, it was required to publish the EA/FONSI for 30 days of public comment, which the Corps failed to do.

*Direct, Indirect Impacts, and Cumulative Impacts of the CMP Project*

75.     The EA contains significant discussion regarding how impacts of the Project will be minimized, avoided, or compensated for, but a remarkable lack of discussion and analysis regarding the nature and extent of the impacts themselves.

76.     A foundational problem undermining the Corps' analysis of the impacts of the Project to the environment is that, as discussed above, the Corps applied an improperly narrow scope of its NEPA analysis. Because the Corps limited the scope of its analysis to only the direct and indirect effects of the Project from the portions of the transmission line that will be constructed within waters of the United States, the Corps did not adequately analyze (or did not analyze at all) effects other than the actual filling of jurisdictional waters and conversion of forested wetlands.

77.     The EA contains a quantitative discussion of, e.g., how many acres of jurisdictional waters exist within the Project area, how many of these waters will be permanently or temporarily impacted as a result of the Project, and the number of forested wetlands that will be converted to scrub shrub or emergent habitat type as a result of the Project. However, the EA does not contain any qualitative discussion regarding how these impacts will affect the environment. Information regarding the number of jurisdictional waters that will be filled or converted by the Project is largely meaningless due to the absence of an adequate discussion of baseline conditions regarding the number, status, quality, and functions and values of jurisdictional waters and forested wetlands in the area affected by the Project and the role and

importance of these waters to the existing environment.

78.     The EA's analysis of the indirect impacts of the Project to the environment is similarly flawed. For example, the Corps did not adequately analyze the impacts of the CMP Project to wetlands and vernal pools. The discussion in the EA regarding impacts to wetlands and vernal pools focuses almost entirely on how such impacts will be avoided, minimized, or compensated for, but besides quantitative statements regarding how many of these waters will be directly impacted by the Project, there is little discussion regarding the Project's impacts to wetlands and vernal pools, including, e.g., impacts resulting from clearing the corridor (such as reduced shade to vernal pools and creating a new forest edge), and impacts to species that depend on vernal pools for habitat and survival.

79.     The EA also did not adequately analyze the impacts to watercourses from the CMP Project. For example, the EA is almost entirely silent as to the fact that Segment 1 of the Project involves horizontal directional drilling under the Kennebec River. There is little discussion in the EA of the impacts from this drilling to the environment, including impacts to the environment when and if spills occur, and the discussion that is included contains unsupported and unsubstantiated generalizations that do not satisfy the Corps' legal obligation to consider the impacts of the CMP Project on the environment.

80.     Another significant impact of the Project almost entirely overlooked by the Corps in the EA is the impact of forest fragmentation due to the clearing of trees for the corridor. Segment 1 will be one of the largest permanent fragmenting features bisecting the Western Maine Mountains. The fragmentation caused by Segment 1 will result in the direct loss of habitat for species, the creation of a permanent "edge zone" that will diminish the extent of interior forest habitat adjacent to the corridor along the length of Segment 1. The Corps failed to consider

these significant impacts of the CMP Project on the environment.

81.     Further, the EA does not address the direct and indirect impacts to species from the Project. The EA states that "[t]he overall project area supports high value ecological resources including but not limited to state and federal listed threatened and endangered species and associated habitat, state mapped Deer Wintering Areas (DWA), state mapped Inland Waterfowl & Wading Bird Habitat (IWWH) and native wild brook trout habitat." But while the EA considered some impacts to federally listed threatened and endangered species and bald and golden eagles, it does not address the impacts to other species, or to these "high value ecological resources." Some species, such as waterfowl and wading birds, are entirely ignored in the EA. For others, including brook trout and deer, the EA ignores and/or glosses over the impacts to these species and instead focuses on CMP's plans to minimize impacts to these species.

82.     Moreover, the Corps did not adequately consider and/or account for impacts to federally listed species from the Project. For example, upon information and belief, some activities associated with the Project will occur at night, and the Corps did not adequately assess the impacts to listed species such as Canada Lynx and the Northern Long-eared Bat, from such nighttime activities.

83.     Other impacts of the Project that are largely or entirely ignored in the EA include, but are not limited to, the direct and indirect impacts from future actions associated with implementation of CMP's Culvert Replacement Program; impacts on watercourses and species due to diminished woody debris contributions, which will result from tree clearing associated with the Project; impacts related to increased all-terrain vehicle and snowmobile use in the Project area due to increased access and the new corridor; and impacts from future maintenance of the corridor, including the use of mechanical and herbicidal vegetation management

COMPLAINT                                                                        29

techniques to maintain the transmission line corridor.

84.     The Corps also failed to adequately consider the cumulative impacts of the CMP Project on the environment. For example, the Corps did not fully consider the impacts from past projects in the same area as the CMP Project, stating that it would be impractical and unreasonable for it to identify all past projects that may have impacted aquatic resources in the project area due to the length of the Project and the number of municipalities implicated. For projects that the Corps identified, it assumed that because the projects are complete and stabilized, the cumulative impacts would not be significant. With regard to future projects, the Corps did not look closely at the proposed projects' potential impacts, but instead simply made conclusory statements that because the projects would be "primarily" or "typically" in already-developed areas, or because some aspects of them may enhance or benefit the environment, the cumulative impacts of the CMP project with these other projects would not be significant.

*Environmental Justice*

85.     The Corps failed to adequately consider environmental justice-related issues of the Project. In particular, the Corps did not consider the impacts of the Project on indigenous communities in Canada. The dams supplying the CMP Project electricity were built without adequate studies analyzing their effects on the environment, and without the consent of the indigenous communities or compensation to them. The EA is silent as to the environmental justice concerns and issues regarding the impacts on indigenous communities of the dams and ongoing hydropower generation that will be supplying the CMP Project's electricity.

**The Corps' Flawed FONSI**

86.     The Corps' FONSI is contained in Section 12.3 of the EA/FONSI document.

87.     In its FONSI, the Corps offers conclusory, unsupported and internally inconsistent

COMPLAINT                                                                                      30

rationales for arriving at its conclusion that the CMP Project will not significantly affect the quality of the human environment.

88.    For example, despite the Project's purpose of delivering purportedly clean energy to the New England region, the Corps stated it was only required to evaluate local impacts, thus ignoring the significance of the action in regards to society as a whole, the affected region, and other affected interests. The Corps also stated the action would "not result in a significant impact—neither beneficial nor detrimental—to the human environment," despite crediting beneficial effects of the Project on regional greenhouse gas emissions in other sections of the EA.

89.    Likewise, the Corps does not adequately address the intensity factors in support of its finding; the agency often acknowledges impacts from the Project but fails to explain why they are not significant. For example, the Corps claims Segment 1 of the Project will be "almost entirely located within heavily managed commercial timberlands" but fails to address, even if that statement were true, the unique ecological characteristics of the area. The Corps claims there are no "designated" ecologically critical areas in the Project area, but the term "designated" does not appear in the CEQ regulations when discussing that factor.

90.    Despite stating in the EA there was a high level of scientific debate over the impacts of the Project, the Corps in its FONSI states without explanation that the Project's effects are not controversial. The Corps' conclusions regarding the other intensity factors—the Project's uncertain impacts, precedent for future actions, cumulative effects, impacts on historic resources and ESA-listed species, and potential to violate state or federal laws—are likewise without rational bases and ignore explicit regulatory language. For example, the Corps only evaluated the Project's potential to violate state or federal laws, but ignored potential to violate

local ordinances, which some affected towns along the transmission corridor have passed.

91.     Contrary to the Corps' finding, all of the significance factors set forth in the CEQ regulations weigh in favor of a finding of significance that requires the Corps to prepare an EIS. Satisfying even one of these factors may suffice to reach the "significance" threshold.

### The Corps' and the Department of Energy's Pending Actions

92.     As of the date this Complaint is filed, the Corps has not issued the CWA section 404 permit for the Project. When the Corps issues the CWA section 404 Permit, Plaintiffs intend to review that Permit in conjunction with the Corps' CWA analysis—including the CWA section 404(b)(1) Guidelines analysis and the Corps' public interest review—and may amend or seek leave to amend their Complaint to add claims challenging the Permit and/or the Corps' CWA analysis.

93.     As of the date this Complaint is filed, the Presidential Permit for the CMP Project has not yet been issued. To the best of Plaintiffs' knowledge, DOE intends to make the EA it is preparing for that Permit available to the public for a 30-day comment period. DOE has not yet released the EA for public comment. When the Presidential Permit is issued, Plaintiffs intend to review that Permit and the NEPA analysis for the Permit, and may amend or seek leave to amend the Complaint to add claims challenging the Presidential Permit and/or DOE's NEPA analysis.

94.     In the EA/FONSI, the Corps lists special conditions of the forthcoming CWA section 404 Permit that are "required to protect the public interest, ensure effects are not significant and/or ensure compliance of the activity" with applicable laws. One special condition relates to the pending Presidential Permit from DOE. It states "[p]rior to initiating work authorized by this permit, the permittee must obtain a Presidential Permit from the U.S. Department of Energy (DOE). A copy of the Presidential Permit shall be furnished to the Corps

of Engineers, Maine Project Office, Attn: Jay Clement."

95.     Despite the fact that neither the CWA section 404 Permit nor Presidential Permit has been issued, to the best of Plaintiffs' knowledge, CMP is preparing to begin construction on the Project, including work that will cause irreparable harm to the Segment 1 project area. That work may begin in early November 2020. Therefore, Plaintiffs are filing this Complaint prior to the issuance of those Permits to seek judicial relief to prevent the environmental destruction the CMP Project will cause and to maintain the status quo until the Court can rule on the claims contained in this Complaint.

## CLAIMS FOR RELIEF
### Claim One: Failure to Prepare an EIS
### (Violation of the National Environmental Policy Act)

96.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

97.     The issuance of a CWA Section 404 permit is a major federal action under NEPA.

98.     NEPA and its implementing regulations require preparation of an EIS whenever an action is determined to have a "significant" effect on the environment. 40 C.F.R. § 1508.9 (1978). To determine if a project will "significantly" affect the environment "NEPA requires considerations of both context and intensity." *Id.* at § 1508.27. Context refers to "significance of an action … in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* at § 1508.27(a). Intensity "refers to the severity of impact" and is determined by a consideration of multiple factors, including those set forth in the CEQ regulations. *Id.* § 1508.27(b)(1)-(10).

99.     NEPA and its implementing regulations require the preparation of an EIS for the CMP Project, for at least the following reasons:

a.     The CMP Project is significant in regards to society as a whole, the affected

region, the affected interests, and the locality;

b.      The variety and magnitude of direct, indirect and cumulative impacts the CMP Project will cause to the environment and society are extensive and present uncertainty and unknown risks;

c.      The CMP Project is indisputably highly controversial;

d.      The CMP Project imposes adverse effects on public health and safety;

e.      The CMP Project's geographic area contains multiple unique characteristics and ecologically critical areas;

f.      The CMP Project may affect ESA-listed endangered or threatened species and their designated critical habitat;

g.      The CMP Project will set a precedent for future actions with significant effects;

h.      The CMP Project will adversely affect resources listed or eligible for listing in the National Register of Historic Places that are within the CMP Project's transmission corridor or may cause loss or destruction of significant scientific, cultural, or historical resources; and

i.      The CMP Project threatens violations of local laws for protection of the environment.

100.    By failing to prepare an EIS, the Corps' EA/FONSI was not in accordance with NEPA and its implementing regulations and was arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, and otherwise not in accordance with law. 5 U.S.C. § 706(2).

### Claim Two: Arbitrary and Capricious EA/FONSI
### (Violation of the National Environmental Policy Act)

101.    Plaintiffs herby incorporate by reference all preceding paragraphs.

COMPLAINT                                                                34

102.     NEPA requires federal agencies to evaluate the environmental impacts of their proposed actions on the affected environment. 42 U.S.C. § 4332(2)(C).

103.     The Corps avoided preparing an EIS by issuing a legally invalid EA and FONSI.

104.     NEPA and its implementing regulations require that each EA include a discussion of: (1) the environment of the area to be affected by the alternatives under consideration; (2) the proposed project and its environmental impacts; (3) alternatives to the proposed project; (4) the cumulative impacts of a proposed project; (5) mitigation measures that may be utilized to mitigate any adverse impacts that result from the project; and (6) connected actions. 40 C.F.R. §§ 1502, 1508. NEPA also requires that the public have the opportunity to review and comment on the above information before decisions are made and before actions are taken. *Id.* at § 1500.1(b).

105.     The Corps' EA/FONSI was arbitrary and capricious for at least the following reasons:

a.       The Corps improperly limited the scope of analysis for its NEPA review;

b.       The Corps did not independently assess the "purpose and need" of the Project;

c.       The Corps failed to determine the baseline conditions of the affected environment;

d.       The Corps failed to consider a true "no action" alternative;

e.       The Corps did not consider whether the compensatory mitigation measures were adequate substitute resources and the Corps improper relied on other mitigation measures;

f.       The Corps failed to fully address, analyze, discuss, or take a hard look at the CMP Project's direct, indirect, and cumulative impacts; and

g.       The Corps did not adequately consider environmental justice when considering

the effects of the CMP Project.

106.     Thus, the EA failed to take the required "hard look" at the CMP Project's adverse environmental impacts and also failed to adequately evaluate and consider all of the significance factors in NEPA's implementing regulations.

107.     By failing to take the requisite "hard look" at the environment impacts of the CMP Project, the Corps' EA/FONSI was arbitrary, capricious and otherwise not in accordance with NEPA, in violation of 5 U.S.C. § 702(2)(A).

108.     A FONSI is a final agency action subject to judicial review under the APA.

109.     The Corps' FONSI was legally deficient because the EA on which it was based did not provide adequate support for a finding of no significant impact and because the Corps' discussion of the significance factors related to the Project was conclusory, internally inconsistent and did not provide a rational basis or convincing statement for the FONSI. Accordingly, the Corps' FONSI was arbitrary and capricious and not in accordance with NEPA and its implementing regulations, in violation of 5 U.S.C. § 702(2).

### Claim Three: Failure to Provide Opportunity for Public Comment on EA/FONSI (Violation of the National Environmental Policy Act)

110.     Plaintiffs herby incorporate by reference all preceding paragraphs.

111.     "Agencies shall make diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a) (1978).

112.     Under NEPA, an agency also must discuss how the proposed action's impacts may be mitigated. *Id.* §§ 1502.16(h), 1508.20.

113.     Mitigation measures are methods that serve to avoid, minimize, rectify, reduce, or compensate for the impact of an action that is otherwise potentially harmful to the environment. *Id.* §§ 1508.20(a)–(e).

114.    As a general rule, agencies should "not rely on the possibility of mitigation as an excuse to avoid the EIS requirement." 46 Fed. Reg. at 18,038. If a project would have a significant impact on the environment, agencies can only issue a FONSI in lieu of an EIS if the agency can show through substantial evidence that mitigation measures reduce these impacts in such a way that they are no longer significant. Merely listing mitigation measures in an EA is insufficient.

115.    "[W]here the proposal itself so integrates mitigation from the beginning that it is impossible to define the proposal without including the mitigation, the agency may then rely on the mitigation measures in determining that the overall effects would not be significant …. In those instances, agencies should make the FONSI and EA available for 30 days of public comment before taking action. Section 1501.4(e)(2)." *Id.*

116.    Public review of a FONSI also is necessary because (1) there is a reasonable argument for preparation of an EIS for the CMP Project; (2) there is scientific and public controversy about the Project; (3) the Project is closely similar to ones that normally require an EIS; and (4) portions of the Project will be located in wetlands.

117.    The Corps failed to make the EA/FONSI for the CMP Project available for 30 days of public comment before taking action, and Corps is unlawfully withholding that public comment opportunity despite its legal obligation to provide it.

118.    The Corps' action was not in accordance with NEPA and its implementing regulations and was arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, otherwise not in accordance with law, and unlawfully withheld. 5 U.S.C. § 706(1), (2).

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that the Court:

119.    Declare that the EA/FONSI for the CMP Project violates NEPA and the APA;

120.    Declare that the Corps' decision to issue a FONSI instead of an EIS for the CMP Project violates NEPA and the APA;

121.    Vacate, set aside, and remand the EA/FONSI consistent with the requirements of NEPA and the APA;

122.    Enjoin Defendants from authorizing project construction and operation until they have fully complied with all of their obligations under NEPA and the APA, and until Defendants ensure that CMP has obtained all required permits required for the Project;

123.    Award Plaintiffs their reasonable attorneys' fees and costs; and

124.    Grant Plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully submitted this 27th day of October, 2020.

/s/ Susan Ely
Susan Ely
Maine Bar # 005087
Natural Resources Council of Maine
3 Wade Street
Augusta, ME 04330
(207) 430-0175
sely@nrcm.org

Kevin Cassidy
(*pro hac vice* admission forthcoming)
Earthrise Law Center
P.O. Box 445
Norwell, MA 02061
(781) 659-1696
cassidy@lclark.edu

COMPLAINT                                                                              38

Lia Comerford
(*pro hac vice* admission forthcoming)
Earthrise Law Center
10101 S. Terwilliger Blvd.
Portland, OR 97236
(503) 768-6823
comerfordl@lclark.edu

*Attorneys for Plaintiff*