UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

SIERRA CLUB, *et al.*,                    )
                                          )
          Plaintiffs                      )
                                          )
     v.                                   )          No. 2:20-cv-00396-LEW
                                          )
UNITED STATES ARMY CORPS                  )
OF ENGINEERS, *et al.*,                   )
                                          )
          Defendants                      )
                                          )
     v.                                   )
                                          )
CENTRAL MAINE POWER CO.,                  )
                                          )
          Intervenor Defendant           )

**ORDER ON MOTION TO SUPPLEMENT OR AMEND COMPLAINT
AND MOTION FOR PRELIMINARY INJUNCTION**

The Sierra Club, the Natural Resources Council of Maine, and the Appalachian Mountain Club ("Plaintiffs") filed this civil action to challenge the decision of the United States Army Corps of Engineers ("the Corps") to issue a permit to Intervenor Defendant Central Maine Power Company ("CMP") under section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act. The Corps' decision turns on the Corps' finding that the permitted activities are not likely to have a significant adverse environmental impact on waters of the United States and, therefore, do not require the Corp to prepare an environmental impact statement.

The matter is before the Court on Plaintiffs' Motion for Leave to Supplement the Complaint (ECF No. 40) and Motion for Preliminary Injunction (ECF No. 18). Plaintiffs' Motion for Leave is hereby summarily GRANTED without further discussion. Plaintiffs' Motion for Preliminary Injunction is DENIED for reasons set forth at length below.

## BACKGROUND STATEMENT

Central Maine Power Company proposes to construct the New England Clean Energy Connect ("NECEC"), an electricity transmission project that would connect Hydro Quebec to the New England energy grid ("the NECEC Project" or "the Project").[1] After proceedings by the Maine Department of Environmental Protection, the Land Use Planning Commission, and the Public Utilities Commission, the Project has evolved in a variety of ways designed to reduce its environmental impact and the Project has been green lighted by the State to begin construction. More specifically, the Maine Public Utilities Commission granted the Project a certificate of public convenience and necessity. The Commission's certificate has been subjected to legal challenge and that challenge has failed. *NextEra Energy Res, LLC v. Maine Pub. Util. Comm'n*, 227 A.3d 1117 (Me. 2000).

Because the Project passes over waters of the United States ("WOTUS"), inclusive of adjacent wetlands, and because the Project proposes both temporary and permanent fill of wetlands, CMP must obtain a permit from the Army Corps of Engineers under the Clean Water Act, 33 U.S.C. §§ 1251 *et seq*. Additionally, because the Project proposes that CMP

---

[1] Although the NECEC Project affects the entire New England energy grid, which includes Maine's population centers, the primary anticipated beneficiaries of the project in terms of the volume of energy consumed are the much larger population centers in Massachusetts. Legislative initiatives in Massachusetts are, in fact, the impetus for the Project. *See Next Era Energy Res*, *LLC v. Maine Pub. Util. Comm'n*, 227 A.3d 1117, 1119-20 (Me. 2020).

will bore a channel beneath the Kennebec River using horizontal directional drilling (HDD), CMP also must obtain a permit from the Corps under the Rivers and Harbors Act, 33 U.S.C. § 403. *See also* 33 C.F.R. § 322.3. The Corps' exercise of CWA and RHA permitting authority over the Project is subject to the National Environmental Policy Act, 42 U.S.C. §§ 4331 *et seq.*, which requires the Corps to assess the environmental impacts of these proposed actions before permitting them.

On July 7, 2020, the Corps memorialized its NEPA assessment in a document entitled Department of the Army Environmental Assessment and Statement of Findings for the [NECEC Project] (hereafter "EA") (ECF No. 19-6). The Corps concluded its EA with a finding that the proposed actions subject to its CWA/RHA permit review authority do not amount to "a major federal action significantly affecting the quality of the human environment." EA at 160 § 12.3. The Corps then provided CMP with an "initial proffered permit" and, after reviewing CMP's objections to certain permit conditions, produced an EA Addendum (ECF No. 19-13) that "finalized" the permit on November 6, 2020.

The Corps's EA is subject to judicial review under the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq. U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (to be final, agency action must consummate the decisionmaking process and determine rights and obligations such that legal consequences follow)).[2] Plaintiffs contend the Corps abused its discretion when it found the proposed actions are not a major federal action and they ask this Court

---

[2] The Corps and CMP argue Plaintiffs filed suit too soon because they filed after the Corps produced its initial EA but before it finalized its permit. Primarily to avoid stumbling over this technical legal hurdle, and to address issues related to the Corps' revision of its EA through an Addendum, Plaintiffs filed their Motion to Supplement (ECF No. 40).

to vacate the Corps' EA, remand the CWA and RHA permit applications for further NEPA proceedings, and enjoin construction of the NECEC until the Corps produces an environmental impact statement for the Project.

## LEGAL BACKDROP

The Clean Water Act (CWA) is part of "a comprehensive legislative attempt 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985) (quoting 33 U.S.C. § 1251). Section 404 of the CWA assigns the Corps jurisdiction to issue permits following public hearings, which permits, if granted, authorize the discharge of "any pollutant," including "fill material," into "navigable waters." 33 U.S.C. §§ 1342(a)(1), (4), 1344(a).

The CWA defines "navigable waters" as "the waters of the United States" (hereafter "waters" or "WOTUS"). *Id.* § 1362(7). That definition "makes it clear that the term 'navigable' … is of limited import." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985). However, the CWA's definition of waters necessarily "delineates the geographic reach" of the Corps' permitting power. *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 625 (2018). As construed by the Supreme Court, the definition authorizes the Corps to extend its permitting authority at least as far as "wetlands adjacent to navigable waters." *Id.* (citing *Riverside*, 474 U.S. at 133). As explained in *Riverside*, it is reasonable for the Corps to exercise CWA jurisdiction over wetlands because it is reasonable for the Corps to conclude "that wetlands may affect the water quality of adjacent lakes, rivers, and streams." 474 U.S. at 134.

The Corps also has jurisdiction under Section 10 of the Rivers and Harbors Act (RHA) to authorize "any obstruction" of "the navigable capacity of any of the waters of the United States." 33 U.S.C. § 403. Pursuant to the Corps' regulations, "[f]or purposes of a section 10 permit, a tunnel or other structure or work under or over a navigable water of the United States is considered to have an impact on the navigable capacity of the waterbody." 33 C.F.R. § 322.3(a). Here, the proposed HDD activity is subject to RHA review. CMP's handling of extracted materials during this activity is also subject to the Corps' CWA oversight, if only to ensure that the materials are not released into the River or other waters and/or wetlands.

The Corps' does not exercise its CWA and RHA permit authority in a silo. The Corps takes into consideration other federal statutory schemes and regulations, as applicable, and the Corps generally considers inputs from federal and state regulatory agencies when reviewing permit applications, all of which it did for the NECEC.

Of particular significance to this civil action, the National Environmental Policy Act requires federal agencies to take a hard look at environmental concerns before approving actions that require federal permits or other forms of authorization. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976). More specifically, NEPA requires federal agencies "to the fullest extent possible" to:

> (A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making which may have an impact on man's environment;
>
> (B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality [to] insure that presently unquantified

environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations;

(C) include in every recommendation or report on proposals for … major Federal actions significantly affecting the quality of the human environment, a [detailed environmental impact statement with five subject areas[3]];

(D) [independently evaluate the relevant findings of state agencies or officials with statewide jurisdiction over the project to the extent they contribute to the preparation of any statement required in subparagraph (C)];

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to

---

[3] The five subject areas for detailed discussion, when applicable based on a "significant" impact finding, are:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). Furthermore:

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes[.]

*Id.*

maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

42 U.S.C. § 4332(2) (alterations my own).

These requirements are "designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983). NEPA "'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action' and to 'ensure[] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process.'" *Mayaguezanos por la Salud y el Ambiente v. United States*, 198 F.3d 297, 300 (1st Cir. 1999) (quoting *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983)). However, these requirements "<u>are procedural in nature and are not intended to dictate any particular substantive outcome</u>." *Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. F.A.A.*, 651 F.3d 202, 217 (1st Cir. 2011) (emphasis added).

As reflected in § 4332(2)(C), the Corps is required to consider whether a project is a "major Federal action[] significantly affecting the quality of the human environment." When federal involvement is limited to the exercise of permit review authority for private

activity[4], the exercise of that authority can result in major federal action where the permitted action is itself major and subject to the agency's power to prevent or influence results. *Mayaguezanos*, 198 F.3d at 302 ("[W]e look to whether federal approval is the prerequisite to the action taken by the private actors and whether the federal agency possesses some form of authority over the outcome.").[5]

The parties dispute whether the Corps' exercise of its authority to grant CMP's CWA and RHA permit applications is a "major federal action" that requires an "environmental impact statement" ("EIS") under 42 U.S.C. § 4332(2)(C). The Corps' process of making that determination began—and here ended—with an environmental assessment. If the Corps' EA reasonably demonstrates that the permitted actions will not produce significant impacts on the human environment, then the Corps was not required to go the extra distance to produce an EIS and permissibly concluded its NEPA review with a "finding of no significant impact" ("FONSI"). 40 C.F.R. § 1508.9(a) (2018) (superseded effective Sept. 14, 2020).[6]

---

[4] The NECEC is not a federal project and there is no federal statute that imposes on the Corps project-wide control and oversight, unlike, for example, FERC's responsibility to review natural gas pipeline projects under the Natural Gas Act, *see, e.g.*, *Twp. of Bordentown*, *New Jersey v. Fed. Energy Regulatory Comm'n*, 903 F.3d 234, 243 (3d Cir. 2018), or the Forest Service's responsibility to review programs and projects that take place in a national forest under the National Forest Management Act, *see, e.g.*, *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 441 (7th Cir. 1990).

[5] Regulations issues by the Council on Environmental Quality (CEQ) state that NEPA's "federal actions" include both the federal government's own actions, such as promulgation of a rule or construction of a public project, as well as government actions that authorize non-federal activities, such as approving private projects "by permit or other regulatory decision." 40 C.F.R. § 1508.18(a), (b)(4) (2018) (superseded effective Sept. 14, 2020). "The CEQ's regulations clarify that the term 'major' 'reinforces but does not have a meaning independent of significantly,' *id.* § 1508.18, and explain that interpretation of the term 'significantly' entails case-by-case consideration of the context of the action and the severity of its impact, *id.* § 1508.27." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015).

[6] "The importance of an EA or an EIS lies not merely in the aid it may give to the agency's own decisionmaking process, but also in the notice it gives the public of both the environmental issues the agency

## THE PROJECT

The NECEC Project is a large-scale electrical power transmission project proposal designed, principally, to connect a source of non-fossil-fuel energy (Hydro Quebec) with a New England population center (Massachusetts). The Project is divided into five segments. Segment 1, the most controversial segment, involves the creation of a new transmission line corridor over 53 miles of forested terrain in the western Maine mountain region. Segments 2 through 5 involve expansion and upgrade of an existing transmission line corridor. Based on Plaintiffs' presentation thus far, Segment 1 of the Project is the primary driver of this litigation.

As a result of regulatory review by state agencies, several requirements have been imposed on or assumed by CMP related to cutting and clearing activity. The Corps has adopted these requirements as special conditions of the Corps' permit. EA at 156-57 § 11.2(15)-(19). Relative to watershed concerns, these requirements include buffers of 100 feet for fisheries habitat and 75 feet for other rivers, streams, and brooks. *E.g.*, EA at 16 ("All streams identified as Atlantic salmon habitat will have a 100-foot riparian buffer and any non-capable species [of tree] exceeding 10 feet will remain within the stream buffer

---

is aware of and those it has missed." *Illinois Commerce Comm'n v. I.C.C.*, 848 F.2d 1246, 1260 (D.C. Cir. 1988). Ordinarily, preparation of an EIS opens the door to greater scrutiny by the public and other branches of the government by exposing in greater detail the reasoning and data the agency relies on to determine that a particular project or particular component of a project is well designed to avoid unnecessary harm to environmental resources. *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 92-94 (2d Cir. 1975). Still, even the preparation of an EA can be a rather elaborate process, and even an EA includes public notice and comment. *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763–64 (2004).Where it is obvious that a permitted action would be major in its impacts on the human environment, the Corps need not draft an EA and may, instead, get on with the business of preparing an EIS. "The purpose of an EA is simply to help the agencies decide if an EIS is needed." *Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir. 1985).

outside the wire zone."). Within Segment 1, CMP will apply buffers to <u>all</u> riparian crossings. Additionally, the entire length of Segment 1 involves a buffered approach to cutting outside the 54-foot wide wire zone.  EA at 18. In the other Segments, CMP will apply buffers to "all coldwater fisheries." EA at 11. This does not mean that no trees will be cleared in the buffers. In Segment 1, for example, capable tree species – those trees capable of growing to heights that would threaten the transmission lines – would be cleared in the wire zone, and all other species of woody vegetation would be cut back to a height of 10 feet. Forest clearing and thinning activity is also scheduled for the winter months to reduce soil disturbance and other surface impact. After the Corridor is cut, proposed maintenance includes periodic application of "environmentally friendly … chemical treatments." However, "CMP has committed to not using herbicides in any location along the 53.1 miles of new corridor (Segment 1) or proximate to waterways or rare plants to include federally listed small whorled pogonia." EA at 10. See also EA at 13 ("Herbicides will not be used within the stream buffers [or] within 25 feet of standing water."). Installation of the Project, as proposed, also involves temporary fill of wetlands with construction pads that enable equipment to transit certain wetlands with less intensive resulting impact for purposes of tree cutting, hole drilling and pole-installation activity.[7] These requirements and others not specified in this Order reduce, but do not negate impacts to fisheries habitat, vernal pools, and wetlands resulting from, for example, increased sunlight infiltration producing increased water temperatures and decreased contribution of woody debris to habitats.

---

[7] CMP is required to place temporary bridges that fully span streams over which work crews transit.

The project also involves permanent fill of wetlands to install 98 support poles (of a total of roughly 1,450 poles) and to expand or build electrical stations along the Corridor.

As for the path and footprint of the project ("the Corridor"), the motion record includes the following information.

### Segment 1

Segment 1, as proposed, would run by means of overhead transmission lines 53 miles from the Maine-Canada border at Beattie Township to the Forks Plantation. The Corridor would run in a generally eastward direction until the western edge of Parlin Pond Township, where the line would veer southward through Johnson Mountain Township before cutting east and crossing Moose Alley (U.S. Route 201) and then dropping south again through West Forks Plantation and into Moxie Gore Township where the line would cross the Kennebec River along the boundary between the West Forks and Moxie Gore, CMP would construct a transition station on each side of the Kennebec River and run its transmission lines between the two transition stations by horizontal directional drilling (HDD) of a tunnel[8] beneath the Kennebec River. After this subterranean crossing, the Corridor would once more be an overhead transmission line that would travel in a generally southerly direction until meeting an existing transmission corridor at the north eastern edge of the Forks Plantation.

Although CMP has acquired a 300-foot right of way for the NECEC in Segment 1, CMP is not authorized by state regulators—and does not itself propose—to clear cut the

---

[8] CMP's original proposal was to span the River with overhead lines, but it amended its proposal "to eliminate visual impacts on recreational users of this Outstanding River Segment and the associated concerns of environmental regulators, the host communities, and other stakeholders." EA at 89.

entire width of its right of way in Segment 1. Instead, CMP would use the southern 150 feet, in which it would cut a swath approximately 54 feet wide and gradually increase tree heights toward the edge of the 150-foot corridor.

The transmission line in Segment 1 would cross over parts of 481 freshwater wetlands, 300 rivers, streams or brooks (most of which are fishery habitat), and 6 water bodies designated Inland Waterfowl and Wading Bird Habitats. The line support structures (principally poles) are spaced at a significant distance (on average 900 feet) and are tall enough to make the line stand proud of the surrounding canopy. In 12 wildlife areas totaling about 14 miles, the poles will be tall enough to permit full height vegetation. EA at 12, 18.

### Segment 2

In Segment 2, the NECEC would join an existing 150-foot wide transmission corridor and, over its 22-mile run upgrade and widen by 75 feet the existing corridor. In Segment 2 the existing corridor crosses the Appalachian Trail three times.[9] Segment 2 terminates at the Wyman Dam hydroelectric facility where there is an existing overhead crossing of the Kennebec River.

The Corps states that the freshwater impacts are largely avoided in this segment because they are crossed by overhead lines. However, 1.13 acres of forest cover for wading bird habitat and 18 vernal pools will be converted to scrub/shrub.

---

[9] CMP's proposal is to use nonreflective cable housings near the AT crossing and allow a greater canopy height beneath the line. CMP's proposal also would adjust the AT so hikers would pass beneath the Corridor one time rather than three.

**Segments 3 and 4**

In Segments 3 and 4, which run 70 and 16 miles, respectively, the Corridor would continue to follow an existing transmission corridor but widen it by an average of 75 feet. These Segments would extend the NECEC from Wyman Dam southward to a proposed new converter station on the Merrill Road in Greene. From Greene, the Corridor continues through three existing substations in Lewiston, before terminating at a proposed new substation in Pownal.

The existing corridor in these Segments makes a second crossing of the Kennebec River (at Wyman Dam) and crosses the Carrabassett River and the Sandy River. There are more than 200 streams and brooks along the Corridor in these two Segments, 84 of which contain fisheries habitat. Conversion of tree cover for 5.65 acres will impact 9 wading bird habitats in Segment 3. Conversion of 4.4 acres of cover in Segment 4 will impact 6 vernal pools.

**Segment 5**

Segment 5 involves upgrades to 26 miles of an existing transmission line corridor between the Coopers Mills substation in Windsor, Maine and the Maine Yankee substation in Wiscasset. This separate corridor passes over but does not touch down in 159 wetlands and 104 rivers, streams, or brooks, including the Sheepscot River. CMP proposes to clear roughly 19 acres to widen this corridor. Cover conversion will also occur for some wetlands/vernal pools.

## Cumulative WOTUS Impacts

Permanent fill impacts for wetlands along the Corridor's entire run are envisioned for roughly 82 wetlands. These wetlands would experience partial, not total fill. In addition, 83 vernal pools will be partly, permanently filled. EA at 3. These impacts result in part from the placement of support structures to carry the transmission line. The Corps states that 98 support poles (of a total of roughly 1,450) will be placed in wetlands. The footprint of these structures (e.g., cement fill) would vary between 30 and 195 square feet. Total permanent wetland fill for all 98 wetland-embedded support structures is less than one-half acre. Permanent wetland fill associated with the larger structures (the transition stations and substations) is estimated to be under 5 acres.

The total surface area of land existing in the proposed NECEC Corridor is said to be 8,600 acres. Of this approximately 1,500 acres (17.4%) constitute waters of the U.S. (inclusive of wetlands). Total conversion of the forest canopy is said to be in excess of 1,000 acres, but only 111.44 of these acres provide canopy to waters of the United States.

## Non-WOTUS Environmental Impacts

In addition to WOTUS impacts, the NECEC Project would impact the human environment in other ways. The Corps' EA discusses these impacts as "project elements … that do not impact navigable or other waters of the U.S." EA at 4. It is not necessary for me to cover that ground in this Order because the issue before me is, in part, whether these other environmental impacts are necessary inputs in the Corps' assessment of whether its exercise of permitting authority is a major federal action. If these other impacts are necessary inputs, one could much more readily second guess the Corps' EA. Indeed, a

remand would be necessary given the Corps' specific indication that it did not include these other impacts in its finding of no significant impact.

Most obvious here is the fact that Segment 1 involves a new permanent corridor through western Maine woodlands. Although the Corps opines that the impact is not so substantial given that the Segment 1 right of way runs through managed timberlands (which the Corps describes as "heavily managed" "working forests" – EA at 4, 9), a reasonable person would appreciate the view of the Land Use Planning Commission that impacts on "scenic and recreational values" will be adverse. Order Granting Certificate of Public Convenience and Necessity at 6 (ECF No. 19-19). Carey Kish, one of Plaintiffs' hearing witnesses, shares my own view that these lands, managed or not, afford a "vast, grand view scape of mountains and valleys and rivers and streams and lakes and ponds all relatively undisturbed by human activity, which, while not true wilderness with a capital W, is nonetheless some of the wildest and remote country not only anywhere in Maine, but in the northeastern United States." Declaration of Carey Kish ¶ 14 (ECF No. 18-1) & Hr'g Testimony. Furthermore, as described by Dr. David Publicover in his declaration (ECF No. 18-10) and hearing testimony, there are many ecological values within the Corridor's footprint other than WOTUS values. These include fauna concerns like deer wintering areas, nesting eagles, and Canada lynx, and flora concerns like small whorled pogonia and Jack Pine communities.[10]

---

[10] Agencies reviewing this Project have imposed a host of conditions to mitigate ecological impacts in Segment 1. For example, CMP must comply with state requirements to substantially reduce cutting in twelve wildlife travel areas to preserve some wildlife travel corridors and reduce the negative impact of the NECEC's transit through deer wintering areas (DWA). Long-term corridor maintenance practices in these areas would attempt to foster conifer growth that provide winter cover for deer. At the Moxie Gore crossing, where the transmission line would pass beneath the Kennebec River, tree cutting adjacent to the Kennebec

DISCUSSION

The Corps' limited its NEPA review of CMP's CWA and RHA permit applications to an Environmental Assessment (EA) (ECF No. 19-6 (EA) & 19-13 (Addendum)) that concluded with a finding of no significant impact (FONSI) (EA at 160 § 12.3). In the Corps' view, the FONSI is appropriate because the CWA and RHA components of the larger NECEC Project will not significantly affect the human environment.

Plaintiffs challenge the FONSI as unreasonable and argue that a project the size and scope of the NECEC cannot be permitted by the Corps unless and until the Corps prepares an EIS for the entire Project that describes the environmental impacts holistically and in detail and subjects the EIS to public review and comment.

The Corps and CMP, on the other hand, argue that Plaintiffs are unreasonably attempting to make the Corps of Engineers arbiter of all environmental impacts generated by the NECEC even though it is a private project and the Corps' jurisdiction is limited to safeguarding waters of the United States. In their view, the Corps paid greater than necessary homage to NEPA, but also reasonably concluded that the CWA and RHA components of the Project will not significantly affect the quality of the human environment when one considers the cumulative impact of these components on a watershed scale.

## A.  Standard of Review

Injunctive relief is "an extraordinary and drastic remedy that is never awarded as of

---

River is minimized to avoid disrupting the scenic quality of the River in that location. The transition stations are well set back to not be seen by persons recreating on the River.

right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations and quotation marks omitted). "To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet*, *Inc. v. Rainbow Treecare Sci. Advancements*, *Inc*., 794 F.3d 168, 171 (1st Cir. 2015). As the party seeking injunctive relief, Plaintiffs bear the burden of establishing that the factors weigh in their favor. *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 117, 119-20 (1st Cir. 2011).

"Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick*, *Inc. v. Baccarat*, *Inc*., 102 F.3d 12, 16 (1st Cir. 1996). On this issue "the district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Corp. Techs*., *Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross–Simons*, 102 F.3d at 16). If the party seeking injunctive relief fails to make a persuasive showing of likelihood of success, then generally the court acts within its discretion if it denies relief without addressing the remaining factors. *New Comm. Wireless Servs*., *Inc. v. SprintCom*, *Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."). However, a likely NEPA violation does not automatically call for an injunction if the balance of harms points the other way. *Conservation Law Found*., *Inc. v. Busey*, 79 F.3d 1250, 1272 (1st Cir. 1996). *See also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010) ("It is not enough for a court considering a [NEPA] request for injunctive relief to ask whether

there is a good reason why an injunction should not issue; rather, a court must determine

that an injunction should issue under the traditional four-factor test ….”).

Plaintiffs' ability to demonstrate a likelihood of success depends on their ability to

demonstrate that the Corps' FONSI was “arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). When reviewing an agency's

NEPA compliance under the Administrative Procedures Act, my “only task is to determine

whether the [agency] has considered the relevant factors and articulated a rational

connection between the facts found and the choice made.” *Baltimore Gas & Elec. Co. v.

NRDC*, 462 U.S. 87, 105 (1983) (citations omitted). To uphold challenged agency action,

I must be satisfied that the Corps fulfilled its procedural duties under NEPA and gave “good

faith consideration to the environmental consequences of its actions,” but I “should not

pass judgment on the balance struck by the agency among competing concerns.” *Grazing

Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1072 (1st Cir. 1980) (Coffin, J.).

“While this is a highly deferential standard of review, it is not a rubber stamp.”

*Dubois v. U.S. Dep't of Agriculture*, 102 F.3d 1273, 1285 (1st Cir. 1996) (quoting *Citizens

Awareness Network*, *Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 290 (1st

Cir.1995)). In the final analysis, the decision must make sense, and only through careful

review of the record can I “ensure that agency decisions are founded on a reasoned

evaluation of the relevant factors.” *Marsh v. Oregon Natural Resources Council*, 490 U.S.

360, 378 (1989). I am not empowered to substitute my judgment for that of the Corps. [11]

---

[11] My personal opinion on the Project is, of course, utterly immaterial to the decision. *Vermont Yankee
Nuclear Power Corp. v. Nat. Res. Def. Council*, *Inc.*, 435 U.S. 519, 558 (1978) (“Administrative decisions
should be set aside in this context, as in every other, only for substantial procedural or substantive reasons
as mandated by statute, not simply because the court is unhappy with the result reached.”).

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

If the record reveals it likely that the Corps paid heed to NEPA's procedural dictates, considered the relevant factors, and adequately explained its rationale, and did not clearly err in its judgment, then I should deny Plaintiffs' motion for a preliminary injunction. *Id; Penobscot Air Servs.*, 164 F.3d at 719 n.3; *Grazing Fields*, 626 F.2d at 1072.

### B.  Analysis

#### 1.  *Likelihood of Success*

The merits issues before me for preliminary estimation are whether the Corps abused its discretion when it declined to weigh every environmental impact of the entire NECEC in its EA/FONSI and, if not, whether the Corps abused its discretion when it determined that the cumulative impacts to WOTUS do not cross the significance threshold that would require preparation of and EIS. Unless Plaintiffs can demonstrate likelihood of success on one of these issues their request for a preliminary injunction should be denied. Before addressing these core issues, I will address two ancillary issues Plaintiffs raised in their Motion for Preliminary Injunction: (a) that the Corps arbitrarily removed a special condition that forestalled construction activity pending the Department of Energy's approval of the border connection and (b) that the Corps needed to provide its EA to the public and allow 30 days for comment. I will then consider the central argument in terms of (c) the Corps' decision to limit the scope of its review to WOTUS impacts and (d) the reasonableness of its FONSI given that narrow scope of review.

       a.   Special Condition 3

Plaintiffs assert that the Corps' removal of Special Condition 3 was arbitrary and capricious. Special Condition 3 of the initial proffered permit stated work could not begin until CMP obtained a presidential permit from the Department of Energy. Plaintiffs argue the Corps owes an explanation why it withdrew Special Condition 3 following CMP's letter response to the initial proffered permit. Motion at 30-32.

The Corps keeps a regulation to "guide" determinations about the "timing of processing of applications." 33 C.F.R. § 325.2(d). The relevant guidance states: "Permits granted prior to other (non-prerequisite) authorizations by other agencies should, where appropriate, be conditioned in such manner as to give those other authorities an opportunity to undertake their review without the applicant biasing such review by making substantial resource commitments on the basis of the DA permit." *Id.* § 325.2(d)(4).

In the EA Addendum, the Corps explained that the condition was "not necessary to satisfy the public interest requirement and not directly related to the aquatic resource impacts evaluated as part of the Corps review." EA Addendum at 1. That is an explanation concerning a discretionary exercise of permitting authority. Moreover, the regulation is advisory, not mandatory. I am not persuaded that it is appropriate for me to overrule the Corps' exercise of permitting discretion in this regard.

Plaintiffs' argument appears, in part, to presume that it is the legal obligation of some federal agency to produce an EIS for the entire private NECEC Project before CMP can start work. At least as of this stage of the proceedings, they have not persuaded me that NEPA requires the DOE to produce an EIS of the entire Project, or that the Corps cannot

authorize CMP to take actions that impact WOTUS pending DOE's review of the border-crossing connection. In their Reply, Plaintiffs also suggest that DOE's review of the application for a presidential permit will turn in some way on DOE's consideration of aquatic resources, but they do not elaborate on this contention and it is not evident why that would be the case. Given that Plaintiffs bear the burden of persuasion on the Motion, and given Plaintiffs' failure to make a persuasive presentation in that regard, I decline to enjoin work on the Project pending DOE's issuance of a presidential permit allowing connection at the border.

### b.  Further Public Comment

Plaintiffs also argue a preliminary injunction is needed to protect the public's interest in commenting on the EA itself. Motion at 29-30. The Council on Environmental Quality (CEQ) has stated that a federal agency reviewing a project that integrates mitigation measures can rely on the mitigation measures in support of a FONSI, but "should" then make the FONSI available for public comment before issuing a permit. Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18038 (Mar. 23, 1981). In contrast to the CEQ's FAQ document, its NEPA regulations call upon agencies to "involve" the public "to the extent practicable," 40 C.F.R. § 1501.4(b) (2018), to make a FONSI "available to the affected public as specified in § 1506.6" (a FOIA provision – not an affirmative disclosure obligation), *id*. § 1501.4(e) (2018); to give the public notice of NEPA-related hearings and public meetings, which hearings and meetings should be held "whenever appropriate or in accordance with statutory requirements applicable to the agency," *id*. § 1506.6(b), (c)

(2018); and to make findings "available to the public pursuant to the provisions of the Freedom of Information Act, *id.* § 1506.6(f) (2018). Only when a FONSI addresses proposed action that would ordinarily require an EIS or is "without precedent" must the agency allow the public 30 days for review of and comment on a FONSI. *Id.* § 1501.4(e)(2) (2018).

I do not believe that the CEQ's public comment regulations support a preliminary injunction. After all, the Corps did provide public notice and held a public hearing as part of its EA review process. The Corps' public hearing complemented other public hearings associated with the Project but overseen by other agencies. Before I would countermand the judgment of the Corps that a 30-day period for public review and comment concerning the EA would not be practicable, I would expect Plaintiffs to identify some critical deficiency in the information available to the public as of the date of the public hearing. Yet Plaintiffs have not demonstrated that the materials that were available for the public hearing were critically deficient in some regard and that the deficiency would have been remedied had the Corps allowed for the public to review and comment on its EA draftsmanship. Furthermore, to the extent Plaintiffs rely on the CEQ's FAQ, the FAQ is not mandatory.

Although I might have exercised discretion differently, I am not persuaded that the law compels the Corps to publish its draft and allow 30 days for public feedback. Plaintiffs lean heavily on the FAQ document, which document likely amounts to an interpretive rule lacking the force of law, *New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir.

2018), but which is, more importantly, stated in advisory rather than mandatory terms.[12] Because it is not clear that any applicable regulation mandates a different approach than what happened before the agency, it is not readily apparent to me that there is a good and valid reason, let alone an adequate hearing record, for me to substitute my own judgment about the practicable extent of public involvement, unless I am persuaded that the Corps' FONSI likely was erroneous and that an EIS is needed.[13]

### c.   Scope of Review

Plaintiffs argue they must merely show that the Corps' determination that a roughly 200-mile transmission corridor that cuts a new, 53-mile permanent path through undeveloped timberlands, cuts through deer yards, bores a hole underneath the Kennebec River, constructs new terminal stations on either side of the Kennebec River, encumbers the artistry of the existing Appalachian Trail crossing, widens by on average 75 feet the remaining 147 miles of corridor, and constructs two new substations affects the human environment in a significant way.  When it's put like that, the answer seems obvious.

However, the fulcrum upon which the Corps' EA pivots is the idea that the Corps does not have to exercise NEPA review beyond the limited scope of the clean water

---

[12] Plaintiffs also cite *Sierra Club v. Wagner*, where the Court of Appeals stated: "An agency that adopts a FONSI without seeking input can be expected at least to accept comments before acting on the merits of a decision[.]" 555 F.3d 21, 31 (1st Cir. 2009). In *Wagner*, the Forest Service circulated for public review drafts EAs that evidently did not include the agency's FONSIs. The Court of Appeals did not find that to be a cause for concern. Here, the Corps sought public input through its public hearing process. Having done so, the expectations established in *Wagner* is not on point.

[13] During the briefing cycle, Plaintiffs brought to my attention the fact that EPA took issue with the timing of the Corps' public notice and thought the Corps should issue another notice after consolidating and organizing the available information that was then existing in part with Maine DEP and in part with the Corps. *See* Apr. 25, 2019 EPA Region 1 Letter to USACE re. Public Notice at 3 (ECF No. 39-1). However, the Corps did not conduct its public hearing until December and I lack the ability on the current record and briefing to assess the adequacy of the information available to the public by the December timeframe.

interests that make it a federal permitting authority for this project. This position is clearly stated in the EA:

> Many public comments expressed concerns about forest and habitat fragmentation, especially in Segment 1. As noted above, the USACE's jurisdiction and the scope of USACE NEPA analysis is limited to the proposed impacts to waters of the U.S. and the immediately surrounding uplands to facilitate the regulated work. Upland forest fragmentation is outside the scope of this EA.

EA at 51.

The Supreme Court instructs that "courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 & n. 7 (1983)). In *Public Citizen*, the Court observed that an agency's NEPA responsibility to account for environmental effects should be a function of the agency's "authority to prevent the effect." *Id.* The ability of a party to make a "but for" argument "is insufficient to make an agency responsible for a particular effect." *Id.*

Whether the exercise of permitting authority over part of a project will impose NEPA procedural responsibility for other parts or for an entire project involves "policy considerations" related to the legal responsibility of administrative agencies. *Id.* It also requires consideration of whether the additional procedural burden is useful to the process of determining whether to issue the permit. *Id.* My own reflection on these cautionary words suggests to me that because it is doubtful that the Corps has the final authority and responsibility to decide whether or not a transmission line project can run through Maine's western mountain region and the non-wetland values present in it, it is unreasonable to

expect the Corps to prepare an EIS for all regional impacts associated with the Project. Instead, we must expect the Corps to evaluate the Project in terms of its impacts on WOTUS.

Of course, the Corps' EA discusses at some length environmental impacts beyond those associated with the Corps preliminary "limited jurisdiction" statement. That begs the question whether the discussion of so many environmental concerns is a tacit acknowledgement of a proximate connection between the Corps' regulatory oversight of WOTUS and the wider regional environmental impacts of the completed Project. As of this writing, I think the answer is likely to be no. Although it may be odd that the Corps would adorn its EA with the discussion of impacts it would not place on the EA/EIS scale, it is not unlawful for it to do so. There is no harm in producing a document that serves the witness-bearing procedural interests that inform the NEPA-review process. Moreover, the Corps' acknowledgment of these other environmental concerns strikes me as a perfectly reasonable response to public commentary, including commentary by organizations like Plaintiffs. For it now to be used as a forensic clue of the Corps' capriciousness seems especially rich. Public comments thoroughly addressed the wider implications of the overall project. Having conducted a public hearing and having elicited this information, it would have been solipsistic of the Corps to ignore the public's wider concerns altogether.[14]

---

[14] The Corps' announcement of public hearing advised interested persons:

> The decision whether to issue a permit will be based on an evaluation of the probable impact of the proposed activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefit, which may reasonably accrue from the proposal, must be balanced against its reasonably foreseeable detriments. All factors which may be relevant to the proposal will be considered, including the cumulative effects thereof; among those are: conservation, economics, aesthetics,

In short, the fact that the Corps expanded its EA to acknowledge regional impacts, the work of state regulatory agencies related to these concerns, and mitigation and compensation beyond the Corps' own WOTUS mitigation and compensation requirements,[15] does not prove that the EA fails to set forth a concise assessment of WOTUS impacts in its pages.

NEPA is a process statute for the environment. *Sierra Club v. Marsh*, 872 F.2d 497, 502 (1st Cir. 1989). How much of a process is required to shepherd stakeholders through the review of a permit-application depends on the circumstances of the proposed action, but it is not unlawful to give more process or more consideration than necessary.[16] And where the Corps must evaluate whether components of a major private undertaking are major in terms of their impact on WOTUS, there is no procedural harm in taking stock of

---

general environmental concerns, wetlands, cultural value, fish and wildlife values, flood hazards, flood plain value, land use, navigation, shoreline erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food production and, in general, the needs and welfare of the people.

Announcement of Public Hearing at 2 (ECF No. 31-3).

[15] The following mitigation/compensation measures are highlighted in the Corps' EA:

To specifically address USACE requirements as they relate to unavoidable direct and indirect impacts to aquatic resources, the applicant has proposed to contribute $3,046,648.37 to Maine's In Lieu Fee Program (ILF), the Maine Natural Resources Conservation Program, and preserve approximately 1022.4 acres of land on three parcels containing a total of 510.75 acres of wetland, 3.95 miles of streams, 16 vernal pools, 75 acres of state mapped Inland Wading Bird and Waterfowl habitat, and 511.65 acres of upland buffer.

EA at 24. These measures in part imposed on and in part assumed by CMP exceed the Corps' regulatory requirements by a considerable margin. EA at 24-34 § 1.3.2.

[16] *See*, *e.g*., *Wagner*, 555 F.3d at 30-31 ("The Forest Service did no EIS but also did not brush off environmental concerns. Its EAs are lengthy by any standard (appendices aside, the Than EA is 194 pages and the Batchelder EA is 146 pages) addressing in detail the environmental concerns that might arise before concluding that, as subject to intended mitigation, the impacts were not significant. The substantive decisions thus did not ignore the possible environmental effects. … Possibly little was saved by doing EAs of this character instead of EISs, but it is not clear that anything was lost.").

the wider pickerel-versus-paycheck tradeoffs involved in the larger private action. For these reasons, I do not view – at least not at this juncture – the Corps' more wide-ranging discussion of environmental impacts in the EA as a logical contradiction, let alone a concession, of the Corp's preliminary jurisdictional statement that, in the final analysis, it would limit its EA to WOTUS impacts.[17]

NEPA required the Corps to consider the "environmental impact of the proposed action." 42 U.S.C. § 4332(C)(i). From the Corps' perspective, the "proposed action" is to temporarily and permanently fill certain wetlands, clear or convert cover provided to WOTUS by forest canopy, and drill a tunnel beneath the Kennebec River. "To determine whether [NEPA] requires consideration of a particular effect, [I] must look at the relationship between that effect and the change in the physical environment caused by the [proposed] action at issue." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983). Moreover, I must remain mindful that "[t]he scope of the agency's inquiries must remain manageable if NEPA's goal of 'ensur[ing] a fully informed and well considered decision' is to be accomplished." *Metro. Edison Co*., 460 U.S. at 776 (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978)).

The Corps' regulations state that when the Corps is required to assess under NEPA the appropriateness of a permit for "one component of a larger project," it need address only "the impacts of the specific activity requiring a … permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to

---

[17] The Corps may be required to consider other concerns such as endangered species and historic properties, as is reflected in the Corps' EA for the NECEC. Plaintiffs have not demonstrated that the Corps' handling of these concerns warrants vacatur of the Corps' EA.

warrant Federal review." 33 C.F.R. Pt. 325, App'x B, § 7(b)(1). The regulations further state that the Corps has "sufficient control and responsibility" to warrant review of a project as a whole, rather than just the specific activity requiring a Corps permit, when "the environmental consequences of the larger project are essentially products of the Corps permit action." *Id.* § 7(b)(2). In other words, as envisioned by the Corps, its control and responsibility are circumscribed by its jurisdictional authority, unless federal involvement "is sufficient to turn an essentially private action into a Federal action," by which the Corps means "cases where the environmental consequences of the larger project are essentially products of the Corps permit action." *Id.* § 7(b)(2).

Nothing in the language Congress employed in NEPA precludes the Corps' placement of a jurisdictional limitation on its review of private projects under NEPA. To the extent Plaintiffs challenge the logic of the restriction, it strikes me at this initial stage of the litigation that the restriction is permissible given the deference owed to agency expertise, the reasonableness of the Corps' desire to calibrate its NEPA involvement to the scope of its jurisdictional power, and statements by the Supreme Court and the First Circuit Court of Appeals that such a restriction is appropriate from a purely legal perspective. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 665 (2007); *Metro. Edison Co.*, 460 U.S. at 776; *Mayaguezanos*, 198 F.3d at 302.

As for the merits of the Corps' application of the regulatory guidance, discussed below, I am at this stage required only to estimate Plaintiffs' likelihood of success, not to resolve the merits in a conclusory fashion. *Harnett*, 731 F.3d at 10. Based on my preliminary review of the regulations, Plaintiffs have not persuaded me that they likely will

succeed in proving that the Project is a major federal action consisting of the full-blown NECEC Project such that all environmental impacts that can be identified by their members and the interested public must be addressed by the Corps through an EIS. Rather, my initial impression is that Plaintiffs' position relies heavily on but-for causation rather than a pragmatic assessment of the Corps' purpose and function. *Pub. Citizen*, 541 U.S. at 767.

The major-federal-action regulatory thicket is comprised of a variety of factors. Based on my review of the EA, I am persuaded at this juncture that the Corps gave each of its regulatory factors (in particular the scoping factors of 33 C.F.R. Part 325, Appendix B, and intensity factors of 40 C.F.R. § 1508.27 (2018)) due consideration and reasonably exercised judgment on the appropriate application of the same. EA at 160-62 § 12.3.[18] I will touch on some of these factors now, but it is not my intention to finally determine these issues once and for all. This is review of a preliminary injunction, not a motion for final judgment on the administrative record.

> i. *Whether the regulated activity comprises "merely a link" in a corridor type project (e.g. a transportation or utility transmission project).*

Plaintiffs argue, not unreasonably, that the Corps' jurisdictional concern with wetlands could be considered more than a mere link, given that the transmission lines

---

[18] Plaintiffs argue the project is federal given the requirement that the Department of Energy authorize the border connection. I do not see how DOE's oversight of the border connection compels the Corps to expand its NEPA review of CWA/RHA permit applications to every externality of the overall project. Plaintiffs also point to the fact that the Corps, DOE, and other federal agencies were signatories to a Historic Properties Memorandum of Agreement related to the NECEC (ECF No. 31-18). Again, it does not follow that the Corps' participation in historic property proceedings compels an all-encompassing NEPA-EIS review by the Corps. In any event, the Corps acknowledged the historical property concern in its EA. EA at 106 § 6.4.3.

would be suspended over a substantial acreage of waters. However, the Corps also offers a reasonable assessment: that the wetland impacts can be localized to separate and distinct impacts comprising roughly 1.9% of the total corridor.[19] EA at 37. The Corps' perspective may be debatable, but it does not strike me as arbitrary and capricious. EA at 37.

> ii. *Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity*

Plaintiffs observe that the Corps considered an alternative proposal to have the supports in Segment 1 zig-zag through the 300-foot right of way to reduce impact on wetlands. The Corps did not think this approach would be advantageous to wetlands and rejected the idea. EA at 94. It seems to me that this kind of consideration would not normally require the Corps to expand its assessment of significance to encompass non-WOTUS impacts. *See also* EA at 37-38.

> iii. *The extent to which the entire project will be within Corps jurisdiction*

Plaintiffs again emphasize that WOTUS are "spaced throughout the corridor" and are roughly 17% of its footprint. Motion at 15 (quoting EA at 37). This is a fair consideration, but it is not compelling. My initial impression is that the Corps did not act in an arbitrary fashion when it discussed cumulative impacts to wetlands, inclusive of

---

[19] According to the Corps:

> Jurisdictional wetland impacts consist of 4.72 acres of permanent fill at two new converter/substations and one HDD termination station, 0.15 acres of permanent fill for pole structures, 47.64 acres of temporary fill, and 111.55 acres of forested wetlands affected by clearing and conversion to scrub-shrub and emergent cover types. Thus, only 164.06 of the project's approximately 8,600 acres are within USACE jurisdiction (approximately 1.9%).

EA at 38.

temporary fills and cover conversion, yet found them inadequate for the Corps to assume

NEPA responsibility for the entire Project. EA at 38-39.

Plaintiffs flag a statement in the Corps' Appendix B that offers an example of how

to assess a transmission line project. The entire example reads as follows:

> For example, a 50–mile electrical transmission cable crossing a 1 1/4 mile wide river that is a navigable water of the United States requires a DA permit. Neither the origin and destination of the cable nor its route to and from the navigable water, except as the route applies to the location and configuration of the crossing, are within the control or responsibility of the Corps of Engineers. Those matters would not be included in the scope of analysis which, in this case, would address the impacts of the specific cable crossing.

> Conversely, for those activities that require a DA permit for a major portion of a transportation or utility transmission project, so that the Corps permit bears upon the origin and destination as well as the route of the project outside the Corps regulatory boundaries, the scope of analysis should include those portions of the project outside the boundaries of the Corps section 10/404 regulatory jurisdiction. To use the same example, if 30 miles of the 50–mile transmission line crossed wetlands or other "waters of the United States," the scope of analysis should reflect impacts of the whole 50–mile transmission line.

33 C.F.R. Pt. 325, App'x B, § 7(b)(3). In Plaintiffs' view, the NECEC is the transmission

line suggested by the second example and, therefore, the Corps's NEPA review should

treat the entire Project as one major federal action.

To advance the argument, Plaintiffs draw on the total area of WOTUS existing in

Segments 1 through 4, although Segments 2 through 4 involve expansion of a preexisting

corridor and do not fit neatly within the example. Plaintiffs' argument would be stronger if

they showed that Segment 1 fits the second example, but they would still be faced with the

fact that the example is written in advisory rather than mandatory terms.

The EA does not include a discussion of the transmission line examples in Appendix B. However, the Corps does reference certain proposed-action acreage figures to support its conclusion that wetland impacts are not considerable enough to bring the entire Project into its jurisdiction. In particular, the Corps references 5 acres of permanent fill, 48 acres or temporary fill, and 112 acres of cover conversion. These, we are told, are less than 2% of the total acreage impacted. The numbers do not appear to encompass WOTUS cross-over, as in the example, but they still suggest something other than an arbitrary and capricious exercise of regulatory judgment.[20]

### iv. The extent of cumulative Federal control and responsibility

The Corps is not the only federal agency with authority over components of the NECEC Project. Plaintiffs think the Project should be federalized for this reason. I am not persuaded that the involvement of the DOE and the Federal Energy Regulatory Commission with distinct project concerns, one with the border connection, the other with utility regulation, transforms the private NECEC Project into a major federal project for purposes of NEPA. Based on the current briefing of the legal issue, I cannot say that the Corps abused its discretion or violated federal law when it reasoned that these "authorities are separate and independent" and that "[t]he scope of review for the Corps waters of the US [sic] does not overlap with the DOE review of the border crossing [or] with the operational review of the FERC." EA at 39.

---

[20] An EPA letter in the record references removal of "11 linear miles of riparian vegetation adjacent to … aquatic resources." Apr. 25, 2019 EPA Region 1 Letter to USACE re. public notice at 4 (ECF No. 39-1). Presumably that is project-wide, but even if it concerned only Segment 1, it would be shy of the 30:50 ratio used in Appendix B's second transmission line example.

*v.  CEQ context and intensity factors*

The CEQ offers a listing of factors that can suggest the existence of a major federal action in need of an EIS, which factors "should be considered." 33 C.F.R. § 1508.27(b). The Corps explained:

> Under the Council on Environmental Quality ("CEQ") NEPA regulations, "NEPA significance" is a concept dependent upon context and intensity (40 C.F.R. § 1508.27). When considering impacts to waters of the US on a linear transmission project like the current proposal, significance is measured by the impacts felt at a local scale, as opposed to a regional or nationwide context.

EA at 161-62 § 12.3.

Plaintiffs argue the context and intensity factors "nearly all … weigh in favor of an EIS." Motion at 21. Plaintiffs then argue the factors from the perspective of impacts associated with the entire NECEC Project, even to the extent of challenging assumptions about the likelihood that the NECEC Project will reduce greenhouse gas emissions, but they principally focus on the ecological and scenic impact of Segment 1. I am not persuaded by Plaintiffs that the Corps' WOTUS-focused discussion of these factors was arbitrary and capricious, abusive of discretion, or a violation of law. Nor, at this stage, am I persuaded that the Corps' decision to permit HDD, wetland cover conversion, and temporary and permanent fill makes it the NEPA shepherd of the entire regional impact of the fully installed Project, rather than the permitted actions.

*vi.* Stewart v. Potts

Plaintiffs argue the circumstances of this case are like the circumstances in *Stewart v. Potts*, 996 F. Supp. 668 (S.D. Tex. 1996), in which case the district court rejected the Corps' assessment that its jurisdiction did not extend to upland forest fragmentation. In

*Stewart*, a municipality sought to develop a golf course on a 200-acre forested parcel and, after redesign efforts to avoid filling wetlands, arrived at a proposal that would directly impact with fill only two acres of the wetlands, but also clear or thin the surrounding forest that sheltered other wetlands scattered throughout the forest. *Id.* at 673, 682. Additionally, the EPA characterized the forest as a "floodplain forest" and both it and the FWS found that development of the surrounding forest would impose "considerable" indirect adverse impacts on area wetlands and neotropical migratory birds. *Id.* In this factual context, the court found arbitrary the Corps' refusal to exercise NEPA jurisdiction over forest clearing that would impact the wetlands and migratory birds that depend on them. Clearly, the court reasoned, concentrated denuding ("clearing 115 acres") of a 200-acre forested parcel would impact the scattered wetlands in the same 200-acre footprint quite intensively. *Id.* at 682-83.

Plaintiffs' attempt to cast this case in the image of *Stewart* is unpersuasive. The NECEC entails linear development. At 150 feet wide, 115 acres of forest impacts would be spread out along more than six miles of Corridor and the surrounding forest in Segment 1 (the segment that Plaintiffs focus on for purposes of their fragmentation argument) would continue to shelter the scattered wetlands over which the Corridor passes. That is quite unlike the situation in *Stewart*, where the development project involved clearing 115 of 200 acres sheltering wetlands.

### d.  The Corps' watershed FONSI

Turning the focus from the forest to the waters, what remains for consideration is whether the Corps' EA/FONSI makes sense from a WOTUS perspective. Drawing on

Ninth Circuit precedent, Plaintiffs best argument, as I see it, is that the Corps' EA is deficient because it gives insufficient attention to "baseline" conditions. Motion at 16-18, 28-29; Reply at 8-10. This is a sound concept that warrants consideration. However, an EA is not an EIS, and the baseline concept effectively could require an EIS in most cases if taken to the extreme. Additionally, I cannot lightly dismiss the notion that the Corps exercised expertise in assessing the relative significance of the proposed WOTUS impacts. To be victorious in this action, Plaintiffs must convince me that the Corps's FONSI is unreasonable or nonsensical in relation to the significance of impacts to WOTUS. They do not need to prove it conclusively at this stage of the proceedings; nevertheless, even in the context of a preliminary injunction motion the burden rests squarely on their shoulders. After very careful consideration of Plaintiffs' preliminary injunction presentation, I conclude that they have not carried their burden.

When it comes to discussing watershed impacts, the Corps' baseline portrayal of WOTUS values is cast in broad brush strokes. EA section 1.2 states the proposed activity impacts "multiple locations of aquatic resources" inside the NECEC's footprint. EA at 1-2. It then describes the following "jurisdictional" impacts.

> A total of 4.87 acres of jurisdictional wetlands will be permanently impacted and 47.64 acres will be temporarily impacted. Permanent fills are limited in size and are at separate and distinct locations along the corridor, and include minor fills for substation construction or limited pole placement in wetlands (ranging from approximately 30 to 195 square feet of fill per structure). An additional 111.55 acres of forested wetlands will be affected by clearing and conversion to scrub-shrub and emergent cover types. This area for total wetlands converted includes 105.25 acres of forested wetland, 3.678 acres of forested wetland habitat proximate to vernal pools, and 2.622 forested wetland associated with state mapped Inland Waterfowl & Wading Bird Habitat (IWWH).

*Id.* at 2-3.[21] The Corps explains that it is important to its assessment that these impacts to WOTUS are but a small percentage of a very large project. *Id.* at 3. This logic is repeated in the Corps' briefing of the preliminary injunction motion. The idea seems to be that the Corps' jurisdictional components of a project become less significant as the project increases in scale. That is false logic. But like Plaintiffs, the Corps is so obsessed with whether the regulations make it permitting authority for the entire Project that it tends to hammer away at that issue every chance it gets. Jurisdictional impacts can be significant impacts even if they are a small subset of a very large project.

The Corps also described the following WOTUS-specific considerations. In Segment 1, cover conversion will occur for 8.24 acres of forest, which will become a scrub-shrub or "emergent habitat type" impacting 110 vernal pools. There will be 0.26 acre of permanent fill to access one of the new transition stations for the subterranean crossing of the Kennebec River. Beneath the proposed line in Segment 1 are 223 rivers, streams, or brooks providing habitat to coldwater fisheries and six inland waterfowl and wading bird habitats (IWWH). In Segment 2, cover conversion will occur for 1.13 acres impacting two IWWH and 18 vernal pools. In Segment 3, cover conversion will occur for 5.65 acres impacting nine IWWH, plus 381 vernal pools. There are 84 rivers, streams, or brooks with coldwater fisheries, in which all woody vegetation would be cleared and non-capable woody vegetation would be allowed to regrow to a height of 10 feet. In Segment 4, cover conversion will occur for 4.4 acres impacting 6 vernal pools and there will be 0.03 acre of

---

[21] The Corps also observes that there are many aerial crossings of WOTUS, and it finds these not to be significant because they do "not include impacts to waters." *Id.* at 4.

permanent wetland fill. In Segment 5, cover conversion will impact 11 vernal pools and there will be 0.04 acre of wetland fill. Finally, the Merrill Road Converter Station improvements involve 3.16 acres of permanent wetland fill, including 0.273 acres of fill in vernal pool habitat, and the Fickett Road Substation improvements involve 1.33 acres of permanent wetland fill.

Concerning wetlands project-wide, the Corps found it significant that 1332 wetlands were avoided out of a total of 1404, but recognized that in addition to direct impacts to 72 wetlands, other wetlands would be impacted indirectly by the "removal of capable species … result[ing] in long-term conversion of wetland habitat type from forested to scrub-shrub and/or emergent." EA at 10.

Concerning vegetation practices, the Corps says CMP has committed to not using herbicide in Segment 1 to "minimize impacts, particularly to high value brook trout resources." *Id.*

Concerning watercourses, the Corps acknowledges that cutting the Corridor involves many potential impacts but also recognizes that the work is subject to several conditions and restrictions designed to soften the impact:

> Potential indirect impacts include sedimentation and turbidity, introduction of pollutants, and locally increased stream insolation (exposure to sunlight, increased temperature, and diminished woody debris contributions) associated with the clearing. Direct and indirect impacts are anticipated from future actions associated with implementation of their Culvert Replacement Plan, a mitigation requirement of the Maine DEP to enhance fisheries habitat. Based on USACE review of similar private, municipal, and state installations throughout the state however, these impacts are generally minimal compared to the long-term benefit achieved.

> Potential sedimentation associated with soil disturbance from equipment use and vehicle access proximate to streams can result in temporary short-term

impacts to fishery resources. Sedimentation can result in reduced light penetration, smothering of aquatic feeding and spawning areas, and impairment of aquatic respiration. Sedimentation can also impact the quality of coldwater fish habitat in waterbodies by burying higher value substrates, reducing habitat complexity, and altering stream channels. To avoid these impacts, CMP will implement its Environmental Guidelines during construction to minimize the potential for sedimentation and to protect fishery resources. CMP's Environmental Guidelines include detailed erosion and sedimentation control measures, resource identification procedures, access road and equipment travel impact minimization measures, and restoration and stabilization measures that will minimize the potential for impacts to waterbody resources. Implementation of the provisions of these Guidelines will be included as a condition of any permit.

Increased sun exposure on smaller waterbodies due to transmission line tree clearing can result in a negative impact due to an increase in water temperature, which can pose problems for coldwater fisheries. Tree clearing has been minimized by co-locating new lines in existing transmission line corridors where practicable and on segments requiring widening, minimizing clearing to only the width necessary to construct and safely operate the facilities. The waterbody crossing table located the administrative record identifies the amount of additional clearing width required within each respective corridor, if applicable.

To minimize any potential for negative impacts to stream habitat and fisheries from vegetative clearing, CMP proposes to allow vegetation to remain in place to the extent practicable and install appropriate sedimentation controls. Furthermore, all waterbody crossings will be spanned by the NECEC transmission line, and no work will take place within stream channels during construction. No new poles will be installed within 25 feet of these waterbodies, and only minimal tree removal is proposed in these stream buffer areas. All capable species will be removed from the stream buffer during initial clearing for construction. Vegetation maintenance, conducted on a 4-year cycle, in the stream buffer areas will consist of cutting back to ground level, all woody vegetation over 10 feet in height, whether capable or non-capable within that portion of the 25-foot stream buffer within the wire zone (i.e., that area within 15 feet, horizontally, of any conductor). Only capable species will be removed outside of the wire zone during vegetation maintenance activities. Otherwise, stream side vegetation will not be disturbed during construction or during future maintenance activities and the buffer will continue to function in a similar manner as before construction. Future maintenance activities in these areas will consist of hand removal of those capable species that are likely to encroach on the conductor safety zone within the next 4 years1. Herbicides will not be used within the

stream buffers, within 25 feet of standing water or along any portion of Segment 1. Stream buffers are described in more detail in the NECEC Vegetation Clearing Plan (VCP) and Vegetation Maintenance Plan (VMP) contained in the administrative record.

EA at 11-13.

Concerning vernal pools, the Corps begins by emphasizing the number of vernal pools (757) in the Corridor that are avoided *in terms of permanent fill* over the 83 that will be partially filled. As for the more expansive impact of cutting activity and cover conversion, the Corps states:

> However, recognizing that many vernal pools are part of a larger wetland system and that important habitat/water quality contributions are served by the surrounding vernal pool envelope, and in order to be consistent with the state permitting authority, the applicant calculated impacts to the vernal pool depressions and the 100' envelope. The applicant also based the mitigation plan using the same methodology. In instances where a pool's surrounding habitat spans the entire width of the corridor; impacts associated with equipment access will be minimized by utilizing temporary timber mats to reduce disturbance. For vernal pools that will be spanned by electric conductors, there is still the potential for limited indirect impacts through conversion of minor amounts of adjacent forested uplands and wetlands. The potential for these indirect impacts is minimal since the transmission line corridor will be maintained in a well vegetated state, and only a small proportion of the forested area around any of these pools will be removed for the proposed transmission line corridor. There should still be ample foraging and overwintering habitat available and the pools themselves are expected to remain productive for the most part. Temporary impacts to adjacent wetlands can occur from equipment travel along the transmission line corridor. These impacts will be minimized by working during frozen conditions (outside the breeding season) or by employing other techniques to minimize impacts. Disturbed areas within the surrounding habitat of vernal pools will be stabilized and restored as soon as practicable.

EA at 14. The Corps also observes that CMP will adhere to operational practices consistent with state and federal vernal pool habitat management guidelines and will execute "a detailed Compensation Plan." *Id.* at 14-15.

The Corps also addresses concern for "potential Atlantic salmon habitat" existing in "various waterbodies crossed by the Project." *Id.* at 16. These areas are identified in maps in the administrative record and they are supposed to receive the least impactful clearing/cutting activity. To get a sense of the impact, and the Corps' considered the following:

> Potential Atlantic salmon habitat occurs within various waterbodies crossed by the Project. The Project will have no direct impact on Atlantic salmon habitat. However, potential indirect impacts to this species include increased stream insolation due to tree removal, sedimentation and turbidity, and the introduction of pollutants from construction-related activities. To minimize these indirect impacts during clearing, riparian buffers will be flagged prior to clearing, a 100-foot buffer will be established for these waterbodies, and these buffers will be cleared in accordance with the NECEC Plan for Protection of Sensitive Natural Resources During Initial Vegetation Clearing (VCP). All streams identified as Atlantic salmon habitat will have a 100-foot riparian buffer and any non-capable species exceeding 10 feet will remain within the stream buffer outside the wire zone. Inside the wire zone all woody vegetation over 10 feet whether capable or non-capable will be cut to ground level. Within this 100-foot buffer any capable species will be removed by hand cutting, herbicides will not be used, and if the construction schedule allows, clearing will occur during frozen ground conditions to minimize soil disturbance.

EA at 16 (emphasis added). From a lay perspective, I cannot say that I am resoundingly reassured. However, the Corps elsewhere specifically references the "Final Biological Assessment" submitted to the U.S. Fish and Wildlife Service and observes that FWS "concurs … that the proposed project may affect but is not likely to adversely affect Atlantic salmon … and critical habitats for Atlantic salmon." EA at 104. *See also id.* at 148-150 § 10.1. Plaintiffs have not presented me with a contrary assessment by a regulatory agency such as Maine DEP or DFW. Given the assessment of FWS and the absence of a strongly worded counter statement by another regulatory agency, and recognizing the

deference owed to the Corps in its exercise of regulatory oversight concerning WOTUS, I conclude it is unlikely Plaintiffs will demonstrate that the Corps' assessment is arbitrary or unreasonable.

Another obvious WOTUS concern involves brook trout habitat. The Corps did not overlook this concern. For example:

> Provided all applicable conditions are implemented and state and local authorizations have been issued, the project is not expected to have more than short-term minimal effect on waterways supporting wild brook trout. State mandated compensatory mitigation in the form of a culvert replacement program should result in long-term benefits to fisheries in terms of improved passage and greater habitat connectivity.
> …. Construction could temporarily disturb fish populations (noise, tree clearing, increased human activity, etc) and could displace individual fishermen from certain waterways. A return to baseline conditions is expected upon completion of the project.

EA at 105. There is countervailing evidence in the record presented by Plaintiffs, discussed below, but again I am struck by the absence of any outcry on the part of state or federal environmental agencies. I am engaged in a deferential review process, not a free-ranging fact-finding exercise. This presents Plaintiffs with a significant uphill climb.

In addition to substantial mitigation requirements designed to reduce the intensity of environmental impacts, projects of this kind come with significant compensatory price tags. The EA describes several compensation requirements for the Project's wetland impacts. Most salient to the Corps' review: "Prior to the start of construction, the applicant proposes to contribute $3,046,648.37 to the Maine Natural Resource Conservation Program" as "a requirement of both the USACE and the DEP as compensation for direct and indirect impacts to vernal pools and permanent wetland fills." EA at 25. This compensation is only partial. CMP also will conserve three large tracts of land.

The applicant has proposed 3 preservation sites to provide compensatory mitigation for impacts to WOTUS. They are the Flagstaff Lake Tract; Little Jimmie Pond-Harwood Tract; and the Pooler Pond Tract. Each site has been evaluated via 33 CFR 332.4(c)(2) through (c)(14) or 12 Components of a Mitigation Plan in Section 8.0.

The Flag Staff Lake Tract currently has approximately 423.96 acres of mapped wetlands; 10,790 linear feet of stream and 417.33 acres of riparian upland. Therefore the site has the potential to produce 49.02 wetland credits (21.918 wetland conversion@20:1 + 27.822 upland conversion@15:1).

The Little Jimmie Pond-Harwood Tract currently has 68.46 acres of mapped wetland; 2 vernal pools; 3,030 linear feet of stream and 41.31 acres of riparian upland. Therefore the site has the potential to produce 6.177 wetland credits (3.423 acres + 2.754 acres).

The Pooler Pond Tract currently has 18.33 acres of mapped wetland; 1 vernal pool; and 4,480 linear feet of street, and 62.91 acres of riparian upland. Therefore the site has the potential to produce 5.11 wetland credits (0.916 acres + 4.194 acres).

To summarize, the applicant proposes to purchase 13.361 wetland credits from the MNRCP ILF Program and will generate approximately 60.307 wetland credits through permitee responsible mitigation to offset impacts to WOTUS. This exceeds the USACE required generation of 38.933 wetland credits.

EA at 26.

On the one hand, these substantial compensation requirements tend to demonstrate the significance of the Project's watershed impacts. On the other hand, the existence of a substantial quid pro quo or environmental compensation regime does not compel a finding that a project's WOTUS impacts significantly affect the human environment. Investment in wetland land bank credits and direct preservation of existing ecological assets reflect forward-thinking environmental policy. Plaintiffs have not convincingly demonstrated that these regulatory schemes provide a litmus test for when an EIS is legally mandated. Moreover, in comparison with the Project's scattered and diffuse impacts to wetlands and

the predominantly cover-conversion type of impact, CMP's credit purchases and preservation projects tend to improve or preserve more cohesive land banks and expansive tracks of forest with high-value wetlands and other WOTUS assets. This is not a case of destroying or crippling one significant WOTUS asset and preserving another, in which case I might be able to say the impact is a relatively clear and a significant net loss. Instead, this case involves scattered adverse WOTUS impacts of relatively mild intensity (according to expert regulators) balanced against improvement and preservation of larger and more coherent aquatic ecosystems. Plaintiffs have not yet persuaded me that there is a readily applicable judicial rule that I could employ here to say when regulators can or cannot consider these sorts of tradeoffs and offsets in their effort to measure the significance of proposed actions on the human environment.

As for impacts to specific WOTUS assets, I can agree with Plaintiffs that it is concerning that the Corps' discussion of baseline WOTUS conditions consists primarily in a recitation of numbers of vernal pools, brooks and streams, and acreage of wetlands. For example, there is no specific identification of a WOTUS asset within the Corridor having special value other than the Rivers and perhaps "coldwater fisheries" in the aggregate.[22] Yet even after reviewing Plaintiffs' motion record, principally comprised of declarations by individuals who submitted written and oral testimony during Maine DEP proceedings, Motion at 6 n. 6, I do not believe I can readily conclude that a specific WOTUS asset

---

[22] In comparison, where it was possible to identify a specific asset to illustrate CMP's care and consideration, the Corps so indicated. For example, consider the Corps' discussion of project alterations to avoid Beattie Pond. EA at 87.

existing in the human environment will be significantly undermined by the proposed actions.

I have reviewed the declarations submitted by Dr. Matthew Schweisberg (ECF No. 18-11) and Dr. Aram Calhoun (ECF No. 18-12). However, I am not persuaded at present that Dr. Schweisberg's identification of "immediate and irreparable harm," Schweisberg Decl. ¶¶ 15, 24, is likely to compel a finding that the localized impact of corridor cover conversion and clearing significantly affect waters of the United States. Nor am I persuaded that Dr. Calhoun's advocacy for vernal pools compels the Corps to produce a vernal pool EIS based on "cumulative impacts … to all vernal pools and wetland resources [that], although potentially small if considered on a pool-by-pool assessment …, are significant taken together …." Cahoun Dep. ¶ 11. This reluctance on my part is also informed by Dr. Calhoun's recognition that Segment 1, the primary focus of this litigation so far, already involves environmental baseline impacts because the transmission line's path would run over "working forest under varied management regimes." *Id.* ¶ 26. My impression after considering this evidence is that there is room for disagreement about the efficacy of state and federal mitigation requirements and whether the Project will significantly destabilize or affect the health of the aquatic ecosystem. *Id.* ¶¶ 29-37. The Corps recognized that corridor cutting will impact the wetlands, but concluded the impacts do not significantly affect the quality of the human environment. It seems to me this conclusion was made after considering the relevant evidence and is the product of reason rather than caprice.

I also have considered the important perspective offered by Jeffrey Reardon, a man with many years of Maine-based expertise in brook trout conservation. Mr. Reardon

describes the western mountain region through which the Project would pass as "the nation's most significant stronghold of native brook trout populations," Reardon Decl. ¶ 14 (ECF No. 18-15), and he regards the Corps' assessment of impacts on fisheries as inadequate and inaccurate. He explains that the 100-foot buffers in Segment 1 are a compromise between protecting a transmission line and preserving brook trout habitat and fall short of a Maine Department of Inland Fisheries standard that call for 60-70% crown closure and resistance to wind throw. *Id.* ¶¶ 17, 33. He also believes the Project threatens the Cold Stream brook trout population, a resource he describes as currently protected by an 8,200 acre preserve. *Id.* ¶ 26. Mr. Reardon believes that cutting of some 1,400 feet of corridor where it crosses the Capital Road east of Route 201 poses a special threat to this preserve and will "degrade the public's investment in protecting this valuable habitat." *Id.* ¶ 27. Nevertheless, I am concerned that Mr. Reardon's dire predictions about the Project's harm to, specifically, the expansive Cold Stream preserve and, more generally, the wider stronghold of brook trout habitat throughout the western mountain region (thousands upon thousands of acres through which the Project would not pass) are inflated by his devotion to brook trout conservation work.[23] I would expect the Maine Department of Fisheries and Wildlife or the Department of Environmental Protection to echo his sentiments loudly if his perspective were not overly strident.

The work of these experts is of great value and I respect their insights and concern for the health of Maine's ecosystems. However, given the nature of my review, it is not

---

[23] Mr. Reardon also appears to be disappointed that CMP's investment in preservation tracts will not focus on expanding brook trout preserves. Id. ¶ 39.

simply a matter of choosing my preferred expert perspective. Given my review thus far, although I might have acted differently had I been standing in the Corps' shoes, Plaintiffs have not persuaded me that they are likely to prevail in this litigation.

### 2. *Irreparable harm*

Plaintiffs bear the burden to show that a denial of interim relief in this case is likely to cause irreparable harm. *See Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009). Although the "measure of irreparable harm can be a sliding scale, working in conjunction with a moving party's likelihood of success on the merits," *Vaqueria Tres Monjitas, Inc., v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009), the movant must provide the court with more than "conjecture, surmise or a party's unsubstantiated fears of what the future might have in store." *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Even a showing as to the "possibility" of such harm will not suffice. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Plaintiffs remind the Court that "if any [important] decision is made without the information that NEPA seeks to put before the decision maker, the harm that NEPA seeks to prevent occurs . . . and courts are to take account of that kind of harm when they consider whether to enjoin governmental actions that plaintiffs claim violate NEPA." Motion at 11 (quoting *Sierra Club v. Marsh*, 872 F.2d at 497 (1st Cir. 1989)). Plaintiffs posit: "when considering preliminary injunctions based on NEPA violations, the potential harm to the environment stemming from the project for which the NEPA analysis was conducted is attributable to the NEPA violation itself." *Id.*

The First Circuit holds that irreparable harm exists "when agencies become entrenched in a decision uninformed by the proper NEPA process because they have made commitments or taken action to implement the uninformed decision." *Busey*, 79 F.3d at 1271. This is a function of the fact that NEPA is a procedural statute "designed to influence the decision making process by making governmental officials notice environmental considerations and take them into account." *Id.* (quoting *Massachusetts v. Watt*, 716 F.2d 946, 952 (1st Cir. 1996)).

Based on my review of the record, I am not persuaded that Plaintiffs are likely to prove that the Corps failed to take Plaintiffs' WOTUS concerns into account. Rather, my initial impression is that before the Corps issued its FONSI it collected and considered a fulsome record containing thorough and detailed inputs from expert administrative agencies and outside experts, including experts who stand behind the respective parties in this litigation, and also from the lay public, including individuals who live and work in the western mountain region and rely on a healthy aquatic ecosystem for their livelihoods. While I recognize that the Project is unpopular and deeply disturbing to many people, in particular those persons devoted to the environmental and scenic values existing in Segment 1, which cannot be restored through issuance of a later court order, my preliminary findings on the merits inform my assessment of whether or not the Corps has run roughshod over the NEPA values at stake in this litigation. As to that question, I believe the answer is no.

### 3. *Balance of equities*

Given my assessment of the first two preliminary injunction factors, identification of equitable interests on the other side of the balance only serves to undermine further Plaintiff's Motion. Delay of construction pending further litigation is no great imposition for the Corps. However, equitable interests held by an intervenor defendant whose economic interests are impacted by a preliminary injunction are legitimate considerations. *Town of Weymouth v. Massachusetts Dep't of Envtl. Prot.*, 973 F.3d 143, 145 (1st Cir. 2020) (per curiam). CMP has committed to the Project considerable human and economic resources and is in the position of expending considerably more – to little or no effect – based on contractor commitments that do not disappear if it loses most of the winter months while defending this litigation. I make this finding simply to recognize that there are competing concerns to weigh, not to suggest that these economic concerns are weightier than environmental concerns. It also strikes me that even if I concluded that the Corps failed to afford adequate procedural protection to WOTUS impacts, or that the Corps should be compelled to publish its draft EA for public comment, it would not necessarily follow that I should enjoin cutting activity outside the riparian buffer zones. For example, I might fashion relief more equitably by enjoining cutting inside those zones. However, because I have ruled against Plaintiffs on the first two factors, I would be abusing my discretion if I devised that kind of preliminary injunctive relief here.

### 4. *Service of the public interest*

The parties all make persuasive arguments concerning the public interest. Because NEPA is a procedural statute and the Corps's FONSI comes at the end of a process that

likely ensured the Corps was "well informed" about the WOTUS impacts it authorized, this factor does not weigh decisively in Plaintiffs' favor, even if the outcome is unpopular. Moreover, as emphasized by Intervenor Defendant CMP, the Maine Public Utilities Commission has granted CMP a certificate of public convenience and necessity, concluding the Project will benefit Maine in a variety of ways, including by reducing rates, improving reliability, and reducing regional greenhouse gas emissions. This finding demonstrates that the public interest is not monolithic.

## CONCLUSION

For the foregoing reasons Plaintiffs' Motion for Leave to Supplement the Complaint (ECF No. 40) is GRANTED.  Plaintiffs' Motion for Preliminary Injunction (ECF No. 18) is DENIED.

**SO ORDERED.**

Dated this 16th day of December, 2020.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE