# United States Court of Appeals
## For the First Circuit

No. 20-2195

SIERRA CLUB; NATURAL RESOURCES COUNCIL OF MAINE; APPALACHIAN
MOUNTAIN CLUB,

Plaintiffs, Appellants,

v.

UNITED STATES ARMY CORPS OF ENGINEERS; COLONEL JOHN A. ATILANO,
II, Commander and District Engineer, in his official capacity;
JAY L. CLEMENT, Senior Project Manager, in his official
capacity; CENTRAL MAINE POWER COMPANY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

Before

Lynch, Thompson, and Barron,
Circuit Judges.

Kevin Cassidy, with whom Earthrise Law Center was on brief,
for appellants.
Jeffrey A. Hall, with whom Jean E. Williams, Acting Assistant
Attorney General, Jennifer S. Neumann, and Amelia G. Yowell were
on brief, for appellees United States Army Corps of Engineers,
John A. Atilano II, and Jay L. Clement.
Joshua D. Dunlap, with whom Matthew D. Manahan, Lisa
Gilbreath, and Pierce Atwood LLP were on brief, for appellee
Central Maine Power Company.

        Kevin Poloncarz, Donald L. Ristow, Lindsay Brewer, and
Covington & Burling LLP on brief for amici curiae Calpine
Corporation, Nextera Energy Resources, LLC, and Vista Corp.
        Shaun A. Goho and the Emmett Environmental Law & Policy Clinic
on brief for amici curiae Environmental Law Clinic Directors.
        Anthony W. Buxton, Jonathan G. Mermin, and Preti Flaherty on
brief for amicus curiae Industrial Energy Consumer Group.
        P. Andrew Hamilton, Timothy C. Woodcock, and Eaton Peabody,
P.A. on brief for amicus curiae H.Q. Energy Services (U.S.) Inc.

————————————

May 13, 2021

————————————

      **LYNCH**, **Circuit Judge**.  Plaintiff environmental organizations appeal from the district court's denial of preliminary injunctive relief barring construction of Segment 1 of a planned five-segment electric transmission power corridor in Maine.  This was part of a larger project which would run from Quebec, Canada to Massachusetts.  See Sierra Club v. U.S. Army Corps of Eng'rs, No. 2:20-CV-00396-LEW, 2020 WL 7389744, at *1 (D. Me. Dec. 16, 2020) ("CMP Decision").

      The corridor would be built by Central Maine Power ("CMP"), a private company.  Plaintiffs' challenge is to the Army Corps of Engineers' ("Corps") decision, after its performance of an Environmental Assessment ("EA"), to issue a permit authorizing CMP to take three actions in Segment 1: (1) temporarily fill certain wetlands, (2) permanently fill other wetlands, and (3) construct a tunnel under the Kennebec River.  They allege that the Corps was required to issue not merely an EA, but a full Environmental Impact Statement ("EIS") and that the Corps acted arbitrarily or capriciously in conducting its EA and issuing a Finding of No Significant Impact ("FONSI").  They raise other secondary challenges to the Corps' EA and FONSI.  We conclude that that plaintiffs have failed to show a likelihood of success on the merits.  We affirm the district court's denial of a preliminary

injunction.[1]  We also vacate the injunction issued by this court
on January 15, 2021 to allow us to consider this expedited appeal.

I. Background

A. State Agency Review of the CMP Corridor.

The parameters for the project were originally set by
Massachusetts.  Massachusetts selected the CMP proposal from
fifty-three proposed clean energy projects in a competitive
bidding process.[2]  State regulators and private utilities were
responsible for that selection.  No federal agency was involved.
Massachusetts approved only the specific route outlined in CMP's
proposal.  "The [Massachusetts] process essentially predetermined
CMP's role as applicant and limited the alternatives analysis to
only those which are available and capable of being done by CMP."

---

[1]    To earn a preliminary injunction, parties must
demonstrate four factors: (1) the likelihood of success on the
merits; (2) the likelihood of irreparable harm absent an
injunction; (3) a balancing of hardships; and (4) the public
interest.  Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir.
2010) (citing Nken v. Holder, 556 U.S. 418, 433 (2009)).  Sierra
Club urges us to place less emphasis on the first prong, even
though our case law has emphasized that prong's primacy in the
preliminary injunction assessment.  See Ryan v. ICE, 974 F.3d 9,
18 (1st Cir. 2020) ("The movant's likelihood of success on the
merits weighs most heavily in the preliminary injunction
calculus.").  Regardless, Sierra Club would not prevail even if we
adopted their view of the test.  We therefore need not decide the
issue.

[2]    Massachusetts originally selected the Northern Pass
Transmission project, which would have travelled through New
Hampshire.  New Hampshire regulators did not approve the Northern
Pass project.  After that rejection, Massachusetts selected the
CMP proposal through Maine.

Maine also approved the project after much more extensive review than the Corps engaged in in its EA. After CMP won the contract to construct the corridor, the Maine Department of Environmental Protection ("MDEP") accepted written and oral testimony about the project, and after a hearing approved construction. MDEP concluded that the CMP Corridor in its entirety had minimal environmental impacts, provided that CMP took mitigation measures, which it has agreed to undertake. The approved route consists of five segments, four of which track existing transmission lines. MDEP reviewed all 8,600 acres of the project, and issued a 113-page order approving the plan subject to various additional conditions, which CMP adopted. The MDEP assessed the project impact on: (1) wildlife, (2) forest and habitat fragmentation, (3) depletion of natural resources, (4) disruption during construction, (5) the visual aesthetics of the region, and (6) the feasibility of alternatives. It concluded that subject to mitigation measures to limit the visual and environmental impacts of the project, the CMP corridor did not impose unreasonable environmental risks. The Corps reviewed the project as modified by the State of Maine.

The Maine Public Utilities Commission also approved the project after holding public hearings and accepting public comment. The Maine Law Court later upheld that approval. NextEra Energy Res., LLC v. Me. Pub. Utils. Comm'n, 227 A.3d 1117, 1119

(Me. 2020).  The Maine Bureau of Parks and Lands also leased to CMP a right of way over state land.

### B. Federal Agency Review of the CMP Corridor.

The Corps became involved in the CMP project because construction in Segment 1 will require (1) temporary filling of wetlands; (2) permanent filling of wetlands; and (3) construction of a tunnel under the Kennebec River.[3]  Each of these activities requires permit approval from the Corps under either the Clean Water Act (for temporary and permanent fills) or the River and Harbors Act (for tunneling under the Kennebec River).  33 U.S.C. §§ 403, 1341, 1344(a).

Federal law requires the Corps to consider the environmental impact of permitting these activities.  The National Environmental Protection Act ("NEPA") is a procedural statute.  42 U.S.C. § 4332(C).  It sets out environmental policy objectives which are largely implemented through regulations promulgated by the Council on Environmental Quality ("CEQ") and individual agencies.  See Sierra Club v. U.S. Army Corps of Eng'rs, 803 F.3d 31, 37 (D.C. Cir. 2015) ("Flanagan South").

Two categories of CEQ and Corps regulations are relevant to this litigation.  The first concerns the appropriate scope of

---

[3]     At MDEP's request, the Corps also advised MDEP that a "zig zag" route through CMP's 300-foot-wide right of way would not significantly mitigate impacts to wetlands, and could cause other environmental consequences.

the required review.  It is uncontested that NEPA applies only to
"major [f]ederal actions." 42 U.S.C. § 4332(C).  Whether a project
is a major federal action is itself governed by federal law.  The
scope of the required federal environmental review of the CMP
corridor, as it involves a private project over state or private
land, is in turn governed by regulations from two federal agencies,
CEQ and the Corps.

CEQ regulations state "[i]n assessing whether NEPA
applies or is otherwise fulfilled, Federal agencies should
determine . . . . [w]hether the proposed activity or decision is
a major Federal action [or if other factors not relevant here
excuse compliance with NEPA]." 40 C.F.R. § 1501.1 (emphasis
added).

The Corps has promulgated more detailed rules for
determining the proper scope of its NEPA analysis. 33 C.F.R. pt.
325, app. B, § 7(b) ("Appendix B") says:

> In some situations, a permit applicant may
> propose to conduct a specific activity
> requiring a Department of the Army (DA) permit
> (e.g., construction of a pier in a navigable
> water of the United States) which is merely
> one component of a larger project (e.g.,
> construction of an oil refinery on an upland
> area).  The district engineer should establish
> the scope of the NEPA document (e.g., the EA
> or EIS) to address the impacts of the specific
> activity requiring a DA permit and those
> portions of the entire project over which the
> district engineer has sufficient control and
> responsibility to warrant Federal review.

Id. § 7(b)(1). The Corps further identifies four "[t]ypical factors to be considered in determining whether sufficient 'control and responsibility' exists" over "portions of the entire project" requiring NEPA review beyond the "impacts of the specific activity requiring a [Corps] permit." These are:

> (i) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).
> (ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.
> (iii) The extent to which the entire project will be within Corps jurisdiction.
> (iv) The extent of cumulative Federal control and responsibility.

Id. § 7(b)(2). Appendix B further states:

> [I]f an applicant seeks a [Corps] permit to fill waters or wetlands on which other construction or work is proposed, the control and responsibility of the Corps, as well as its overall Federal involvement would extend to the portions of the project to be located on the permitted fill. However, the NEPA review would be extended to the entire project, including portions outside waters of the United States, only if sufficient Federal control and responsibility over the entire project is determined to exist; that is, if the regulated activities, and those activities involving regulation, funding, etc. by other Federal agencies, comprise a substantial portion of the overall project.

Id. § 7(b)(3)(emphasis added).

A second category of regulations governs the nature of the environmental inquiry the Corps is required to do. CEQ regulations say that agencies should identify categories of agency actions that do not normally require preparation of an EA or EIS. For all other actions, CEQ states agencies should first prepare an EA to determine whether more detailed analysis is necessary. 40 C.F.R. § 1501.4-5. The EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]."[4] 40 C.F.R. § 1501.5.

CEQ regulations set out ten factors for the agency to consider in assessing the impact from a proposed action and whether an EIS is necessary. 40 C.F.R. § 1508.27(b)(1)-(10).

C. Environmental Findings of the Corps, Conclusions of Law, and the Scope of Review.

Applying these rules, the Corps limited the scope of its environmental review to the jurisdictional waters that required a permit from the Corps for construction. It weighed each of the four Appendix B factors, and found no reason to expand the scope of its review beyond the environmental impact of its own permit. The Corps found that it had only limited jurisdiction over a small

---

[4]    Other circuits have described an EA as "a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement -- which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project -- is necessary." Spiller v. White, 352 F.3d 235, 237-38 (5th Cir. 2003) (quoting Sabine River Auth. v. U.S. Dep't of Interior, 951 F.2d 669, 677 (5th Cir. 1992)).

portion of the project, and accordingly this did not warrant review of the entire CMP Corridor. In particular, it repeatedly emphasized that activities requiring a Corps permit "compris[e] approximately 1.9% of the total project corridor." The Corps also found that the total cumulative federal oversight was insufficient to "federalize" the entire project. It stated, "[t]he scope of review . . . does not overlap with [other federal agencies' review]."

The Corps conducted an EA for the activities that fell within its limited jurisdiction. The Corps incorporated MDEP's comprehensive environmental analysis into its own analysis. It also incorporated the U.S. Fish and Wildlife Service's ("FWS") analysis of the impact of the project on endangered species. The U.S. Department of Energy ("USDOE") further acted as a consulting and cooperating agency during the Corps' EA process.

The Corps made findings as to a number of potential environmental impacts. It concluded, for example, that "forest fragmentation as a result of activities within . . . [the Corps'] jurisdiction is not significant," and it assessed the potential loss of habitat for a number of Maine species, and in particular the impact under the Endangered Species Act. It also considered CMP's proposed mitigation measures. Its review took approximately three years. During that period, the Corps issued notice of its proposed action, and accepted hundreds of public comments. It

also conducted a public hearing and considered alternatives to the proposed CMP route.  In its 164-page final EA, issued on July 7, 2020, the Corps found no significant environmental impacts from the issuance of a permit for the three categories of activity requiring a Corps permit.

We outline the Corps' description of the entire project and the role of Segment 1 within it.  The entire five-segment CMP corridor consists of approximately 144.9 miles of transmission lines running from the Maine/Canadian border to a substation in Lewiston, Maine, where it connects to existing power infrastructure.  The Corps' EA found the majority of the corridor route follows existing transmission lines.  It concluded that Segment 1 covers 53.1 miles, which passes through primarily commercially harvested timber forest, crosses the Kennebec River, then continues through largely undeveloped stretches of the Western Maine Mountains.  In Segment 1, only 0.26 acres of wetlands will be permanently filled.  The Corps noted that along Segment 1, 14.08 miles will remain entirely forested, and the remainder of the corridor will involve "tapered" clearing, which limits the impact on forest fragmentation.

The Corps stated that along the entire corridor, 4.87 acres of wetlands will be permanently filled during the construction, and by power stations and poles.  An additional 47.64 acres will be temporarily filled during construction.  111.55 acres

of wetlands will be affected by forest cover clearing. The Corps identified 1404 distinct wetlands and 757 vernal pools located within the transmission line portions of the entire project. Of these, 82 wetlands and 83 vernal pools would be partially affected by permanent fills.

The Corps also noted that CMP will undertake a number of mitigation measures to offset environmental impacts from the corridor. CMP committed to "conserv[ing] 40,000 acres of land in the vicinity of Segment 1" "to address the project's impact on habitat fragmentation and wildlife movement." Along the entire project CMP committed to preserving "in perpetuity" a further 1022.4 acres of land, including 510.75 acres of wetlands.

The Corps also reviewed FWS's biological assessment and concluded that construction in the areas requiring a permit from the Corps had a limited impact on endangered species.

Accordingly, the Corps issued a FONSI, and did not prepare a more intensive EIS.

D.    Other Federal Agency Review of the CMP Corridor project.

Three other federal agencies issued permits to CMP as well. The USDOE became involved solely as to the issuance of a Presidential Permit necessary to approve an international border crossing. On January 14, 2021, after plaintiffs brought this appeal, USDOE issued a Presidential Permit allowing the border

crossing. In that context, USDOE reviewed the environmental impacts of the project before issuing that permit, but all parties agree that it did not conduct an EIS, as plaintiffs seek here.[5]

The FWS also licensed the taking of endangered species during construction. FWS reviewed the impact of the project on endangered species, as reflected in the Corps' own EA. Finally, the Federal Energy Regulatory Commission ("FERC") approved CMP's transmission service agreements related to the corridor. FERC's review was limited to the potential impact from the project on rates paid by utility customers.

## II. Procedural History

Plaintiffs brought this lawsuit on October 27, 2020.[6] They argued that the Corps' EA and FONSI were arbitrary or capricious in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). In particular, plaintiffs argued that the Corps failed to properly apply its own Appendix B regulations. They argued (1) the scope of the Corps' EA was too narrow, (2) the Corps failed to account for baseline environmental conditions in

---

[5] In fact, USDOE stated that it takes the position that it is not subject to NEPA, and its environmental review was entirely discretionary. U.S. Dep't of Energy, New England Clean Energy Connect Environmental Assessment, DOE/EA-2155, at 3 (Jan. 14, 2021), available at https://www.energy.gov/sites/default /files/2021/01/f82/ea-2155-necec-2021-01.pdf.

[6] We acknowledge and thank all of the amici curiae for their helpful submissions in this matter.

its EA, (3) the Corps underestimated the intensity of environmental impacts from the project and should have conducted an EIS, and (4) the Corps failed to provide adequate opportunity for notice and comment. See CMP Decision at *9-10, *17. Plaintiffs also made other arguments which they do not raise on appeal. Id.

On December 16, 2020, the district court denied plaintiffs' motion for preliminary injunctive relief. It held, "the Corps gave each of its regulatory factors (in particular the scoping factors of 33 C.F.R. Part 325, Appendix B, and intensity factors of 40 C.F.R. § 1508.27 (2018)) due consideration and reasonably exercised judgment on the appropriate application of the same." Id. at *14. The district court also rejected plaintiffs' other challenges to the EA.

On December 28, 2020, plaintiffs brought this interlocutory appeal. On December 30, 2020, plaintiffs filed an Emergency Motion for Injunction Pending Appeal. This court, as said, granted plaintiffs motion on January 15, 2021.[7]

---

[7] The same day CMP filed a Motion to Reconsider on the grounds that the USDOE had issued an EA and FONSI that covered all of Segment 1, which CMP argued satisfied plaintiffs' request for relief. At oral argument plaintiffs countered that assertion as untrue and made clear that the USDOE had not issued an EIS and that its claims against the Corps were not affected by the USDOE action. We denied the CMP motion on January 22, 2021.

III. Analysis

We review the district court's denial of plaintiffs' motion for a preliminary injunction for abuse of discretion. Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 10 (1st Cir. 2013). "[T]he trial court, at the preliminary injunction stage, need not predict the eventual outcome on the merits with absolute assurance, [and] an appellate court need not conclusively determine the merits of the underlying claims to execute abuse-of-discretion review." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996) (citation omitted). The grant of a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). An agency decision is unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The reviewing court determines whether the agency action is arbitrary or capricious. Id. Here, plaintiffs have failed to demonstrate a likelihood that the Corps acted arbitrarily and capriciously.

To be clear about what is not at issue, plaintiffs make no argument that the Corps' general standards (codified in Appendix B) for whether an otherwise private project has been federalized

are inadequate.[8]   To the contrary, in their opening brief
plaintiffs cite only to Appendix B as the applicable legal standard
by which to adjudicate whether the Corps engaged in the proper
scope of review.  Accordingly, they have waived any challenge that
the Corps' Appendix B regulations are inconsistent with NEPA or
fail to capture all relevant considerations.[9]  See White v. Hewlett
Packard Enter. Co., 985 F.3d 61, 70 (1st Cir. 2021) (citing
Rife v. One W. Bank, F.S.B., 873 F.3d 17, 19 (1st Cir. 2017)) (an
issue not briefed on appeal is waived).  Plaintiffs' lead argument
is instead that they have shown a likelihood of success that the
Corps' application of the Appendix B factors was arbitrary or
capricious.  Plaintiffs have not met their burden.  The Corps
applied each of the Appendix B factors with a reasoned discussion
before reaching its conclusion.

A central consideration, based on the record,
articulated by the Corps as to each of the factors and as to its
conclusion, was that its permitting jurisdiction over waters of
the United States constituted only a small part of Segment 1 and

_____

[8]     Relatedly, defendants make no argument that Appendix B
is too broad in federalizing a project and thus do not contend
that the project would not be federalized if it met the conditions
in Appendix B.

[9]     As to the genesis of Appendix B, see generally William
B. Ellis & Turner T. Smith, Jr., The Limits of Federal
Environmental Responsibility and Control Under the National
Environmental Policy Act, 18 Env't L. Rep. 10055 (1988).

- 16 -

an even smaller part of the overall project. The Corps found that less than 2% of the overall corridor required a Corps permit. We do not repeat the other findings we described earlier in this opinion. The Corps also properly considered the cumulative effect of the activities of other federal agencies: FERC had in 2018 allowed CMP to enter into service contracts; USDOE issued a Presidential Permit for the Canadian border crossing; FWS's analysis was incorporated into the Corps' EA; and FERC's analysis related solely to consumer rates. Plaintiffs have not shown a likelihood of success that the Corps' conclusion that the overall project was not a major federal action was arbitrary or capricious.

"The [Corps] is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a federal action." Appendix B § 7(b)(2). As we explained above, the Corps lists four factors that should typically be considered in determining whether sufficient federal control exists. Id. Plaintiffs focus in large part on the first listed factor in Appendix B, "[w]hether or not the regulated activity comprises 'merely a link' in a corridor type project." Plaintiffs are correct that the examples in Appendix B do not address dispersed regulated activities or the import of multiple "links." But plaintiffs disregard the framing of the Appendix B factors as "[t]ypical factors to be considered."

Nothing in Appendix B suggests that if a regulated activity is not "merely a link" it necessarily indicates "sufficient control and responsibility" on the part of the Corps.[10]  Even assuming that, as plaintiffs argue, the Corps' regulated activity did not constitute "merely a link" and that, as the plaintiffs also argue, "there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect [its] location and configuration,"[11] we find that the Corps could reasonably rely on the negligible percentage of the entire project that is within Corps jurisdiction to conclude that the Corps did not have "sufficient control and responsibility to warrant Federal review" of the entire project.

Plaintiffs do challenge the Corps' conclusion that only 1.9% of the project is within the Corps' jurisdiction, suggesting

---

[10]    In fact, it is possible to understand this first factor in Appendix B only as rejecting a particular form of but-for causation in the corridor-project context.  See Ellis & Smith, supra note 7, at 10060-61; cf. Ohio Valley Env't Coal. v. Aracoma Coal Co., 556 F.3d 177, 195 (4th Cir. 2009) ("[T]he fact that the Corps' § 404 permit is central to the success of the valley-filling process does not in itself give the Corps 'control and responsibility' over the entire fill.").  And, because this is a corridor-type project, we find the plaintiffs' reliance on White Tanks Concerned Citizens, Inc. v. Strock, 563 F.3d 1033, 1041 (9th Cir. 2009), unavailing.

[11]    The Corps argues that this second factor "is inapt for corridor projects."  "We defer to the Corps' interpretation unless it is plainly erroneous or inconsistent with Appendix B," Sierra Club, Inc. v. Bostick, 787 F.3d 1043, 1054 (10th Cir. 2015), but we need not resolve this interpretive question because we find that the factor is not dispositive even if it applies.

that the proper figure is 17%. Plaintiffs have failed to show,
however, that the 1.9% figure excludes areas within the Corps'
jurisdiction. Cf. Flanagan South, 803 F.3d at 34 (analyzing a
pipeline project and explaining that the agencies' actions,
including the "Corps' Clean Water Act verifications of the
pipeline's many water crossings," were "limited to discrete
geographic segments of the pipeline comprising less than five
percent of its overall length"). Moreover, as the Corps argued to
us, both the 1.9% figure and the 17% figure are well under the 60%
figure referenced in Appendix B's examples. See Appendix B
§ 7(b)(3) ("[I]f 30 miles of [a] 50-mile transmission line crossed
wetlands or other 'waters of the United States,' the scope of
analysis should reflect impacts of the whole 50-mile transmission
line.").

Nor do plaintiffs' arguments about cumulative federal
involvement suffice to tip the scale. For the reasons we have
adverted to, the Corps could rationally conclude that the
involvement of other agencies here did not rise to the level of
cumulative involvement sufficient to trigger Appendix B's
federalization theory. The Corps' holistic determination that
"sufficient 'control and responsibility'" did not exist was not
arbitrary or capricious.

Plaintiffs' remaining challenges also do not demonstrate
a likelihood of success on the merits. Plaintiffs argue that (1)

the Corps failed to adequately assess the baseline environmental conditions in Segment 1 in its EA, (2) apart from any argument about cumulative federal control, the Corps improperly "segmented" its own EA from the USDOE's analysis, (3) the Corps should have conducted an EIS, and (4) the Corps failed to provide adequate opportunity for notice and comment. In several of these claims plaintiffs rely on the premise we have rejected, that the Corps was obligated to review the entirety of Segment 1. In any event, none have merit.

The Corps assessed the baseline environmental conditions in its EA both in a standalone section, and in discussing the environmental impacts of the project. The Corps also incorporated the whole of MDEP's environmental analysis, which discussed baseline environmental conditions along the entirety of the CMP Corridor. Plaintiffs argue in conclusory terms that this assessment was insufficient. Plaintiffs have failed to show a likelihood of success on their claim that the Corps' assessment of the baseline environmental conditions was arbitrary and capricious.[12]

Plaintiffs next claim that the Corps improperly "segmented" its environmental analysis from USDOE's separate

---

[12] Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), on which plaintiffs rely, is plainly distinguishable. In Half Moon Bay the Corps "fail[ed] to set forth any baseline conditions." Id. (emphasis added).

assessment.  This argument is waived.  Plaintiffs did not raise it before the district court, and do not explain why they were unable to do so.  See United States v. Zannino, 895 F.2d 1, 9 n.7 (1st Cir. 1990).  While USDOE did not issue its final EA until January 14, 2021, after plaintiffs filed this appeal, plaintiffs were aware that USDOE and the Corps were conducting separate EAs throughout the district court litigation.  In any event, CEQ regulations direct agencies to coordinate in preparing an "impact statement." 40 C.F.R. § 1508.25(a)(1).  CEQ does not impose similar requirements on EAs and plaintiffs provide no other source of authority for such a requirement.

Plaintiffs also claim that the Corps should have conducted an EIS because "[t]he [corridor] will have significant impacts not only to aquatic resources but also the surrounding forest and wildlife."  Again, plaintiffs fail to demonstrate that the Corps' decision to issue a FONSI instead of proceeding to an EIS was arbitrary or capricious.  The Corps issued a 164-page EA, which analyzed the impacts of the Corps permits on wetlands, as well as surrounding forest land and wildlife.  The Corps' conclusions matched MDEP's own detailed environmental analysis. The Corps considered factors relating to the "intensity" of environmental impact pursuant to CEQ regulations.  40 C.F.R. § 1508.27(b).  Plaintiffs do not challenge those regulations. Instead, plaintiffs state "Segment 1 . . . will run through more

than 800 aquatic resources, and will establish new, fragmenting electrical infrastructure through the Western Maine Mountains." Plaintiffs argue the Corps "failed to consider the effects from forest fragmentation." This is contrary to the record. The argument also fails because it depends on their already rejected assertion that Segment 1 is a major federal action.

Separately, plaintiffs claim that the project is scientifically "controversial" and therefore required an EIS. Cf. Hillsdale Env'tl Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs, 702 F.3d 1156, 1181 (10th Cir. 2012). "Controversy is only one of ten factors the Corps must consider when deciding whether to prepare an EIS." Id. (citing 40 C.F.R. § 1508.27(b)(4)) "[It] is not decisive but is merely to be weighed in deciding what documents to prepare." Town of Marshfield v. FAA, 552 F.3d 1,5 (1st Cir. 2008). Plaintiffs argue that they have submitted a series of affidavits from experts who disagree with portions of the Corps' EA analysis. Many of these claims rely on plaintiffs' unsuccessful argument that the Corps was obligated to consider the environmental effects along the entirety of Segment 1. Plaintiffs and their experts argue, for example, that the greenhouse gas reductions from the CMP Corridor are overstated, and that the impacts of forest fragmentation are understated. Because we have rejected plaintiffs' arguments as to scope, these arguments do not show controversy. Plaintiffs' remaining claims also fail to show

a scientific controversy requiring an EIS.  The Corps considered and responded to criticisms of its methodology and conclusions in its EA, and its analysis accords with the detailed position of MDEP.  This situation is plainly distinguishable from the cases that plaintiffs rely on.  See Sierra Club v. U.S. Forest Serv., 843 F.2d 1190, 1193-94 (9th Cir. 1988) (Forest Service approval of timber sales for "experimental, untested and certainly unproven" clearcutting of giant sequoias was controversial in light of testimony and affidavits from biologists and conservationists opposing the Forest Service's conclusions in its EA); Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 985 F.3d 1032, 1044-46 (D.C. Cir. 2021) (agency decision was controversial where the agency failed entirely to address in its EA criticisms about the use of a particular leak detection technology that was untested for pipelines like the one at issue).

Finally, plaintiffs say that the Corps failed to provide adequate opportunities for notice and comment before issuing the final FONSI.  But the "Corps did provide public notice and held a public hearing as part of its EA review process.  The Corps' public hearing complemented other public hearings associated with the [CMP Corridor] but overseen by other agencies."  CMP Decision at *11.  As the district court noted, the Corps has discretion under CEQ rules as to whether it opens the final FONSI to 30 days of public comment.  CEQ regulations require agencies to provide for

- 23 -

public involvement "to the extent practicable," 40 C.F.R. § 1501.5(e), and hold or sponsor NEPA hearings "whenever appropriate or in accordance with the statutory requirements applicable to the agency," id. § 1506.6(c); see also CMP Decision at *10. A 30-day comment period is only required if an EIS would ordinarily be required, or if the agency's proposed action is "without precedent." 40 C.F.R. § 1501.6(a)(ii). Neither condition is present here.

IV.

The order of the district court is affirmed. This court's January 15, 2021 injunction is vacated.