UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| SIERRA CLUB, NATURAL RESOURCES COUNCIL OF MAINE, and APPALACHIAN MOUNTAIN CLUB, | ) ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | No. 2:20-cv-396-LEW |
| UNITED STATES ARMY CORPS OF ENGINEERS, COL. JOHN A. ATILANO II, in his official capacity as District Commander and District Engineer, and UNITED STATES DEPARTMENT OF ENERGY, | ) ) ) ) ) ) ) | |
| Defendants | ) ) | |
| v. | ) ) | |
| CENTRAL MAINE POWER COMPANY and NECEC TRANSMISSION LLC, | ) ) ) ) | |
| Intervenor-Defendants | ) | |

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
ON THE ADMINISTRATIVE RECORD**

The matter is before the Court for the entry of final judgment on cross motions for

summary judgment on the administrative record. *See* Plaintiffs' Motion for Summary

Judgment (ECF No. 177); Intervenor-Defendants' Opposition to Plaintiffs' Motion for

Summary Judgment and Cross Motion for Summary Judgment (ECF No. 181); Federal Defendants' Corrected Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment (ECF No. 183).  For reasons that follow, Defendants' Motions for Summary Judgment are GRANTED and Plaintiffs' Motion for Summary Judgment is DENIED.

## LEGAL BACKGROUND

The Sierra Club, the Natural Resources Council of Maine, and the Appalachian Mountain Club ("AMC") ("Plaintiffs") filed this civil action to challenge the decision of the United States Army Corps of Engineers ("the Corps") to issue a permit to Intervenor-Defendant Central Maine Power Company ("CMP") that authorizes CMP to discharge certain materials into waters during construction of a new energy transmission corridor from the Canadian border to the Forks Plantation (the "Project").  Through a Second Amended Complaint, Plaintiffs joined a related claim against the Department of Energy that challenges the Department of Energy's decision to issue a presidential permit authorizing an international boundary connection between CMP's transmission corridor and electrical facilities located in the Province of Quebec.  The case presents issues arising under the Clean Water Act, Executive Order 10485, the National Environmental Policy Act, and the Administrative Procedures Act.

The Clean Water Act ("CWA") assigns to the Corps the authority to issue permits for projects that involve or require discharges of pollutants into navigable waters of the

United States ("WOTUS"). 33 U.S.C. §§ 1342, 1344.[1] The applicable CWA regulatory scheme required the Corps to evaluate the Project's anticipated impacts on the public interest. 33 C.F.R. § 320.4. When exercising its review responsibilities over private projects under the CWA, the Corps' obligation is to carry out the CWA's statutory purpose of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), not restoring or maintaining flora and fauna values existing outside of these waters. *See also* 40 C.F.R. § 230.1(a) (purpose of CWA regulatory Guidelines is the same but drawn in terms of "aquatic ecosystems").

The Department of Energy ("Energy") is a defendant in this matter based on its issuance of a presidential permit for the Project's cross-border electrical transmission connection. Executive Order 10485 (Sept. 3, 1953), as amended by Executive Order 12038 (Feb. 3, 1978), provides that "the proper conduct of the foreign relations of the United States requires that executive permission be obtained for the construction and maintenance at the borders of the United States of facilities for the exportation or importation of electric energy and natural gas."

The Corps' and Energy's exercise of their respective permitting authority was informed by the National Environmental Policy Act ("NEPA"). "NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). NEPA supplements a federal

---

[1] The construction project also involves installation of transmission facilities beneath the Kennebec River. Though that activity does not call for the discharge of pollutants into the River, the Corps has jurisdiction to permit such activity under the Rivers and Harbors Act, 33 U.S.C. § 403. The pending motions do not discuss the Rivers and Harbors Act or suggest that any pollutants will be discharged into the Kennebec River.

agency's permit review process by superimposing a variety of procedural requirements, including public notice and public input requirements, and the preparation of an environmental assessment ("EA") or, in more impactful scenarios, a more detailed environmental impact statement ("EIS"). 42 U.S.C. §§ 4332-36e. As part of its enactment of NEPA, Congress established a Council on Environmental Quality ("CEQ") to, among other things, formulate national policy on environmental matters, including matters associated with the implementation of NEPA. 42 U.S.C. §§ 4321, 4342, 4344. CEQ regulations are, therefore, also at issue.

Finally, the Administrative Procedure Act ("APA") provides United States District Courts with judicial power to review the Corps' and Energy's decisions under the aforementioned statutes, with the possible exception of the presidential permit issued under Executive Order 10485. The APA instructs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Judicial review under this standard is deferential. To vacate and remand an agency's decision a district court must conclude that the agency relied on considerations that Congress did not intend, entirely disregarded or overlooked an important aspect of the problem, or explained the basis for its decision in a way that runs counter to the evidence of record or is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S.*, *Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).

Because my review is limited to the administrative record, there are no issues of material fact, and summary judgment is an appropriate procedure for resolving these challenges. *Protect Our Lakes v. U.S. Army Corps of Eng'rs*, No. 1:13-CV-402-JDL, 2015 WL 732655, at *2 (D. Me. Feb. 20, 2015).

## FACTUAL BACKGROUND

The following background is drawn from the parties briefs and associated record citations. It is not a comprehensive statement concerning the New England Clean Energy Connect ("NECEC") Transmission Project. To the extent greater factual detail is needed for the discussion of an issue, the relevant background is supplemented in the discussion.

The Project is a large-scale electrical power transmission corridor designed, principally, to connect a source of non-fossil-fuel energy (Hydro Quebec) with a New England population center (Boston). The portion of the Project that gives rise to this litigation is that portion of the Project that traverses the Western Maine Mountains for roughly 53 miles. The Project requires permits from the Corps to authorize ground drilling and the discharge of pollutants into wetlands to support infrastructure, and the temporary covering of wetlands with construction pads and streams with bridges to enable equipment to transit the Project for purposes of tree cutting, hole drilling, pole-installation, and transmission line-running activity. The Project also involves a subterranean crossing of the Kennebec River.

Beyond the primary activities that compel CWA and Rivers and Harbors Act ("RHA") permits from the Corps, the Project involves some secondary impacts to waters. For example, some of the canopy cover will be cleared in the vicinity of power lines,

including in areas where the Project traverses streams that support brook trout populations. The reduction in cover can result in increased water temperatures. Additionally, the Project includes certain mitigation measures tied directly to water-related concerns. For example, the Project involves the replacement of preexisting road culverts with bridges that are anticipated to improve stream bed conditions for aquatic life. The Project will also suspend power lines over waterbodies, producing a visual impact for persons present on those waterbodies. Yet another step removed from the CWA and RHA concerns that require permitting by the Corps are a host of ecological impacts associated with land-based flora and fauna, such as land-based habitat fragmentation.

At the state level, Maine's Department of Environmental Protection ("MDEP"), Land Use Planning Commission, and Public Utilities Commission ("MPUC"), and state courts have reviewed and approved the Project on a more comprehensive scale. In so doing, the state agencies extracted substantial concessions and mitigation measures that attest to the environmental significance of the Project writ large. However, although the Project as a whole has a significant impact on environmental interests, it does not automatically follow that the permitting authority of the Corps is therefore transformed into an authority to permit or scrutinize components of the Project that do not involve the discharge of pollutants into or the drilling of a subterranean passage under waters of the United States.

In terms of the Department of Energy's permitting authority, it is not apparent that there is any special environmental concern at the border between the United States and Canada. Plaintiffs contend, instead, that Energy's involvement in reviewing the

presidential permit application, when combined with the Corps involvement, lends the Project the kind of federal imprimatur that transforms it into a federal project rather than a private project that requires federal permits.

At the conclusion of the administrative process, first the Corps and then Energy produced NEPA environmental assessments ("EAs") that concluded with findings of no significant environmental impacts ("FONSIs"). These assessments flowed from the more narrowly focused concerns associated with their respective permits (discharges into waters and the border connection). However, as part of its CWA review, the Corps also determined that the Project would not harm the public's interest. Consequently, the Corps discussed environmental concerns at length in its permitting decision, including comprehensive environmental concerns associated with the Project. Energy did likewise, insofar as it incorporated the Corps' environmental assessment into its own permitting decision. Though they accepted public input for purposes of compiling the administrative records and considered what the public had to say,[2] neither the Corps nor Energy circulated

---

[2] From Intervenor-Defendants:

> The Corps issued a Public Notice soliciting comments on March 26, 2019. Corps_20198. Subsequently, on November 1, 2019, the Corps issued another Public Notice announcing that it would hold a public hearing on December 5, 2019 and would continue to receive comments until January 6, 2020. Corps_39239. Hundreds of comments were submitted, and more than 300 individuals attended the hearing, resulting in a robust record. Corps_59078 at 59119-20. The Corps also participated in six days of public hearings before MDEP, which "highlighted the impacts the proposed project would have on fish and wildlife habitat, scenic character, and recreational uses," Corps_51603, and incorporated the voluminous submissions from that proceeding and MDEP's order into its record, Corps_59078 at 59120.
> * * * *
> DOE provided an opportunity for public involvement upon receipt of the application for the Project. [DOE] 61308-09. Further, its role was discussed in both of the Corps' public notices, and DOE attended the December 5, 2019 public hearing. *Id.* During its process,

draft EAs or permitting decisions for public comment or feedback prior to their issuance. In Energy's case, the failure to circulate the decision for public comment contradicted representations about how Energy intended to proceed. Also, although earlier in the review process the agencies considered producing a joint NEPA environmental assessment or impact statement, the Corps ultimately delivered its EA without assistance from Energy. Energy then produced its own, separate EA that incorporated much of the Corps' EA by reference. As well, both federal agencies incorporated into their decisions much of the environmental analyses offered by the state agencies. Desirous of maximal participation and believing that federal law calls for a joint NEPA environmental impact statement (EIS) under the circumstances, Plaintiffs cry foul.

Plaintiffs filed their original complaint, a motion for preliminary injunction, and a first motion to amend the complaint in November and December of 2020 (ECF Nos. 1, 18, 40). By Order of December 16, 2020 (ECF No. 42), I denied preliminary injunctive relief. The First Circuit affirmed that Order in *Sierra Club v. United States Army Corps of*

---

DOE reviewed public comments provided during proceedings before all relevant state agencies, including MDEP and MPUC. *Id.* at 61309.

Intervenor-Defs' Opp'n and Cross Mot. at 3 (ECF No. 181).

From Defendants:

Both agencies conducted environmental reviews, relying extensively on the State agencies' findings. USACE_AR_59078-240; DOE_AR_61293-490. Energy sought motions to intervene in its Presidential Permit process. 82 Fed. Reg. 45013 (Sept. 27, 2017); DOE_AR_61308. The Corps similarly issued a public notice soliciting comments. USACE_AR_20198. At the request of Plaintiff Sierra Club of Maine, the Corps later held a public hearing and continued to review comments for an extended window. USACE_AR_39239, 40613. The Corps additionally participated in public hearings before DEP. USACE_AR_59120, 27313; *see also, e.g.*, USACE_AR_27326, 27865. Federal Defendants reviewed hundreds of comments and many hours of testimony. USACE_AR_59120; DOE_AR_61308-09.

*Engineers*, 997 F.3d 395, 399 (1st Cir. 2021). While the appeal was pending, Plaintiffs further amended the complaint to add Energy as a defendant following Energy's issuance of the presidential permit (ECF Nos. 69, 70, 75), and Intervenor-Defendants intervened in the action (ECF Nos. 62, 68). The operative complaint is now Plaintiffs' Second Amended Complaint (ECF No. 75).

**DISCUSSION**

The questions presented for summary judgment require the application of legal standards found in the CWA, NEPA, and CEQ's NEPA regulations. Because the APA's deferential standard of review overlies my consideration of these questions, the following discussion walks through the CWA and NEPA disputes with the deferential standard of review in mind.

**A.     Clean Water Act**

Plaintiffs contend that the Corps' CWA permit decision is flawed because it (1) does not fairly discuss the availability of practicable alternatives to the proposed path of the Project corridor inside the Western Maine Mountain region and (2) makes a public interest determination that is contradicted by the record. Pls.' Mot. at 7-21.

*1.     Corps' Alternatives Discussion*

The CWA provides that the Corps "may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). As a component of its review of proposed discharges, the Corps is directed by applicable Guidelines to "[e]xamine practicable alternatives to the proposed discharge, that is, not discharging into the waters of the U.S.

or discharging into an alternative aquatic site with potentially less damaging consequences." 40 C.F.R. § 230.5(c) (cross-referencing *id.* § 230.10). In general, this means that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." *Id.* § 230.10. By way of definition:

> An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

*Id.* § 230.10(a)(2). However, "[a]lthough all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities." *Id.* § 230.10.

Plaintiffs argue that the Corps' alternatives discussion (a) fails to properly assess what is practicable in terms of alternative approaches and (b) cherry picks impacts without considering holistic impacts on aquatic ecosystems. Pls.' Mot. at 7-11. Federal Defendants say they considered multiple alternatives and reasonably rejected them based on a myriad of factors. For its part, Intervenor-Defendant contends Plaintiffs' arguments misconstrue both the Corps' regulations and its application thereof, and that no alternatives were practicable given the goal of the Project and the screening criteria used in evaluating alternatives.

<u>a. Practicable alternatives</u>

Plaintiffs argue the Corps skewed its alternatives analysis toward CMP's preferred alternative by using improper definitions of "available" and "capable of being done" to deem otherwise practicable alternatives impracticable. Plaintiffs contend that alternatives were incorrectly deemed unavailable simply because CMP would have had to purchase new parcels and the Corps' alternatives analysis therefore favored CMP's proposed project from the get-go. Specifically, Plaintiffs point to the Corps' rejection of alternatives using existing private logging roads and Alternative Route 2 as arbitrary and capricious because the Corps put too much weight on the alternatives' availability. Plaintiffs further argue the Corps arbitrarily and capriciously dismissed Alternative Route 2 and underground alternatives as not capable of being performed solely because they were too expensive to CMP.

The Corps determined:

> The overall purpose [of the NECEC is] to construct and operate an electrical transmission line and related facilities capable of delivering up to 1,200 megawatts of electrical power from hydroelectric sources in Quebec to the New England Control Area, specifically in response to a Request for Proposals for Long-Term Contracts for Clean Energy Projects from the State of Massachusetts.

Corps_59119.[3] Plaintiffs do not dispute that determination. In considering off-site alternatives, such as Alterative Route 2, the Corps favored routes that (1) avoided conserved lands, (2) avoided undeveloped rights of way, (3) minimized tree clearing, (4)

---

[3] The Corps' alternatives analysis is found within its NEPA Environmental Assessment. Corps_59136-77; *see also* 40 C.F.R. § 230.10(a)(4) ("For actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents . . . will in most cases provide the information for the evaluation of alternatives under these Guidelines.").

minimized stream crossings, (5) minimized total transmission line length, (6) minimized crossings of mapped wetlands and water bodies, (7) minimized intersections with deer wintering areas, (8) minimized intersections with inland waterfowl and wading bird habitat, (9) minimized crossing of public water supplies, (10) minimized crossings of significant sand and gravel aquifers, and (11) had "the highest likelihood of successful land rights acquisition and utilized the number of parcels for which [CMP] would need title." Corps_59137-38.  After review of the record, I cannot say that the Corps impermissibly favored this eleventh factor over the other ten so as to skew its analysis.

The Corps did note "CMP's projected inability to obtain an easement to cross the [Appalachian Trail ("AT")] brings into question the overall availability of this alternative," however, the Corps also concluded that even if practicable Alternate Route 2 was not less environmentally damaging than the preferred alternative.  The record before the Corps supports this determination as reasonable.  When compared to CMP's preferred alternative, Alternative Route 2 crosses more conserved lands, streams, and wetlands with a negligible to minor increased environmental impact when compared to the preferred alternative, Corps_463-64, 59145-46; crosses the same number of deer wintering areas and waterfowl and wading bird habitats with a decreased impact area, Corps_59145-46; requires less clearing and development of undeveloped right of way, *id.*; and requires CMP to obtain more parcels (included rights across the Penobscot Indian Nation, the Bigelow Preserve, and the Appalachian Trail corridor).  Altogether, the record does not indicate the Corps' impermissibly favored CMP's preferred alternative or put too much weight on Alternative Route 2's availability.  Likewise, the information before the Corps indicates Alternative

Route 2 and the preferred alternative are quite similar with respect to environmental impact to WOTUS. Therefore, I cannot find the Corps acted arbitrarily and capriciously in ruling out Alternative Route 2 on the basis that it was not less environmentally damaging than the preferred alternative.

The record also reveals that the Corps rejected logging road alternatives not because of a skewed analysis but because they were unavailable or impracticable. Plaintiffs' challenge focuses on Spencer Road, the only logging road the Corps deemed practicable. Corps_59157. In 2014, the then-owner of Spencer Road rejected the idea of any transmission line on its land. Corps_36155_0217-18. By 2016, Spencer Road was acquired by Weyerhauser Company, with whom CMP had prior dealings to acquire its preferred alternative. *Id.* In 2019, CMP inquired about buying Spencer Road and Weyerhauser responded that CMP would have to follow the same three-year process it had to acquire the existing corridor. *Id.* The Corps then concluded that Spencer Road was impracticable because the "logistics and time required to acquire the land would result in the [Project] not moving forward." Corps_59158. Plaintiffs argue this reasoning is arbitrary and capricious as Spencer Road was "available" from 2016 onward. All parties cite the "market entry" approach analyzed in *Bersani v. Environmental Protection Agency*, where availability is assessed at the time the permit applicant enters the market to search for a site. 850 F.2d 36, 44 (2d Cir. 1988). Plaintiffs contend this means Spencer Road was available when Massachusetts sent out a request for proposals. Defendants instead argue this means Spencer Road was unavailable in 2014, when CMP began acquiring land for a transmission corridor.

The applicable regulations and policy better support Defendants' argument. The *Bersani* Court used, and I adopt, an interpretation of the regulations which noted 40 C.F.R. § 230.10(a)(2) was silent with respect to timing[4] and the objectives and policy of the CWA supported the market entry approach to timing. *Bersani*, 850 F.2d at 44. The Second Circuit noted:

> If the practicable alternatives analysis were applied to the time of the application for a permit, the developer would have little incentive to search for alternatives, especially if it were confident that alternatives soon would disappear. Conversely, in a case in which alternatives were not available at the time the developer made its selection, but became available by the time of application, the developer's application would be denied even though it could not have explored the alternative site at the time of its decision.

*Id.* Spencer Road closely fits this latter case. Developers purchase sites before requests for proposals or permitting applications are received. To read the CWA as requiring that alternatives be available at those times would mean there is little to no incentive to explore alternatives for a particular project that begins post-purchase. It would also run afoul of applicable regulations that apply to alternatives not owned by the applicant. Those regulations specify such an alternative may be considered if it "could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity." 40 C.F.R. § 230.10(a)(2). The Corps was permitted to, and did, consider whether that alternative was obtainable in light of the increased time to finish the Project.

---

[4] Although the regulation uses the present tense language "an alternative is practicable if it *is* available," 40 C.F.R. § 230.10(a)(2) (emphasis added), a common-sense approach suggests that writing the regulation in present tense should not convey a special timing condition, particularly where the regulation does not say when to analyze if an alternative is available. *See Bersani*, 850 F.2d at 43 ("[T]he 'present' of the regulations might be the time the application is submitted; the time it is reviewed; or any number of other times.").

Corps_59158.  The Corps' conclusion that Spencer Road was unavailable is reasonable and supported by the underlying record.

Plaintiffs also argue that the Corps impermissibly ruled out undergrounding alternatives and Alternative Route 2 due to their high cost.  Having already determined the Corps reasonably rejected Alternative Route 2 as not less environmentally damaging,[5] I focus only on the undergrounding alternatives.  The applicable regulations explicitly task the Corps with considering cost in assessing practicability, though they offer no equations or methodology.  40 C.F.R. § 230.10(a)(2).  Federal Guidelines do provide that analysis should "consider those alternatives which are reasonable in terms of the overall scope/cost of the proposed project."  Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85336, 85339 (Dec. 24, 1980).

The Corps' environmental assessment included cost estimates of multiple underground alternatives in comparison to the current project cost of $950 million.  Corps_59154.  It estimated $1.9 billion to install the entire transmission line underground and $2.6 billion in total construction costs.  *Id.*  If only the transmission line in Segment 1 was installed underground the estimated cost would be $750 million and $1.6 billion in total construction.  *Id.*  An alternate underground route co-located with an existing transmission line would cost approximately $2.8 billion total.  *Id.*  The Corps concluded, "[i]n each scenario, the underground alternative is not practicable due to cost, relative to the overall cost of the Project."  *Id.*  The Corps' cost estimates are supported by the record.

---

[5] "[T]he purpose [of 404(b)(1) permitting guidelines] is to create an incentive for developers to avoid choosing wetlands when they could choose an alternative upland site."  *Bersani*, 850 F.2d at 44.

Witnesses for and against the Project agreed that undergrounding was more expensive. *See* Corps_20002. Testimony and a peer-reviewed study repeated that underground transmission lines are more expensive than overhead lines. *See id.* (citing Robert Benato & Domenico Napolitano, *Overall Cost Comparison Between Cable And Overhead Lines Including The Costs For Repair After Random Failures*, ELECTRA, Dec. 2012, at 9.). CMP, via engineering consultants, provided itemized, detailed estimates of underground alternatives. Corps_20029-45.

Plaintiffs do not dispute these cost estimates. Instead, Plaintiffs argue that the Corps' cost inquiry was superficial and conclusory without any underlying analysis. There is much analysis and opining on undergrounding costs in the record before the Corps, and it is apparent that the Corps adopted those estimates in its environmental assessment. I do not find it irrational that the Corps found those alternatives too costly. The cheapest option, undergrounding only Segment 1, was still 67% more expensive than the total cost of the preferred alternative. Corps_19982. I do not find that the Corps' conclusion that this increased cost renders the project impracticable arbitrary and capricious. Nor do I find that the Corps failed to consider the cost of undergrounding relative to the cost of the whole project. After laying out the costs of undergrounding alternatives, the Corps stated "[t]hese costs are approximately three times more costly than the preferred alternative. In each scenario, the underground alternative is not practicable due to cost, relative to the overall cost of the Project as proposed and contractually agreed to through the Massachusetts RFP solicitation." Corp_59150. The Corps' brevity does not show that it merely stated its cost was too high without sufficient analysis. The record contains in-depth cost analysis. The

Corps adopted that analysis, and its conclusion that it would be impracticable to increase the project cost by, at least, 67% is not unreasonable.

In any event, the record indicates that the Corps considered more than just cost. While the Corps did conclude "the underground alternative is not practicable due to cost," Corps_59150, the Corps also assessed the environmental impacts of undergrounding and concluded installing an underground transmission line "would add significant risk to the hydrology of wetlands and waterbodies along and adjacent to the project route," and that CMP "sufficiently demonstrated that [an underground] alternative is not environmentally less damaging than the preferred alternative." *Id.* at 59151-54. Indeed, after arguing "the Corps simply stated that some alternatives were simply too expensive," Pl.'s Mot. at 10, Plaintiffs go on to argue that the Corps' environmental analysis of those same alternatives was deficient. While I have found the Corps' costs considerations appropriate, I nonetheless turn to the Plaintiffs' cherry-picking arguments in the interest of completeness.

   b.    Holism

Plaintiffs argue that the Corps "cherry-picked" environmental impacts instead of considering them holistically when evaluating alternatives. Plaintiffs focus on the Corps' rejection of underground and on-alignment shift alternatives. *Id.* at 59148-54, 59171. Plaintiffs contend that the Corps instead introduced a new screening criteria of sedimentation impacts while ignoring criteria favorable to the alternatives. Plaintiffs further argue that the Corps took a quality-over-quantity approach to its analysis, improperly focusing on acreage impacted instead of the impact to the aquatic ecosystem.

On the environmental impacts of undergrounding, the Corps' EA concluded:

17

[T]he surface disruption caused by trenched underground transmission line construction is continuous along its length rather than intermittent and widely spaced at each overhead structure installation location. In areas of uneven or side-sloping terrain, grading and significant cuts and fills would need to occur to provide a safe travel surface for equipment and personnel during construction, operation, and maintenance. The additional surface disruption would require additional control measures for soil erosion, sedimentation, and dust generation during construction, and poses a risk that those control measures could be damaged during an extreme weather event. Further, underground installations involving trench excavation entail significantly more trench de-watering than individual transmission structure excavations, resulting in an increased risk of sedimentation in wetlands and waterbodies.

***

The inspection, maintenance and repair requirements for underground transmission lines requires access to every jointing location along the route. This requires permanent access roads to be maintained to each jointing location. For overhead lines, permanent access roads to each structure are not required. As a result, the extent of permanent wetland fill to construct the Project in an underground configuration would be significantly higher than an overhead design. In addition, for an underground design, permanent stream crossings would need to be constructed and maintained.

Corps_59151-52.

The record contains extensive testimony on underground alternatives. Testimony on behalf of Plaintiff AMC during state proceedings proposed underground transmission lines along existing corridors such as Spencer Road or Route 201. Corps_17671-72. It noted such an alternative would "eliminate or greatly reduce the fragmentation impacts, resulting in much less clearing," and "[t]here would be wetland and stream impacts, but these resources are already impacted by the road, and burying the line next to the road results in limited and marginal additional impacts, as opposed to the greater impacts to relatively intact streams and wetlands located within the new corridor." Corps_17672. Rebuttal testimony discussed the availability, costs, and environmental impact of

underground alternatives.  *See, e.g.*, Corps_20004-05.  That testimony stated that undergrounding would require a clearing width of 75 feet as opposed to 150 feet for overhead lines.  Corps_20004.  It also discussed the different impacts from underground transmission lines, namely continuous surface disruption along the line that brings about erosion, sedimentation, and dust generation during construction as well as the requirement of permanent access roads for maintenance and repair, which also increases the impact to wetlands.  *Id.*

The record indicates that these "cherry-picked" impacts were impacts particularly salient when discussing undergrounding alternatives.  The Corps, tasked with considering the environmental impacts of alternatives, considered specific impacts, such as sedimentation, in an appropriate context.  Plaintiffs' argument that the Corps cherry-picked certain impacts seems closer to an argument that the Corps gave weight to testimony from CMP witnesses.  An agency is afforded great latitude in assessing the credibility and importance of evidence.  It was not arbitrary and capricious for the Corps to focus on impacts that were discussed at length in the record.  Nor do I find it arbitrary and capricious for the Corps to conclude the underground alternatives are not less environmentally damaging based on the evidence in the record.

The story is much the same for on alignment shift alternatives.  These alternatives involve shifting the location of the transmission line within the proposed corridor or zig-zagging throughout the corridor to avoid WOTUS.  Plaintiffs argue these alternatives were rejected based on the quantity of acreage impacted and not the specific impact to wetlands.  Plaintiffs add the Corps failed to consider alternatives that reduced impact to brook trout,

such as minor alignment shifts or increase pole height to keep overhead canopy coverage.

With respect to zig-zagging, the Corps concluded,

> Zig-zagging through the 300-foot-wide corridor would require at least three additional angle structures for each jog in the corridor, which would increase soil disturbance through larger site development and temporary impact areas, increasing the threat of erosion and sedimentation and the potential to directly impact protected natural resources. Also, zig-zagging throughout the corridor may not achieve the overall goal of avoidance and then minimization, since it may simply shift the impacts to other protected natural resource areas.

Corps_59171. Again, this assessment adopts evidence in the record. I do not find it arbitrary and capricious for the Corps to consider impacts specific to this alternative nor to reject this alternative based on those impacts. When assessing shifting the alignment north, as opposed to the preferred alternative (south), it is true the Corps' environmental assessment lists impacts by acreage. *See id.* But this does not ring of improperly focusing on acreage. Plaintiffs urge that the Corps prioritized quantitative values presumably because it ultimately found the north alignment practicable. But the CWA does not mandate particular outcomes, and my review of the Corps' permitting decision is limited to whether that decision was rational. The Corps concluded, "direct impacts to waters of the U.S. for both alignments were similar but that secondary impacts, i.e., temporary fill and forested wetland conversion, were substantially greater on the northern alignment." *Id.* The Corps breakdown of wetland impacts is granular and evidences that they considered impacts on both a qualitative and quantitative level.[6] The comparison between

---

[6] For instance, in listing the acreage of environmental impact the Corps distinguished between forested wetlands, wetlands of special significance, inland waterfowl and wading bird habitat, and significant vernal pools. *See* Corps_59171.

the north and south alignments is not so outcome-determinative as to remove the Corps' decision from the realm of rational decision-making.

With respect to alternatives proposed to limit the impact on brook trout, the record shows CMP's own proposal includes leaving trees at specific crossings to keep full shade and minimize such impacts, as suggested for other alternatives. Corps_36155_44. The Corps deemed other aerial crossings to have no impact on WOTUS or the least environmental impact. *See* Corps_59083, 59166. Plaintiffs are correct to state the Corps cannot simply cite to state proceedings to demonstrate that they considered alternatives; however, the Corps is entitled to incorporate state-level testimony and evidence into its conclusions. Before the Corps was the suggestion to shift the project to avoid crossings near brook trout. At the state level, testimony refuted those suggestions as either unavailable or demonstrated the proposed crossings had little-to-no impact. *See* Corps_19766-19767. The Corps reiterated this in its analysis, evidently giving weight to that evidence. The Corps' EA does not reveal indifference or ignorance to shifting alternatives but rather a reasonable rejection.

### 2.    *The Corps' Public Interest Discussion*

The Corps' review of a permit application under the CWA requires consideration of how the proposed activity will impact the public interest. 33 C.F.R. § 320.4(a). This is a wide-ranging inquiry that exists separate and apart from the NEPA procedural overlay associated with the production of environmental assessments and impact statements. In other words, the CWA's public-interest-review requirement is not exclusively a concern for environmental impacts and allows the Corps to weigh a number of values important to

the public.  One implication of the public interest review is that a permitting decision may

be of considerable length and incorporate related assessments made by state regulators, but

for NEPA purposes may contain a finding of no significant impact concerning the

environmental impacts of the proposed discharge into waters of the United States.  This

breadth of the public-interest-review requirement is best understood by a review of the

regulation, the initial component of which I quote at length:

> The decision whether to issue a permit will be based on an evaluation of the
> probable impacts, including cumulative impacts, of the proposed activity and
> its intended use on the public interest.  Evaluation of the probable impact
> which the proposed activity may have on the public interest requires a careful
> weighing of all those factors which become relevant in each particular case.
> The benefits which reasonably may be expected to accrue from the proposal
> must be balanced against its reasonably foreseeable detriments.  The decision
> whether to authorize a proposal, and if so, the conditions under which it will
> be allowed to occur, are therefore determined by the outcome of this general
> balancing process.  That decision should reflect the national concern for both
> protection and utilization of important resources.  All factors which may be
> relevant to the proposal must be considered including the cumulative effects
> thereof: among those are conservation, economics, aesthetics, general
> environmental concerns, wetlands, historic properties, fish and wildlife
> values, flood hazards, floodplain values, land use, navigation, shore erosion
> and accretion, recreation, water supply and conservation, water quality,
> energy needs, safety, food and fiber production, mineral needs,
> considerations of property ownership and, in general, the needs and welfare
> of the people.  For activities involving 404 discharges, a permit will be denied
> if the discharge that would be authorized by such permit would not comply
> with the Environmental Protection Agency's 404(b)(1) guidelines.  Subject
> to the preceding sentence and any other applicable guidelines and criteria
> (see §§ 320.2 and 320.3), a permit will be granted unless the district engineer
> determines that it would be contrary to the public interest.

33 C.F.R. § 320.4(a).  The regulation continues with additional policy language on a

number of specific concerns, including but not limited to wetland resources; fish and

wildlife; historic, cultural, scenic, and recreational values; conditions or requirements imposed on the project by other regulatory authorities, federal or state; environmental benefits; economics; and mitigation measures. *Id.* § 320.4(b), (c), (e), and (j), (p), (q), and (r).

Concerning requirements imposed by, for example, state regulatory authorities, the regulation explains that state, local, and tribal governments have "primary responsibility for determining zoning and land use matters," and that the Corps may "accept decisions by such governments on those matters unless there are significant issues of overriding national importance." *Id.* § 320.4(j)(2). "In the absence of overriding national factors of the public interest that may be revealed during the evaluation of the permit application, a permit will generally be issued following receipt of a favorable state determination provided the concerns, policies, goals, and requirements as expressed in 33 CFR parts 320-324, and the applicable statutes have been considered and followed . . . ." *Id.* § 320.4(j)(4). The list of relevant statutes includes, of course, NEPA, discussed in Part B of this discussion. *Id.* But for present purposes, Plaintiffs argue the Corps' public interest discussion was arbitrary and capricious because (a) it is "skewed" in favor the project, (b) makes unwarranted assumptions about the greenhouse gas implications of the Project, (c) misses the mark on recreational impacts, and (d) unreasonably relies on mitigation measures to conclude that the Project does not harm the public.

a.   Skewed analysis

Plaintiffs attack the Corps' CWA public interest review as including an improperly skewed economic analysis. Plaintiffs insist the Corps first improperly put a thumb on the

scale by offering CMP the opportunity to collaborate on the environmental assessment to highlight the projects benefits.  But such an opportunity is expressly allowed under the regulations: "If the district engineer determines, based on comments received, that he must have the views of the applicant on a particular issue to make a public interest determination, the applicant will be given the opportunity to furnish his views on such issue to the district engineer."  33  C.F.R.  §  325.2(a)(3).  Plaintiffs  do  not  attack  the  district  engineer's determination that he must have the views of CMP as arbitrary and capricious, so my consideration of this argument ends here.

Beyond that, Plaintiffs contend the Corps' review of economic benefits must be limited to those that are tethered to the physical dredge and fill activity permitted.  Plaintiffs thus bemoan the Corps' consideration of specific economic benefits as lacking a nexus to the project's physical impact:

> 15M for fiber optic and broadband expansion (5 yrs.)
>
> 10.5M for economic development and promotion of regional tourism (10 yrs.)
>
> $6M for education funding . . .
>
> $3M in benefits to the Passamaquoddy Tribe (40 yrs.) . . .
>
> $15M for electric vehicle infrastructure (5 yrs.)
>
> $15M for heat pump support (8 yrs.)
>
> $2.5M for decarbonization & Maine energy resource planning studies

Corps_59189.  CMP argues Plaintiffs misconstrue these benefits as too attenuated from the Project when they directly result from a stipulation to obtain MPUC approval and would not occur without project construction.  Alternatively, CMP argues that if $67 million in economic benefits was indeed off the table any consideration the Corps gave them was a

harmless error because the Corps also rightfully considered nearly $1.5 billion in economic benefits directly tethered to the Project such as the increase in Maine's gross domestic product, worker compensation, lower electricity cost, and tax revenues. Federal Defendants add that an applicable regulation explicitly allows consideration of broader economic impacts such as "employment, tax revenues, community cohesion, community services, and property values." 33 C.F.R. § 320.4(q).

The CWA and applicable regulations do not lay out hard limits on the scope of the economic analysis for a public interest review. It might be reasoned that the Corps' economic analysis under the CWA must be tethered to effects that result from the physical changes to WOTUS, *see Mall Properties.*, *Inc. v. Marsh*, 672 F. Supp. 561, 565-71 (D. Mass. 1987) (so reasoning), but an overly restrictive view in this regard might exalt form over substance and be hyper-technical, depending on the project. After all, the regulation does speak of "economics" and the "needs and welfare of the people." 33 C.F.R. § 320.4(a). Defendants argue the *Mall Properties* line of thinking is inapplicable here because it predates 33 C.F.R. § 320.4(q). That portion of the regulation, which is specifically addressed to economics, reads:

> When private enterprise makes application for a permit, it will generally be assumed that appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the market place. However, the district engineer in appropriate cases, may make an independent review of the need for the project from the perspective of the overall public interest. The economic benefits of many projects are important to the local community and contribute to needed improvements in the local economic base, affecting such factors as employment, tax revenues, community cohesion, community services, and property values. Many projects also contribute to the National Economic Development (NED), (i.e., the increase in the net value of the national output of goods and services).

33 C.F.R. § 320.4(q).

A plain reading of § 320.4(a) and (q), minimally, gives the Corps leeway to exercise discretion when it comes to assessing the likely economic outcomes of projects. Discretion can be reasonably exercised or abused, depending on the situation. In my own view, the economic factor rather clearly allows the Corps discretion to assess whether and even the extent to which proposed disruptions to WOTUS will bear economic fruit from a cost-benefits perspective by referencing the anticipated benefits of the finished project. With a project that creates a green energy corridor through a remote region, having limited economic development, the economic benefits may well be varied and far-reaching at the local level (the list of objected-to items involve anticipated local impacts). I do not find the Corps' contemplation of these benefits to be irrational, and in any event there is a veritable bounty of economic benefits on the scale, even if Plaintiffs' flyspeck argument has more legal merit than just expressing a difference of opinion.[7]

---

[7] Plaintiffs assert that "over a third of the alleged economic benefits the Corps considered were improper." Pls. Mot. at 14. However, my review cannot be limited to the quantity of economic impacts considered but must also consider the quality of each impact. The benefits that Plaintiffs challenge amount to $67 million. Other permissible benefits, such as lower electricity costs, increases to Maine's gross domestic product, worker compensation, and tax revenue, amount to $1.4 to $1.5 billion. Corps_59189. The Corps rationally concluded that the economic public interest factor favored the grant of the needed permits. *Id.* And even if some impermissible economic factors were considered, it would not automatically make the Corps' decision arbitrary and capricious. "While agency decisions must be sustained, if at all, on their own reasoning, . . . this principle does not mechanically compel reversal when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." *Kurzon v. U.S. Postal Serv.*, 539 F.2d 788 (1st Cir. 1976) (internal quotation marks omitted). I would conclude that the Corps' decision was rational insofar as the $67 million line items are concerned, even if Plaintiffs had convinced me that those items were too attenuated to deserve mention. Ultimately, the weight of the economic analysis favors rather than detracts from the project.

On another tack, Plaintiffs argue that any rightfully considered benefits are outweighed by detriments that the Corps failed to consider. In Plaintiffs view, the Corps wholly ignored these detriments while touting other benefits. Plaintiffs also malign the Corps use of the state agency public interest analysis. Both the Maine Public Utilities Commission and Maine Department of Environmental Protection performed public interest analyses; however, these agencies used different standards and considered factors outside the Corps' purview. Plaintiffs urge that the Corps public interest review cannot use these state agency findings to support its own public interest review and, on the record before the Corps, its finding that the Project is in the public's interest is unreasonable. Plaintiffs point to portions of the record suggesting that the tourism and guiding industries will be negatively impacted by the Project.

Plaintiffs' argument fails because when weighed against the permissible benefits the Corps considered, adverse impacts to recreation do not make the Project's overall economic impact contrary to the public interest. At the state level, MPUC found that there was some unquantifiable adverse impact to scenery, tourism, and recreation, but nonetheless concluded that the Project, overall, had a net economic benefit. Corps_24458. Likewise, MDEP found that the project "will not adversely affect existing uses that are related to the scenic character," based on photo simulations and survey data. Corps_51658. Plaintiffs are correct that MDEP was not evaluating the Project's economic impact and that the Corps' standard was not the state agency's standard of "unreasonable adverse impact." Corps_51660. But it is not irrational for the Corps, in its independent analysis, to find that

the economic impact on tourism would be minimal based on the state agency findings. As

the Corps put it:

> Concerns that tourism will be adversely affected by the project are speculative. Once constructed, the NECEC project and all of its components are operationally benign, meaning there is little active human activity and no ongoing disturbance. As has been noted. Segment 1 in particular is a destination for hunters, fishermen, boaters/rafters, snowmobile and ATV users, hikers, and outdoor naturalists. Most of this recreation occurs on private timberlands under broad agreements with the landowners. Assuming landowner permission continues, none of these uses will be restricted. The [underground] crossing of the Kennebec River Gorge eliminates any visual impact and the general outdoor experience for rafters and other users of the river. Hikers along the Appalachian Trail (AT) and other local trails will continue to have full access, albeit with some new exposure to the transmission line, at least partially mitigated by actions proposed to minimize visual effects from higher vantage points and at the existing AT crossings at Moxie Pond. Pursuant to the Section 106 Memorandum of Agreement, the National Park Service and several key trail conservancies support the improvements at the Moxie Pond location. Hunting and fishing opportunities continue to abound in the region and the applicant has minimized the potential for short-term and long-term impacts to wildlife and fisheries. Existing levels of ATV use and trail networks are expected to remain unchanged and snowmobile opportunities may actually be improved.

Corps_59126-27. This economic analysis drew largely the same conclusion on largely the

same facts as state agencies: detraction to scenery-based activity is minimal therefore

adverse economic effects to scenery-based activity will be minimal. The conclusion is

within the zone of reasonableness.

#### b. Greenhouse gas

Plaintiffs next argue the Corps was incorrect to determine the Project was in the

public's interest because of its anticipated positive impact on greenhouse gas ("GHG")

emissions. Plaintiffs attack both the scope of the Corps' review and the sufficiency of its

findings. First, Plaintiffs contend that the Corps, in performing its CWA analysis, should

have refused to consider environmental impacts beyond that of dredge and fill activity as it did during its NEPA analysis.  Plaintiffs further attack the Corps' conclusion that GHG emissions will be reduced as unproven by the record.

With respect to the scope, the Corps assessed the Project under both NEPA and the CWA. Each statute and its applicable regulations set the scope of each review. Unsurprisingly, those scopes are not the same, nor will one limit the other.  In its CWA public interest review, the Corps must "evaluat[e] of the probable impacts, including cumulative impacts, of the proposed activity."  33 C.F.R. § 320.4(a).  When the permitted activity is installing a transmission line, impacts on energy use (and its resultant impact on GHG emissions) is not so far attenuated the Corps cannot consider it.

As to the sufficiency of the Corps' determination, the record contains extensive argument over GHG emission values.  The conclusion that the Project will result in reduced GHG emissions requires, among other things, that Hydro-Quebec ("HQ") be able to meet energy delivery thresholds.  If it cannot, then GHG emissions may stay the same or increase as other HQ customers increase fossil fuel use or HQ builds more infrastructure.  Going back to the state level, MPUC concluded:

> [T]he NECEC will result in significant incremental hydroelectric generation from existing and new resources in Quebec and, therefore, will result in reductions in overall GHG emissions . . . . In making this decision, the Commission recognizes the inherent uncertainty in determining how HQ Production will develop and operate hydroelectric facilities over the next 20 years and beyond; thus the levels of incremental hydroelectric generation and GHG reductions resulting from the NECEC cannot be precisely determined.

Corps_46606.  MDEP "accept[ed MPUC] findings on this issue and weigh[ed] the [Project's] reductions in GHG emissions against the Project's other impacts in its

reasonableness determination." Corps_51707. Likewise, the Maine Law Court found that "the NECEC project will result in incremental hydroelectric generation [and] will reduce greenhouse gas emissions in the region." *NextEra Energy Res.*, 227 A.3d 1117, 1127 (Me. 2020).

In reaching its conclusion, MPUC relied, in part, on studies and testimony from Daymark Energy Advisors and London Economics International ("LEI"). Corps_46606. Plaintiffs paint these studies as flawed because they explicitly assumed HQ had sufficient energy to meet its contract requirements. Corps_42966. MPUC also considered HQ's past spillage (water not converted to energy) numbers and the fact that CMP would rationally want to increase capacity and storage. Corps_46606-07. Plaintiffs argue that these assumptions are faulty because past spillage numbers may not make future numbers predictable and because in the state proceedings CMP represented that GHG emissions were irrelevant to MDEP's decision.

The parties go back and forth on multiple reports assessing HQ's capabilities. After state proceedings had finished, NorthBridge Energy released a report, provided to the Corps, in which it concluded that HQ's energy output requirements, including the Project, "will eventually create the need for the construction of new hydro facilities, with their associated environmental impacts." Corps_45846. Plaintiffs also point to a report they had prepared by Energyzt Advisors, which disclaimed HQ's ability to "service NECEC without diverting energy from other markets and engaging in greenwashing . . . ." Corps_46887. The Federal Defendants conducted their own peer review. Energy contractor ICF reviewed CMP's climate change benefits analysis. In a preliminary report,

ICF noted the information before it was insufficient to perform a detailed assessment of HQ's hydro capacity and energy production. Corps_42966. Energy subsequently sought more information from CMP, and ICF updated the report. The updated report noted that wide-range, complex modeling that simulates market operation by the hour would be able to provide "some confidence [HQ] would, or would not, be able to meet the contractual requirements of the NECEC." Corp s_49510. None of the parties involved in the Project performed such modeling. Nonetheless, on the information it had ICF concluded:

> [I]t is likely that [HQ] can meet the energy delivery requirements for NECEC with its current and planned incremental supply and not need to divert clean energy from other areas that it would otherwise serve, and thereby increase fossil generation to serve these customers and increase greenhouse gas emission. Thus, we infer that the expected operation of NECEC will likely result in a reduction in GHG emissions in New England and neighboring markets.

Corps_49513. ICF used some assumptions about HQ's standard operating conditions in reaching this conclusion. *Id.* And ICF included a caveat that the information it had did not allow it "to state conclusively that [HQ] will have incremental capacity and energy from clean energy resources to meet the NECEC obligation in each hour of the 20-year contract period." *Id.* Plaintiffs put much stock in this qualification. In Plaintiffs view, when coupled with the lack of modeling and a preliminary lack of sufficient information that qualification means "ICF's guesstimates are explicitly riddled with assumptions," rendering it improper for the Corps to use them in making a public interest determination. Pls.' Combined Resp. and Reply (ECF. No. 185) at 13.

This Court "must take into account contradictory evidence in the record." *Penobscot Air Services, Ltd. v. F.A.A.*, 164 F.3d 713, 718 (1st Cir. 1999). But "the

possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* (quoting *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 523 (1981)).  All of the reports the parties cite contain some level of assumptions and qualifications, as is the case with most predictive studies.  It is not within this Court's' purview nor expertise to determine if those assumptions and qualifications are reasonable for some studies while rendering others unreliable.  For instance, Plaintiffs ignore that the Energyzt report is one of the studies included in ICF's statement that "the information available in the provided studies is not sufficient . . . to perform a detailed assessment of hydro capacity and energy production capability."  Corps_42966.  Yet they ask this Court to credit that report over the Daymark and LEI studies.  It is true that if the evidence the Corps relies on is so lackluster that any conclusion drawn from it is inherently unreasonable its decision will not be entitled to deference.  The studies here conflict, build on different assumptions, and impose various qualifications, but none is so markedly unfounded that the Corps was wrong to consider them.  Likewise, if the Corps' conclusion flies in the face of the data and experts it is arbitrary and capricious.  But there is no consensus among the reports such that I could find that the Corps' conclusion completely disregards the evidence.  It is not this Court's place to re-weigh that evidence.  In this instance then, the standard of review is whether the Corps itself adequately weighed the evidence and did not act in a conclusory, unreflective manner. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018).

Did the Corps adequately consider conflicting evidence?  The Corps stated:

The USACE has reviewed the large amount of detailed and often conflicting information submitted by both sides in this matter. The applicant has furnished additional information to include information from Hydro-Quebec. We have coordinated with DQE on this issue, and they in turn directed a peer review of all of the various analyses performed by an agency contractor with special expertise in this area. The independent review concluded that the expected operation of NECEC would likely result in a reduction in greenhouse gas (GHG) emissions, specifically carbon dioxide emissions, in New England and neighboring markets.

*****

It is reasonable to expect the project will result in an annual reduction in GHG emissions in New England. The claim that the NECEC will result in additional GHG emissions because Hydro-Quebec would have to reduce existing export levels to other markets in order to supply the NECEC and those other markets would then have to resort to burning dirtier fuels appears to be unfounded as there appears to be sufficient capacity for Hydro-Quebec to fulfill all of its obligations.

Corps_59199-200. I do not find that this assessment or conclusion amounted to arbitrary and capricious behavior or that the conclusion lacks substantial evidentiary support. The Corps deferred to the MPUC and found the LEI and Daymark studies credible. Corps_59199. Notwithstanding the credibility finding, the Corps coordinated with Energy to conduct an independent review in part because Energy "identified gaps in the assumptions and analysis that limited their ability to fully vet the results of the studies and understand the drivers underpinning the stated reductions in GHG emissions." Corps_43578. The ordered report specifically addresses some of Plaintiffs concerns. The Corps' environmental assessment agrees with the ICF conclusion, but not at the expense of competing evidence. The Corps did not refute contrary studies line-by-line, but the record shows they rejected the conclusions in those studies based on ICF's determination

that HQ could fulfill its contractual requirements.  The foundational evidence for this rejection is not baseless and the rejection is not unreasonable.

### c.  Recreation

Plaintiffs claim the Corps' decision that recreational impacts were negligible and/or beneficial is contrary to record evidence.  Plaintiffs argue the Corps wholly deferred to state agency determinations without conducting its own analysis despite having a separate standard from those agencies and record evidence of detrimental effects to recreation.

Looking at those state determinations, MPUC was tasked to "make specific findings with regard to the public need."  Corps_24428.  Under Maine law, public need is equivalent to public interest, and MPUC interprets public as regionally limited to Maine.  *Id.* (citing *Enhanced Commc'n of N. New Eng.*, *Inc. v. Pub. Utils. Comm'n*, 169 A.3d 408, 413 n.4 (Me. 2017)).  MPUC found that the Project would have adverse effects on scenic and recreational values (and therefore, tourism and recreation), but those affects were balanced by the benefits of the Project.  Corps_24417.  MPUC also deferred to MDEP's findings in these same areas.  *See* Corps_24418, 77.

MDEP considered testimony, public comment, and record evidence on recreational activity throughout the Project (primarily in segment one), and found:

> The project will not impose limitations on these activities. Outdoor recreationalists will be able to cross the corridor and access the same areas they have traditionally used.
>
> *****
>
> The proposed line will be co-located with this previously existing transmission line corridor and within a previously existing transmission line right-of-way where the AT and the project intersect. Hiking will not be

> impeded here or at other hiking trails. With regard to fishing, the proposed line was routed to avoid some particularly sensitive fish spawning stream headwaters, and the line in some potentially affected sensitive fish spawning areas will be elevated to allow for the growth of taller vegetation within the corridor that will provide shade for fish habitat.

Corps_51659-60. Based on those findings, MDEP concluded "the project will not have an unreasonable adverse impact on existing uses, including recreational or navigational uses." Corps_51660. The Corps' recreation determination repeats much of the same language. *See* Corps_59194.

Plaintiffs' feud again arises from the idea that the MDEP's "unreasonable adverse impact standard" sets a lower bar than the Corps' "within the public interest" standard. Plaintiffs cite to ample testimony that the Project would diminish recreational value to some portion of the public because there is always some unquantifiable loss when industry clashes with nature. I may agree that to many people seeking a wilderness getaway "[i]t will be impossible for this corridor/line not to be in-your-face and obtrusive." Corps_18719. But that does not make the Corps' conclusion arbitrary and capricious. The Corps can use a state's determination as valid evidence in making its own determination. In this case, the Corps concluded that once construction ceases, recreational activities will not be impeded. Corps_59193. Although there was testimony about the eye-sore the transmission line may cause, the Corps also concluded that aesthetics were neutral based on MDEP's assessment of photo-simulations. Corps_59190. These conclusions may be unpopular and unreasonable in the eyes of Mainers who enjoy nature in the area of the corridor. But based on the underlying record showing minimal visual impacts and no

impediment to recreational access, the Corps' decision is one reasonable assessment of the situation.

### d.  Mitigation

Lastly, Plaintiffs challenge the Corps' decision that the Project's effect on fish and wildlife would be neutral and/or mitigated.  Central to Plaintiffs' arguments are wild brook trout.  *See* Corps_18411.  At issue is not discharge, but the effect of the Project's hundreds of water crossings on brook trout and their habitat.  Clearing vegetation for the corridor can increase water temperature with caliginous consequences for the cold-water trout.  To mitigate this, CMP proposed riparian buffers, initially at 25 feet, and later increased to 100 feet:

> All streams identified as Atlantic salmon habitat will have a 100-foot riparian buffer and any non-capable [tree] species exceeding 10 feet will remain within the stream buffer outside the wire zone.  Inside the wire zone all woody vegetation over 10 feet whether capable or non-capable will be cut to ground level. Within this 100-foot buffer any capable species will be removed by hand cutting, herbicides will not be used, and if the construction schedule allows, clearing will occur during frozen ground conditions to minimize soil disturbance.

Corps_59093[8]; *see also* Corps_59133 ("In streams supporting salmonids, including Atlantic Salmon and brook trout, riparian buffers will be expanded to 100' to provide greater levels of protection").

A public comment of Plaintiff Natural Resources Council of Maine noted riparian buffers function optimally with a "high degree of canopy closure."  Corps_22880

---

[8] Capable species are those plants having the capability to grow into the new transmission line.  CMP also agreed to maintain full canopy cover and/or vegetation with a minimum height of 35 feet at specific wildlife areas.  Corps_51687

(describing inverse relationship between effective buffer width and canopy coverage). Trout Unlimited witness, Jeff Reardon, voiced similar concerns at state proceedings that the clearing of capable vegetation would not leave sufficient cover. Corps_31470. MDEP nonetheless concluded CMP "has minimized impacts to waterbodies that serve as fisheries habitat to the greatest extent practicable, that the project will not unreasonably harm any aquatic habitat or fisheries provided the applicant [implements certain mitigation efforts].". Corps_51688.

The Corps' oversight over the Project's impact on brook trout was limited in its public interest review with respect to fish and wildlife values. The Corps argues it properly gave deference to MDEP's determination that brook trout habitats will not be unreasonably harmed considering CMP's mitigation efforts. Plaintiffs assail this deference and point to record testimony and comment refuting the effectiveness of CMP's buffer, arguing the Corps failed to grapple with this evidence.

The competing views as to the efficacy of the Project's riparian buffers do not ultimately undermine the reasonableness of the Corps conclusion: for a public interest determination, the Project's effect on brook trout habitat was neutral. Corps_59192. Given MDEP's own conclusions, the Corps' acceptance of the understanding that a 100-foot buffer that clears select vegetation will have neither a detrimental nor beneficial effect on brook trout habitat is not unreasonable or unsupported by substantial evidence.

## B.    National Environmental Policy Act

Concerning Plaintiffs' NEPA arguments, Defendants interpose a preliminary obstacle to judicial review of Energy's EA, which is: (1) whether the APA allows for

judicial review of an administrative decision that implements the President's authority over cross-border electrical connections.  Defs.' Opp'n and Cross-Motion at 6.  To this threshold concern, Plaintiffs add additional NEPA issues: whether the Corps and Energy abused their discretion when applying NEPA by failing to prepare a combined EIS given (2) the combined significance of the two federal permits and the need to avoid improper segmentation that minimizes the scope or significance of their NEPA review; and (3) based on a variety of other factors that militate in favor of preparing one comprehensive EIS. Pls.' Mot. at 21-33.

### 1. *APA and Presidential Permits*

The First Circuit has "expressly held that NEPA provides no right of action at all." *Town of Portsmouth, R.I. v. Lewis*, 813 F.3d 54, 62 (1st Cir. 2016) (collecting authority).  Plaintiff's cause of action, if any, must come from the APA.  The APA provides judicial review where a party suffers a "legal wrong because of agency action" or is "adversely aggrieved by agency action within the meaning of the relevant statute."  5 U.S.C. § 702.  To be judicially reviewable the challenged agency decision must be a "final agency action."  5 U.S.C. § 704.  Agency action is final when it is the end of the agency's decision-making process and the action determines the rights and obligations of the interested parties or subjects them to legal consequences.  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  Under the APA, the President is not an agency, and Presidential actions are not subject to APA review.  *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).

Energy argues that its issuance of a Presidential Permit pursuant to E.O. 10485 is an exercise of delegated presidential foreign power authority and therefore not subject to

suit under the APA.  Energy also argues that Plaintiffs' NEPA claim must fail because NEPA applies only to final agency action, not presidential action.

Permitting requirements for building transmission lines across international borders are governed by Executive Order 10485, 18 Fed. Reg. 5397 (Sept. 9, 1953), as amended by Executive Order 12038, 43 Fed. Reg. 4957 (Feb. 3, 1978).  E.O. 10485 tasks the Secretary of Energy with processing presidential permit applications.  The Secretary of Energy receives permit applications and must consult with the Secretaries of Defense and State for their recommendations.  If all Secretaries agree, the permit is issued or denied accordingly.  If there is disagreement among the Secretaries, the permit application and the Secretaries' recommendations are submitted to the President for a final decision.  A permit remains in effect until the President or Energy modifies or revokes it.

In support of its argument, Energy cites *Natural Resource Defense Council v. United States Department of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009) [*NRDC*].  In *NRDC* the District of D.C. assessed whether the State Department's issuance of a Presidential Permit to TransCanada Keystone Pipeline was reviewable under the APA.  The permitting scheme at issue required the State Department to issue a permit if it "would serve the national interest." 69 Fed. Reg. 25,299 (Apr. 30, 2004).  The State Department was required to consult with other agencies and departments.  *Id.* § 1(b)(ii).  If any disagreed with the State Department, the application was referred to the President "for consideration and final decision." *Id.* § 1(i).  The *NRDC* Court reasoned:

> The State Department, here, is not acting pursuant to any congressional delegation of power, nor is it even acting pursuant to an Executive Order that was promulgated to carry out a particular congressional mandate.  To the

> contrary, the State Department is acting solely on behalf of the President, and in doing so, it is exercising purely presidential prerogatives.

658 F. Supp. 2d at 109 (footnote omitted). The *NRDC* Court further rejected the argument that the Supreme Court's definition of "final agency action" meant that the agency action is distinguishable from presidential action where there is no requirement the President review and approve the agency decision. *Id.* The *NRDC* Court ruled that the "determinative consideration is whether 'the President's authority to direct the [agency] in making policy judgments' is curtailed in any way or whether the President is 'required to adhere to the policy decisions' of the agency." *Id.* at 111 (alterations in original) (quoting *Franklin*, 505 U.S. at 799).

Plaintiffs argue that both Energy's issuance of a presidential permit and its issuance of NEPA documents are reviewable under the APA. Plaintiffs assert that *NRDC* was "wrongly decided." Pls.' Combined Resp. and Reply at 19. In support, Plaintiffs cite to multiple decisions outside of the First Circuit that reached the same conclusion. In *Protect Our Communities Foundation v. Chu*, No. 12-cv-3062, 2014 WL 1289444 (S.D. Cal. Mar. 27, 2014), at \*5-6, a California District Court found that Energy's issuance of a Presidential Permit was reviewable under the APA, reasoning that "the purpose and structure of NEPA demonstrates that judicial review . . . is appropriate," and suggesting that the public has a role to play in the presidential decision-making process. *Id.* at \*5.

In *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147, 1156 (D. Minn. 2010), the District Court found that the State Department's issuance of a Presidential Permit to construct the Alberta Clipper Pipeline was reviewable under the APA. The Court reasoned that the

permit for the border crossing "does not insulate . . . the environmental impacts of the entire pipeline project from judicial review under the APA" or make the State Department's related environmental impact statement a presidential action. *Id.* at 1157. Similarly, the Montana District Court found that the State Department's issuance of a presidential permit in connection with the Keystone XL Pipeline did not insulate related NEPA findings associated with the larger project from review. *Indigenous Env't Network v. U.S. Dep't of State*, No. CV-17-19, 2017 WL 5632435, at *6 (D. Mont. Nov. 22, 2017).

In this case, Energy's involvement with the border crossing of the Project might reasonably be regarded as severable from the larger project, which larger project is a private initiative rather than a major federal action (more on that below). The private nature of the Project offers a point of departure from the pipeline scenarios addressed by the Minnesota and Montana District Courts, and calls into question whether they are on point here. Furthermore, it is not evident from the record that environmental impacts in the vicinity of the cross-border connection are of concern in this litigation. I therefore decline to rule that the NEPA statement offered by Energy in connection with its Presidential Permit is necessarily subject to APA review. At the same time, because I find below that the NEPA review conducted by the Corps and Energy was sufficient, it is unnecessary to decide whether Energy's involvement is insulated from judicial review.

### 2. *Two EAs instead of one EIS*

Plaintiffs argue that it was improper for the Corps and Energy to issue separate Environmental Assessments for the Project because their combined authority over different federal permitting requirements transformed the Project into a "major federal action" that

requires a more detailed Environmental Impact Statement, and that permitting separate EAs would condone segmented analyses designed to minimize the Project's overall environmental impacts. Pls.' Mot. at 3; Pls.' Combined Resp. and Reply at 32.

NEPA provides for two levels of environmental review. If the "proposed agency action . . . has a reasonably foreseeable significant effect on the quality of the human environment," then the agency "shall issue" an EIS. 42 U.S.C. § 4336(b)(1). However, if the "proposed agency action . . . does not have a reasonably foreseeable significant effect on the quality of the human environment," then the agency "shall prepare" an EA. *Id.* § 4336(b)(2). If the agency's NEPA review concludes with an EA, the document should be "a concise public document" that sets forth the basis for the agency's finding of no significant impact or "FONSI." *Id.* NEPA also provides that an EIS is the proper level of environmental review when federal agencies are reviewing a "major federal action." 42 U.S.C. § 4332(C).

### a.  Major Federal Action

The NEPA framework is drawn in a manner that distinguishes between projects that are major federal actions and those that are not. *Id.* §§ 4332(C), 4336(b), 4336(e)(4)-(6). A major federal action calls for an EIS. *Id.* § 4332(C). The task of outlining the hallmarks of a major federal action fell to the Council on Environmental Quality. According to its 1978 regulations, a major federal action generally does not include a "non-federal action," but "actions by non-federal actors 'with effects that may be major and which are potentially subject to Federal control and responsibility' can be major federal actions." *Mayaguezanos por la Salud y el Ambiente v. United States*, 198 F.3d 297, 301 (1st Cir. 1999) (quoting 40

C.F.R. § 1508.18 (1978)).   Through more recent regulations, since superseded, CEQ loosened the major federal action definition, extending the concept to "government actions that authorize non-federal activities, such as approving private projects 'by permit or other regulatory decision.'"  40 C.F.R. § 1508.18(a), (b)(4) (2018) (superseded effective Sept. 14, 2020).  Under that approach, the federal versus private nature of the project matters less than the significance of the project's impacts on the environment.

Federal control and responsibility mean something more than the power to grant or withhold a permit, otherwise every project subject to federal permitting would be a major federal action.  In the First Circuit, at least under the 1978 regulations, courts were to "look to whether federal approval is the prerequisite to the action taken by the private actors and whether the federal agency possesses some form of authority over the outcome." *Mayaguezanos*, 198 F.3d at 302.  Federal funding was a typical example of a scenario that would make a private project subject to review as a potential major federal action.  *Id.*

Although the Project is a large-scale electrical project subject to federal permit requirements,[9] it is a non-federal project proposed and carried out by state government and private industry.  The Project is not federally funded, was not instituted at the behest of the federal government and is not subject to federal control upon completion.  Given the absence of such characteristics, I find that the Corps and Energy did not abuse their discretion by concluding that the Project is not a federal action.  However, the question remains whether the significance of the Project transforms the mere exercise of permitting

---

[9] Four federal agencies have touched parts of this Project.  *See Sierra Club*, 997 F.3d at 406.

authority into a major federal action.  This inquiry will overlap with the baseline inquiry related to the significance of a proposed action in terms of the need for either an EA/FONSI or an EIS, which is addressed below.  Before reaching it, I pause to consider whether there are other technical deficiencies that would compel a remand.

### b.  Under First Circuit Binding Precedent, CEQ Regulations Do Not Require Agencies to Consolidate Environmental Assessments

Plaintiffs contend that the provision of separate EAs by the Corps and Energy is a freestanding violation of NEPA regulations.  The First Circuit has already rejected Plaintiffs' claim that CEQ regulations required the Corps and Energy to consolidate their Environmental Assessments.  Plaintiffs first raised this argument on appeal from my earlier order denying their request for a preliminary injunction.  *Sierra Club v. U.S. Army Corp of Eng'r*, 997 F.3d 395, 406 (1st Cir. 2021).  The First Circuit held that "CEQ regulations direct agencies to coordinate in preparing an 'impact statement,' 40 C.F.R. § 1508.25(a)(1) [(2020)].  CEQ does not impose similar requirements on EAs and plaintiffs provide no other source of authority for such a requirement."  *Id.*

"[A] panel decision on a preliminary injunction motion constitutes binding precedent, at least when the record before the panel was 'sufficiently developed and the facts necessary to shape the proper legal matrix we[re] sufficiently clear.'"  *Comcast of Me./N.H., Inc. v. Mills*, 988 F.3d 607, 612 (1st Cir. 2021) (alteration in original) (quoting *Naswer Jewelers, Inc. v. City of Concord*, 538 F.3d 16, 20 (1st Cir. 2008)).  So it is here.

The First Circuit, in the context of an interlocutory appeal, interpreted the plain language of CEQ regulations.  Those regulations command that "[c]onnected actions . . .

should be discussed in the same *impact statement*," 40 C.F.R. § 1508.25(a)(1) (2020) (emphasis added), which the First Circuit held to mean agency coordination is only required in preparing an EIS and not an EA. *Sierra Club*, 997 F.3d at 406. Contrary to Plaintiffs' argument, I see no reason why further development of the record was needed to "shape the proper legal matrix" of a plain-language interpretation or how the revelation of new underlying facts would change that interpretation. *Comcast of Me.*, 988 F.3d at 612.

Plaintiffs further argue that they have now provided authority for the requirement that EAs should be consolidated. This authority is in the form of courts interpreting the CEQ "connected action" regulation as applying to EAs. Pls.'s Mot. at 24. These are not "source[s] of authority for such a requirement," *Sierra Club*, 997 F.3d at 406, so much as they are court interpretations of CEQ regulations that differ from the First Circuit's, and none of those interpretations are binding on this Court. Accordingly, Plaintiffs' segmentation argument fails so long as it was appropriate for the Corps and Energy to prepare EAs rather than EISs.

Even if CEQ regulations regarding segmentation applied to agencies' Environmental Assessments, I cannot find that the Corps and Energy impermissibly segmented their analyses. Segmentation doctrine "prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Nat'l Res. Defense Council v. Hodel*, 865 F.2d 288, 297 (D.C.Cir.1988). "'Piecemealing' or 'segmentation' allows an agency to avoid the NEPA requirement that an EIS be prepared for all major federal action with significant environmental impacts by segmenting an

overall plan into smaller parts involving action with less significant environmental effects." *City of West Chicago v. U.S. Nuclear Regul. Comm'n*, 701 F.2d 632, 651 (7th Cir. 1983).

The ultimate inquiry is whether the Corps and Energy artificially limited their jurisdiction to avoid producing an EIS. *See Conservation L. Found. v. Federal Highway Admin.*, 827 F. Supp. 871, 878 (D. R.I. 1993). In assessing this, I am mindful that "NEPA does not mandate action which goes beyond the agency's organic jurisdiction." *Gage v. U.S. Atomic Energy Comm'n*, 479 F.2d 1214, 1220 n.19 (D.C. Cir. 1973).

The Corps' and Energy's oversight of the Project is limited to review of the Project in connection to issuing a permit to discharge material in waters of the United States and a presidential permit to make a cross-border connection, respectively. Given the agencies' limited involvement in this non-federal project, it is hard to see how either could impermissibly segment their actions. In any event, Energy's EA makes clear that improper segmentation did not occur, since it incorporated the Corps' EA, along with the Maine state agencies' environmental assessments. DOE_AR_61305-06 ("None of the agencies found, with these [mitigation] conditions, a potential for significant environmental impact . . . [Energy] has reviewed the conditions and finds them to be reasonable and appropriate."). Energy's own analysis then "considered potential environmental effects of the project for the length of the line from the United States-Canada border to the point of first interconnection in Lewiston, Maine." DOE_AR_61305.

Plaintiff's do not challenge Energy's scope either, but merely argue that a consolidated environmental analysis would have included not only "the impacts the Corps determined were within the scope of its NEPA jurisdictional analysis of WOTUS, but also

the impacts [Energy] considered." Pls.'s Mot. at 25. In fact, Energy's EA includes, by incorporation, all this analysis. *See*, *e.g.*, *Weiss v. Kempthorne*, 683 F. Supp. 2d 549, 561-62 (W.D. Mich. 2010), *aff'd in part Weiss v. Secretary of U.S. Dept. of Interior*, 459 F. App'x 497 (6th Cir. 2012) ("The difficulty with Plaintiffs' segmentation claim, however, is that the aspects of the [project] that were not addressed in [National Park Service's] review were addressed by the Corps in its review.").

I appreciate Plaintiffs' representation that it is frustrating that the Corps and Energy would have announced an intention to issue a joint EA but then did not do so. *See* Corps_59242, 59253, 59686. However, "it is not the place of a reviewing court to second-guess the agency." *Safeguarding the Historic Hanscom v. F.A.A.*, 651 F.3d 202, (1st Cir. 2011). In any event, communications between the Corps and Energy note Energy's concern that the Corps' timeline would not give Energy enough time to review the Corps' EA or adhere to its own regulations, Corps_59253, which provides a fair justification for the separate environmental assessments. Because improper segmentation is not present here, I am not persuaded that the eventuality of separate EAs reflects arbitrary or capricious decision-making or resulted in meaningful harm to Plaintiffs' NEPA interests.

### 3. Do The Impacts Alone Require an EIS?

Plaintiffs argue that the idea that an EA and FONSI could suffice in this case is the product of (a) an arbitrary focus on only local environmental impacts rather than the Project's holistic impacts, including regional and national impacts; (b) over-emphasis on the Project's benefits over its detriments; (c) disregard for unique characteristics of the

Project; (d) endorsement of controversial greenhouse gas findings; and (e) reliance on unproven mitigation measures.

For reference, the Corps' permit authorizes a project consisting of the placement of temporary and permanent fill in waters of the United States between Beattie Township and Lewiston, Maine. Conditions imposed on the fill activity include sediment and erosion control and, specific to streams, prohibit any stream crossing involving in-stream work or the discharge of temporary or permanent fills into streams. Temporary crossings are to be removed and pre-crossing conditions restored. Permit at 9 ¶¶ 4-6 (ECF No. 31-5). A review of drawings depicting the transmission line show spaced water-discharge impacts to local waters (mostly to wetlands lacking contiguity to navigable water bodies) where transmission poles touch down and where widely scattered substations and similar facilities are to be installed. In this context, the Corps considered the intensity of the permitted activity, following 40 C.F.R. § 1508.27 (2020), and reasoned: "When considering impacts to waters of the US on a linear transmission project like the current proposal, significance is measured by the impacts felt at a local scale, as opposed to a regional or nationwide context." Corps_59237. It further observed that the new portions of the Project run through predominantly managed commercial timberlands. Corps_59237-38.

The Corps' approach to the scope of its significant impact review is grounded in its regulations. Specifically, the regulations provide that when a permit application proposes "a specific activity requiring a Department of the Army (DA) permit, . . . which is merely one component of a larger project," the scope of the NEPA review, as in the Corps' EA versus EIS analysis, is calibrated "to address the impacts of the specific activity requiring

48

a [Department of the Army] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review," not the entire project. 33 C.F.R. pt. 325, app. B, § 7(b) ("Appendix B"). The CEQ has condoned this approach. Implementation of National Environmental Policy Act; Council recommendations, 52 FR 22517-02 (CEQ June 12, 1987). I do not find it to be an abuse of discretion for the Corps to follow its regulation in this case.[10]

### a. Holism

Plaintiffs argue that the Corps' focus on the permitted discharge activity is myopic and that NEPA requires a holistic assessment of follow-on impacts on "society as a whole (human, national), the affected region, the affected interests, and the locality." Pls.' Mot. at 27 (quoting 40 C.F.R. § 1508.27(a)). On a regional level, they argue that the Corps also failed to appreciate the impacts to cold water fisheries and native brook trout. *Id.* at 27-28 (citing concerns raised by Maine Department of Inland Fisheries and Wildlife in its 2018 Environmental Permit Review, Corps_8580 (title page), 8590-91, which concerns helped to shape mitigation measures, Corps_51666). Plaintiffs' argument hides the fact that the Corps considered what all state regulatory agencies and others had to say about water-based impacts and concluded that the considerable mitigation measures that address these concerns avoid a significant impact on waters and fisheries. This conclusion is consistent with the assessment the Maine Department of Environmental Protection made in its

---

[10] Plaintiffs also argue the Corps failed to explain how CMP's culvert replacement program will mitigate impacts to fish or address how that mitigates NECEC impacts specifically. These arguments fail for much of the same reason. The Corps public interest conclusion that the culvert replacement program will benefit fisheries and habitats, and, among other mitigation efforts, will render the Project "neutral" with respect to fish and wildlife is reasonable considering the record and state agency findings.

Findings of Fact and Order on, among other things, freshwater wetland alteration and water quality certification.  Corps_51603 (title page), 51686-88.

When it comes to the Corps' statutory obligation to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), I am not persuaded that the Corps' FONSI finding was arbitrary and capricious.  It is not evident to me that the Project negatively impacts the Nation's waters beyond its localized impacts.  Nor is it evident that the Corps' EA deprived the public of information not already of record or a procedural step that would serve an interest other than delay.

### b.  Benefits v. Detriments

Plaintiffs' argument here focuses on the Corps' NEPA analysis and applicable regulations.  The Corps NEPA regulations provide that "[i]n all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal."  33 C.F.R. pt. 325 app. B, § (7)(b).  Under this regulation, Plaintiffs grieve where the Corps' EA considers broad-ranging benefits but limits detriments to direct WOTUS impacts.  But, as the Corps points out, its EA contains not only its NEPA review, but a CWA 404(b)(1) analysis, with its public interest review.  A regulation that applies only to the Corps' NEPA obligations does not act to expand the scope of the Corps' NEPA review simply because the Corps discusses broader impacts in its CWA public interest analysis.

Still, Plaintiffs persist that the Corps' EA reveals that the Corps impermissibly manipulated the scale of its NEPA review.  Plaintiffs conjecture is that because the Corps' alternative analysis cites both NEPA and CWA standards, when it discusses large-scale

project benefits it is obligated under NEPA to use the same scale when discussing detriments. This is false. The Corps' alternatives analysis begins:

> An evaluation of alternatives is required under the Section 404(b) (1) Guidelines for projects that include the discharge of dredged or fill material. NEPA requires discussion of a reasonable range of alternatives, including the no action alternative, and the effects of those alternatives; under the Guidelines, practicability of alternatives is taken into consideration and no alternative may be permitted if there is a less environmentally damaging practicable alternative. Although the Corps scope of authority in this matter is limited by the small area of jurisdictional impact, a full analysis of alternatives is none the less presented.

Corps_59136.   As this section covers multiple requirements, it is unsurprising its discussions have an expansive scope. For instance, in the no action alternative discussion Plaintiffs cite, the Corps discussed broad benefits and direct impacts—covering the dual scopes of review. *See* Corps_59136. In essence, Plaintiffs ask that I demand the Corps to re-write its alternatives analysis to make this separation clearer. But the Corps explicitly laid out its two standards for considering alternatives and its conclusions do not evidence an arbitrary muddling of these standards. I will not remand the Corps' decision simply so it reworks its EA into separate conversations that ultimately reach the same conclusion.

Plaintiffs also argue that the Corps further arbitrarily narrowed its NEPA scope by considering only direct impacts without giving fair consideration to indirect or cumulative impacts. The Corps' scarce discussion on indirect/cumulative impacts was again due to its limited oversight of the Project. *See* Corps_59124 ("The limited extent of USACE scope of authority in this Project has been repeatedly noted in this EA. As such, activities occurring on uplands that are outside our control and responsibility, e.g. upland forest conversion/fragmentation are not discussed in great detail or considered further.").

Plaintiffs again attempt to expand the scope of the Corps' NEPA review by linking it to the scope of conditions the Corps set in granting its CWA permit.  This misreads the applicable regulations:

> District engineers will add special conditions to Department of the Army permits when such conditions are necessary to satisfy legal requirements or to otherwise satisfy the public interest requirement.  Permit conditions will be directly related to the impacts of the proposal, appropriate to the scope and degree of those impacts, and reasonably enforceable.

33 C.F.R. § 325.4.  Plaintiffs argue that "those portions of the entire project over which the district engineer has sufficient control and responsibility" should expand to match the scope of the Corps' conditions. 33 C.F.R. pt. 325 app. B(7)(b).  Under Plaintiffs' approach, if a project's impacts are far reaching but the WOTUS impacts are not, or if the Corps must impose a broad condition for compliance with the law, the Corps suddenly has NEPA responsibility for the entire project.  But the fact that the Corps may impose a condition that limits deforestation to serve the ends of a state regulatory program, for example, or to ensure compliance with the Endangered Species Act, does not mean the Corps' CWA jurisdiction expands beyond WOTUS and into the woods and upland habitat.[11]

### c.  Unique Characteristics

At the time of the Corps' analysis (but not Energy's), NEPA regulations required that agencies consider the intensity, or severity, of environmental impact.  40 C.F.R. § 1508.27(b) (2020).[12]  To evaluate intensity, agencies consider the "[u]nique characteristics

---

[11] In any event, the Corps did discuss indirect and cumulative impacts, subject to its limited overview disclaimer.  *See* Corps_59215-225.

[12] Defendants argue Plaintiffs have waived the right to challenge Energy's EA by failing to raise a substantive argument in their filings.  Plaintiffs respond that Energy's EA incorporated the Corps'

of the geographic area." *Id.*  Plaintiffs argue the Project area is a unique and ecologically critical area that is host to diverse wildlife whose habitats will be fragmented by the Project.[13]  They see the impacted region not as an area of heavily managed timberlands, but as "the heart of the Northern Appalachian/Acadian Forest Ecoregion, an integral piece of the largest and most intact temperate forest in North America."  Pls.' Mot. at 30-31. Plaintiffs contend the Corps' conclusion that the uniqueness factor did not support preparing an EIS must give under the weight of record evidence to the contrary.

Plaintiffs' uniqueness arguments largely extend beyond the Corps' jurisdiction.  The Corps jurisdiction (and therefore NEPA impact assessment) extends to only 1.9% of the Project.  The Corps assessment of uniqueness is not of the Project's whole area but of jurisdictional wetlands.  In assessing "[u]nique characteristics" of the Project's area within its control, the Corps determined:

---

assessment, so any arbitrary and capricious decision of the Corps transfers to Energy.  Ordinarily, Plaintiffs' position would hold WOTUS.  However, Intervenor Defendant notes that the NEPA regulations under which Plaintiffs argue (the intensity factors of uniqueness and scientific controversy) were removed in September 2020.  *See* 40 C.F.R. § 1506.13 (2020).  Under its discretion, Energy applied the new regulations. *See id.*  Plaintiffs argue their attacks on the Corps' NEPA analysis apply to Energy's analysis equally, but Plaintiffs uniqueness arguments are almost entirely isolated to the Corps.  *See* Pl.'s Mot. at 32 ("Therefore, the Corps' conclusory determination that [uniqueness] did not support an EIS is at odds with the record and the Corps deserves no deference in the absence of any analysis.").  It does not follow that a successful attack on the Corps' EA would also defeat Energy's EA given the new regulations Energy applied.  Consequently, where Plaintiffs specifically develop an argument against Energy's analysis, I will address it.  *See United States v. Diggins*, 36 F.4th 302, 319 (1st Cir. 2022) ("We have repeatedly made clear that a party waives an argument when it 'neither develops the argument nor accompanies it with even a shred of authority.'" (quoting *United States v. González*, 981 F.3d 11, 23 (1st Cir. 2020), *cert denied*, 141 S. Ct. 1710 (2021))).

[13] It is unsurprising Plaintiffs urge for northern Maine's uniqueness.  The Western Maine Mountains provide forest travel for moose and lynx, are a Globally Important Bird Area per the National Audubon Society and Birdlife International, are a core habitat to the American marten, and hold the most intact native trout population within the continental United States.  *See generally* DOE_19716-733.  But my assigned task is not to determine the uniqueness of northern Maine.  I must assess whether Federal Defendants acted arbitrarily and capriciously, that is without reason, in considering the impacts of the Project on the unique characteristics of the region, limited to the Defendants' jurisdiction.

> Approximately 74% of the Project's transmission line components, inclusive of the 144.9-mile HVDC transmission line, are collocated within an existing transmission line corridor. The 53.1 miles segment of new corridor for the HVDC transmission line will be almost entirely located within heavily managed commercial timberlands. Six of the eight converter or substations projects will be on-site upgrades to existing facilities with no impact to waters of the U.S. The impacts to waters of the U.S. are discussed above, and do not constitute a significant impact. There are no designated parklands, wild and scenic rivers, ecologically critical areas, or prime farmlands impacted. Impacts to the Appalachian National Scenic Trail will be mitigated. The permit has been conditioned to further minimize the project's short-term, long-term, and cumulative impacts, and there are no unique characteristics that will be impacted by the proposed project.

Corps_59237.  With respect to Plaintiffs habitat fragmentation concerns, the Corps found MDEP's prescribed reduction in tree clearing and CMP's vegetation management practices would minimize forest wetland conversion.  This conclusion is not unreasonable based on MDEP findings and record evidence.

Plaintiffs again argue the Corps' finding places quantity of impact over quality of impact, but the Corps EA discussed specific habitat impacts and mitigation effects before using acreage in its concluding paragraph.  My earlier disposition on the Corps' conclusion has not changed.  *Sierra Club*, 2020 WL 7389744, at *16 (D. Me. 2020).  I remain unconvinced by Plaintiffs that the Corps' WOTUS-focused discussion of these factors was "arbitrary and capricious, abusive of discretion, or a violation of law."  These extra-jurisdictional project concerns, though considerable, are subject to the stewardship of the State of Maine in the final analysis.

### d.  Greenhouse gas

The parties again argue over competing analyses surrounding the Project's effect on GHG emissions, this time with respect to Federal Defendants' intensity determinations.

CEQ regulations provided intensity evaluations should consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4).[14]  Plaintiffs insist that because there was debate around GHG emissions the controversy intensity factor weighs in favor of producing an EIS.  I have addressed Plaintiffs arguments over the competence of GHG studies relied upon by the Corps and Energy.  The fact that there are competing studies does not show the Project's effect on GHG emissions is "highly controversial."

With opponents and proponents for the Project it is no surprise that virtually every aspect of the Project was met with evidence for and against it.  But expected factual competition is not a high controversy.  And at every level of review for this Project, agencies determined, based on competing evidence before them, that the Project would reduce GHG emissions.  It is not unreasonable for the Federal Defendants to find the same, nor to find that GHG emissions were not highly controversial.

e.    Mitigation Measures

Plaintiffs last NEPA argument is that Federal Defendants' FONSIs are arbitrary and capricious for relying on mitigation without discussing its effectiveness.  Plaintiffs accuse Energy of wholesale reliance on MDEP state findings and the Corps of lacking discussion of the impacts of mitigation.

---

[14] This regulation was removed in September 2020. 40 C.F.R. § 1506.13 (2020).  While the Corps analyzed intensity factors under the previous iteration of CEQ regulations, Energy did not.  Nonetheless, Plaintiffs request that I review both Energy's and Corps' conclusions regarding GHG emissions.  In support, they cite out-of-circuit precedent that predates CEQ's intensity factors but still required agencies to assess uncertainties in their EIS.  While I do not find nonbinding precedent that predates both CEQ's intensity factors and subsequent removal of those same factors particularly persuasive, in an abundance of caution I consider whether Energy's GHG conclusions were arbitrary and capricious.

With respect to the Corps, Plaintiffs specifically contend CMP's mitigation efforts to limit impacts to vernal pools and brook trout do not adequately mitigate impacts and the Corps acted arbitrarily and capriciously by accepting the measures without adequate analysis. Plaintiffs again run into the barricade that is the Corps' limited NEPA scope. There is no discharge into brook trout habitat under the Corps' purview. *See* Corps_59081-83, 117. On vernal pools, Plaintiffs accuse the Corps of improperly relying on MDEP findings that CMP's mitigation was adequate. Plaintiffs take issue with the differing state and federal definitions of vernal pool and on that basis argue that MDEP's analysis did not fully overlap with the Corps review responsibility. In any event, the Corps considered mitigation measures as to vernal pools to be within its jurisdiction:

> The access to and placement of structures has been designed to avoid and minimize impacts to vernal pools to the maximum extent practicable. Of the 757 vernal pools located within the Project area, 674 were avoided, leaving 83 (11%) that will be impacted by permanent fill. When considering vernal pool impacts, only four of the vernal pool depressions that are within Corps jurisdictional areas are proposed for permanent fill, totaling approximately 2.218 acres. However, recognizing that many vernal pools are part of a larger wetland system and that important habitat/water quality contributions are served by the surrounding vernal pool envelope, and in order to be consistent with the state permitting authority, the applicant calculated impacts to the vernal pool depressions and the 100' envelope. The applicant also based the mitigation plan using the same methodology. In instances where a pool's surrounding habitat spans the entire width of the corridor; impacts associated with equipment access will be minimized by utilizing temporary timber mats to reduce disturbance. For vernal pools that will be spanned by electric conductors, there is still the potential for limited indirect impacts through conversion of minor amounts of adjacent forested uplands and wetlands. The potential for these indirect impacts is minimal since the transmission line corridor will be maintained in a well vegetated state, and only a small proportion of the forested area around any of these pools will be removed for the proposed transmission line corridor. There should still be ample foraging and overwintering habitat available and the pools themselves are expected to remain productive for the most part. Temporary impacts to adjacent wetlands

can occur from equipment travel along the transmission line corridor. These impacts will be minimized by working during frozen conditions (outside the breeding season) or by employing other techniques to minimize impacts. Disturbed areas within the surrounding habitat of vernal pools will be stabilized and restored as soon as practicable.

Corps_59091.[15]    The Corps also considered a compensatory mitigation plan which I discussed in previous proceedings. *Sierra Club*, 2020 WL 7389744, at *21. The compensation plan tends to preserve high-value wetlands, such as vernal pools, and does not come at the expense of sacrificing others. I do not find the Corps' conclusion that impacts to vernal pools have been sufficiently mitigated to support a FONSI arbitrary and capricious or unsupported by substantial evidence.

With respect to Energy, the agency did not solely rely on MDEP findings. It incorporated the Corps' own EA and mitigation analysis. Energy's EA also discusses the extensive compensation plan. DOE_AR_61352-54, 357. Energy's incorporation of prior decisions does not render its FONSI arbitrary and capricious—it is grounded in record evidence already evaluated by prior agencies and again by Energy.[16]

## C.    Broken Promises

Finally, Plaintiffs argue that Energy proceeded in an arbitrary and capricious manner when it went back on the representation that it would circulate a draft environmental document for comment. According to Plaintiffs, that event harmed their

---

[15] Defendants argue, not without merit, that even if I found the Corps' analysis arbitrary and capricious any error is harmless after *Sacket v. EPA* drastically reduced the Corps' jurisdiction by redefining wetlands. 598 U.S. 651, 678 (2023) ("In sum, we hold that the CWA extends only to those wetlands that are as a practical matter indistinguishable from waters of the United States." (internal quotations and citation omitted)). Because I do not find error in the Corps' analysis, I do not discuss this argument further.

[16] To the extent Plaintiffs brook trout arguments are applicable to Energy, the adequacy of mitigation via buffers has already been discussed.

NEPA procedural rights because they relied on a "promise" and otherwise expected the opportunity based on Energy's prior "practice."  Pls.' Mot. at 35-40.

In support of their argument, Plaintiff's note that Energy's shift away from policy requires adequate explanation.  *See Encino Motorcars v. Navarro*, 579 U.S. 211, 221 (2016).  Plaintiffs construct the alleged policy of providing a comment opportunity on draft EAs based on the Federal Defendants' answer that Energy has conducted public hearings on EISs, data from Energy showing that 85 percent of EA drafts from 2016 to 2020 allowed for public comment, and an email from the Deputy Assistant Secretary representing that Energy's regulations required public comment.

For purposes of finding an agency decision arbitrary and capricious, I am not convinced that these trends and a representation amount to an official policy stance.  *See I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) ("Though the agency's discretion is unfettered at the outset, if it announces and follows-*by rule or by settled course of adjudication*-a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion . . . .'" (emphasis added) (alteration in original) (quoting 5 U.S.C. § 706(2)(A))). That Energy has allowed comment on EISs does not necessarily make it an agency policy created by rulemaking or adjudication, let alone to do the same for EAs.  And, apparently, in the snippet of time Plaintiffs' data on Energy's EAs covers, 15 percent of those EAs did not receive public comment, further indicating there is no brightline policy as to public comment.

The representation by the Deputy Assistant that there was such a brightline policy seems to be the strongest evidence Plaintiffs present.  But it is contradicted by Energy's past practice of not allowing comment on draft EAs.  Furthermore, Plaintiffs do not cite to any evidence that Energy promulgated rules or regulations creating this policy.  The usual agency waffling that is found arbitrary and capricious reflects an irrational departure from settled action.  That is, the agency makes it position clear through some final agency action only to ignore it later.  Here, Energy seems to have reneged on a promise but not on its own regulations or officially promulgated policy. Was it discourteous?  Yes.  Was it arbitrary and capricious under the APA?  No.

## CONCLUSION

For the foregoing reasons Defendants' Cross Motions for Summary Judgment (ECF Nos. 181 & 183) are GRANTED and Plaintiffs' Motion for Summary Judgment (ECF No. 177) is DENIED.

SO ORDERED.

Dated this 31st day of March, 2025

/s/ Lance E. Walker
Chief U.S. District Judge